# EXHIBIT A

Motion for leave to file Amicus
BY WGR & AFA
No. 3:23-cv-05364-RJB

THE HONORABLE ROBERT J. BRYAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| LAWRENCE HARTFORD, et al.,<br>PLAINTIFF,<br><br>vs.<br><br>BOB FERGUSON, et al.<br>DEFENDANTS. | No. 3:23-cv-05364-RJB<br><br>BRIEF AMICI CURIAE OF WASHINGTON GUN RIGHTS AND THE AMERICAN FIREARMS ASSOCIATION IN SUPPORT OF PLAINTIFFS' MOTION TO FOR PRELIMNARY INJUNCTION |

## I. CORPORATE DISCLOSURE STATEMENT

Washington Gun Rights and the American Firearms association have no parent corporations nor do they issue any stock, so no publicly held corporation holds any stock in the organizations.

There is no parent, shareholder, member, or partner to identify as required by Local Rules W.D. Wash. LCR 7.1(a)(1).

## II. INTEREST OF *AMICI CURIAE*

Washington Gun Rights is a nonprofit organized under section 501(c)(4) of the Internal Revenue Code. WGR is dedicated to preserving Washingtonians' Second

AMICUS BY WGR & AFA
NO. 3:23-cv-05364-RJB

1

ANGUS LEE LAW FIRM, PLLC
9105A NE Hwy 99, Suite 200
Vancouver, WA 98665
T: 360-635-6464

TREVOR BURRUS
2301 S. June
Arlington, VA 22202
T: 720.231.4899

Amendment rights through advocacy, legislative action, and participating in important cases before the courts.

The American Firearms Association is a nonprofit organized under section 501(c)(4) of the Internal Revenue Code. The AFA seeks to preserve Second Amendment rights around the nation and therefore opposes Washington's attempt to ban arms protected by the Second Amendment.

The current case interests WGR and AFA because Washington has attempted to ban commonly owned firearms that are protected by the Second Amendment.

### III.  SUMMARY OF ARGUMENT

In *New York State Rifle and Pistol Association v. Bruen*, the Supreme Court clarified that the "Second Amendment protects the possession and use of weapons that are 'in common use.'" *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). While some disagree with policies that allow law-abiding citizens to own common firearms, the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense." *Id.* at 2131. Until the Constitution is duly amended, courts are obliged to give constitutional text, history, and tradition proper weight.

Despite the Court's clear holding in *Bruen*, Washington has joined other states in trying to ban so-called "assault weapons"—better termed "modern sporting rifles" (MSRs)—even though Washingtonians have been responsibly using those weapons

AMICUS BY WGR & AFA
NO. 3:23-cv-05364-RJB

2

ANGUS LEE LAW FIRM, PLLC
9105A NE Hwy 99, Suite 200
Vancouver, WA 98665
T: 360-635-6464

TREVOR BURRUS
2301 S. June
Arlington, VA 22202
T: 720.231.4899

for decades. This prohibition clearly goes against the holding in *Bruen*, and this Court should grant the preliminary injunction requested by the Plaintiffs.

A preliminary injunction is a remedy that "preserves the *status quo* pending a determination of the action on the merits." *Chalk v. U.S. Dist. Ct. C.D. Cal.*, 840 F.2d 701, 704 (9th Cir. 1998). On constitutional questions where violations of constitutional rights are at issue, a preliminary injunction is an important remedy to prevent citizens from being denied their constitutional rights for even a short time. By including the right to keep and bear arms in the Constitution, the Framers showed which interests get priority when a law bans commonly owned firearms.

*Amici* are two gun rights groups that are concerned with how brazenly Washington's law violates the Second Amendment and the Court's decision in *Bruen*. The banned weapons are clearly "arms" and thus presumptively protected by the text of the Second Amendment. *Bruen*, 142 S. Ct. at 2126. Until Washington's ban, the semiautomatic rifles at issue were overwhelmingly purchased by law-abiding citizens for self-defense, target shooting, hunting, and defense against oppressive government. In fact, nationwide, there are more MSRs in private hands than there are Ford F-Series pickups on the streets, one of the most popular cars in the country. *Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016) rev'd, 849 F.3d 114 (4th Cir. 2017) (*en banc*) ("in 2012, the number of AR- and AK-style weapons manufactured and imported into the United States was more than double the number of Ford F-150 trucks sold, the most commonly sold vehicle in the United States."). And almost none of those MSRs are being used for crime.

AMICUS BY WGR & AFA
NO. 3:23-cv-05364-RJB

3

ANGUS LEE LAW FIRM, PLLC
9105A NE Hwy 99, Suite 200
Vancouver, WA 98665
T: 360-635-6464

TREVOR BURRUS
2301 S. June
Arlington, VA 22202
T: 720.231.4899

MSRs were (and are) normal, everyday rifles until they were re-christened "assault weapons" to sound more menacing. The term is often linked to a 1988 paper by gun-control activist Josh Sugarmann of the Violence Policy Center. Sugarmann felt the incendiary term, coupled with public ignorance, could increase support for banning the weapons: "The weapons' menacing looks, coupled with the public's confusion over fully automatic machine guns versus semi-automatic assault weapons—anything that looks like a machine gun is assumed to be a machine gun—can only increase the chance of public support for restrictions on these weapons." Aaron Blake, "Is it fair to call them 'assault weapons'?," Wash. Post (Jan. 17, 2013), https://perma.cc/8HCC-FZGK. Inventing a term like "assault weapon" and then applying it to an ad hoc group of weapons does not change the Second Amendment's scope.

Like many other states that ban MSRs, the Washington law bans some weapons by name and others by characteristics. The characteristics singled out, however, do not make the banned guns any less commonly used for lawful purposes, nor do they make the weapons "dangerous and unusual." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627); *see also Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring in the judgment) (explaining that the test is conjunctive and "[a] weapon may not be banned unless it is *both* dangerous *and unusual*."). That millions of Americans use the banned weapons for lawful purposes sufficiently demonstrates that Washington's ban cannot be sustained under the Second Amendment and the Supreme Court's precedents.

AMICUS BY WGR & AFA
NO. 3:23-cv-05364-RJB

4

ANGUS LEE LAW FIRM, PLLC
9105A NE Hwy 99, Suite 200
Vancouver, WA 98665
T: 360-635-6464

TREVOR BURRUS
2301 S. June
Arlington, VA 22202
T: 720.231.4899

Because Washington's law flouts current doctrine, the Plaintiffs are likely to win on the merits. And because this is a constitutional case, the equities clearly weigh in Plaintiffs' favor. The Court should grant the preliminary injunction.

## IV.   ARGUMENT

### I.   The *Bruen* Decision Presumptively Protects "Arms," Which Unquestionably Includes So-Called "Assault Weapons" or "Modern Sporting Rifles," the Type of Rifles Singled-Out by Washington's Ban

Washington has tried to ban commonly owned firearms that are presumptively protected by the Second Amendment and overwhelmingly used for lawful purposes. That ban is unconstitutional under the standards articulated by the Supreme Court. *See*, *Heller*, 554 U.S. at 625 (holding that the Second Amendment protects arms "typically possessed by law-abiding citizens for lawful purposes.").

*Bruen* adopted a text-first approach that is informed by history and tradition. *Bruen*, 142 S. Ct. at 2134–35. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129; *id*. at 2132 ("the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.") (quoting *Heller*, 554 U.S. at 582). Thus, under *Bruen*, a court should first look to whether something is an "arm," and subsequent analysis looks to history and tradition to determine which type of regulations "are consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2129–30.

Unlike some difficult-to-interpret constitutional terms, the definition of bearable "arms" is straightforward. For example, the term does not include F-16

AMICUS BY WGR & AFA
NO. 3:23-cv-05364-RJB

5

ANGUS LEE LAW FIRM, PLLC
9105A NE Hwy 99, Suite 200
Vancouver, WA 98665
T: 360-635-6464

TREVOR BURRUS
2301 S. June
Arlington, VA 22202
T: 720.231.4899

fighter jets because no one can "bear" a fighter jet. And the amendment's definition of "arms" is no more restricted to 18th-century weapons than the First Amendment's definition of "speech" is restricted to parchment, town criers, and movable-type printing. "[E]ven though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132 (citing *Caetano*, 577 U. S. at 411–412 (per curiam) (stun guns)). The relevant question is whether a given "arm" is a bearable "modern instrument[] that facilitate[s] armed self-defense." *Id*. If the answer to that question is "yes," then a court should presume that the arm is protected and look to history and tradition to determine whether the arm can nevertheless be banned.

Some bearable arms can be prohibited because the Second Amendment doesn't guarantee "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626; see also *Bruen*, 142 S. Ct. at 2132, 2143. When such "arms" can be prohibited depends on history and tradition to overcome the textual threshold: "bearable arms" are "presumptively protect[ed]." *Id*.

It is beyond reasonable argument that MSRs are bearable arms presumptively protected by the Second Amendment. Millions of Americans, and an untold number of Washingtonians, keep and bear these arms for lawful purposes. See, *infra*, Part II. The weapons' "bearability" is a significant reason why so many Washingtonians prefer to use them for lawful purposes rather than other, more cumbersome guns.

AMICUS BY WGR & AFA
NO. 3:23-cv-05364-RJB

6

ANGUS LEE LAW FIRM, PLLC
9105A NE Hwy 99, Suite 200
Vancouver, WA 98665
T: 360-635-6464

TREVOR BURRUS
2301 S. June
Arlington, VA 22202
T: 720.231.4899

Stephen P. Halbrook, *America's Rifle: The Case for the AR-15*, 8 (2022) ("They are particularly attractive for women and older individuals because of their light weight and ease of use, particularly in comparison to shotguns."). The average "starting weight" for an unloaded AR-15 is around 6.4 lbs—7 lbs with a loaded 30-round magazine. Everyday Marksman, "Deal With Compromise: AR-15 Weight, Capability, and Balance," (Feb. 8, 2022), https://perma.cc/B8Y4-JHFC. By contrast, an M1 Garand, the semiautomatic rifle that was the standard-issue weapon for American troops in World War II—a literal "weapon of war," as detractors often erroneously describe MSRs—weighs 9.5 lbs unloaded and around 11 lbs loaded.

Because MSRs are clearly "presumptively protect[ed]" by the Second Amendment, the Court should next look to whether such weapons are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.

### II. "Modern Sporting Rifles" or "Assault Weapons" Are Standard Semiautomatic Rifles that Are Commonly Used for Self Defense and Other Lawful Purposes and Are Thus Protected by the Second Amendment

Given that MSRs are clearly "arms" that are presumptively protected by the Second Amendment's text, the next question is whether banning such arms is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2132. The "Second Amendment protects only the carrying of weapons that are those 'in common use at the time'" and doesn't protect arms that are "highly unusual in society at large." *Id.* at 2143 (quoting *Heller*, 554 U.S. at 627). By any metric, MSRs are standard semiautomatic rifles that are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.

AMICUS BY WGR & AFA
NO. 3:23-cv-05364-RJB

7

ANGUS LEE LAW FIRM, PLLC
9105A NE Hwy 99, Suite 200
Vancouver, WA 98665
T: 360-635-6464

TREVOR BURRUS
2301 S. June
Arlington, VA 22202
T: 720.231.4899

### A. The Semiautomatic Rifles Singled Out by Washington's Ban Are Used by Millions of Americans for Lawful Purposes

Washingtonians have long used the banned guns for lawful purposes. It is irrelevant that such guns are arguably "new" or that the arms are different than those that were commonly used at the time of the ratification of the Second Amendment. *Caetano*, 577 U.S. at 420 (Alito, J., concurring in the judgment) ("[T]he pertinent Second Amendment inquiry is whether stun guns are commonly possessed by law-abiding citizens for lawful purposes *today*."). The common nature of these weapons was pointed out by Justice Thomas in 2015: "The overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting. Under our precedents, that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons." *Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from the denial of certiorari).

*Amici* have been unable to find data specifically for how many MSRs are owned by Washingtonians. It is unlikely such granular data exists because there is no gun registry and Americans (and Washingtonians) often don't want the government to know what arms they own, which only underscores the difficulty of enforcing a ban like Washington's. But nationwide surveys estimate that there are more than 24.4 million MSRs in the country. National Shooting Sports Foundation, *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation*, (July 20, 2022) ("the firearm industry trade association, updated the industry estimate of Modern Sporting Rifles (MSRs) in circulation in the United States to 24,446,000 since 1990. That is an

AMICUS BY WGR & AFA
NO. 3:23-cv-05364-RJB

8

ANGUS LEE LAW FIRM, PLLC
9105A NE Hwy 99, Suite 200
Vancouver, WA 98665
T: 360-635-6464

TREVOR BURRUS
2301 S. June
Arlington, VA 22202
T: 720.231.4899

1  increase of over 4.5 million rifles since the last estimate was released in 2020."),
2  https://perma.cc/2LX6-UN3B. As mentioned, that's more than the number of Ford F-
3  Series pickup trucks on the road, which is the second most popular car in the country.
4  *Id*; Chase Gardner, "The Most Popular Cars in America (2022)," Insurify (Apr. 5,
5  2022), https://perma.cc/D4A3-934L.

6        According to one survey, "[i]n 2021, 75 percent of those who shot a center-fire
7  rifle shot an MSR[,]" and of "the 66 percent who hunted with a center-fire rifle, 60
8  percent used an MSR." Halbrook, *America's Rifle*, *supra* at 1. In general,
9  semiautomatic rifles that accept detachable magazines have been commonplace in
10 America for at least a century. *Id.* at 2. It wasn't until the rhetorical category of
11 "assault weapons" was invented in the late 1980s that there was any concerted effort
12 to ban these commonly owned firearms. *Id.*

13       Washington's Governor Jay Inslee claimed that the banned weapons "have no
14 reason other than mass murder," and their "only purpose is to kill humans as rapidly
15 as possible in large numbers." Jeff Zymeri, "Washington Governor Signs AR-15 Ban:
16 'No Reason Other Than Mass Murder,'" Yahoo.com (Apr. 25, 2023),
17 https://perma.cc/T3JF-B3AB. That would come as a surprise to people like Zack
18 Peters, an Oklahoma man who used an AR-15 to defend his home against three home
19 invaders. Avalon Zoppo, "Oklahoma Man Uses AR-15 to Kill Three Teen Home
20 Intruders," NBCNews.com (Mar. 28, 2017), https://perma.cc/RX8B-6A7S. Or a
21 pregnant woman in Florida who defended her home and her husband with an AR-15.
22 David K. Li, "Pregnant woman uses AR-15 to fatally shoot armed intruder,"

NBCNews.com (Nov. 4, 2019), https://perma.cc/TW7N-QN44. Or a man in Glen St. Mary, Florida, who defended himself and his home with an AR-15 against seven armed intruders, discharging 30 rounds in the process. Garrett Pelican, "Deputies: 30 rounds fired from AR-15 in deadly Florida home invasion," New4Jax.com (Apr. 17, 2018), https://perma.cc/RE7J-8XDS.

Governor Inslee's comments would also come as a surprise to the significant number of police departments that equip their officers with AR-15s and other "assault weapons." Police Executive Research Forum, *Police Department Service Weapon Survey* 2 (2013) ("Ninety-three percent of responding agencies equip some of their officers with rifles or assault weapons."), https://perma.cc/5AMT-WNGN. Presumably, departments don't equip their officers with a weapon that has "no reason other than mass murder."

A Massachusetts police training manual describes the utility of such weapons for the lawful defense of self and others. The weapons are used "due to the increased accuracy that the rifle afforded over the pistol and the shotgun." Massachusetts Municipal Police Training Committee, *Basic Firearms Instructor Course: Patrol Rifle* 3 (Sept. 2007), https://perma.cc/6HMQ-QS7W. The weapons are useful because the department "found most officers have difficulty hitting the MPTC Q target with regularity using their service pistol at distances further than the 10-yard line," and when you "factor in the stress level of a life and death encounter with rapidly evolving circumstances—the actual hit ratio drops even further." *Id.* Ordinary citizens who aren't as extensively trained would of course suffer from similar difficulties.

AMICUS BY WGR & AFA
NO. 3:23-cv-05364-RJB

10

ANGUS LEE LAW FIRM, PLLC
9105A NE Hwy 99, Suite 200
Vancouver, WA 98665
T: 360-635-6464

TREVOR BURRUS
2301 S. June
Arlington, VA 22202
T: 720.231.4899

Moreover, rather than being a distinctly powerful rifle, "the most popular patrol rifle round, the 5.56mm NATO (.223 Remington) will penetrate fewer walls than service pistol rounds or 12-gauge slugs," thus lowering the possibility of accidents. *Id.* In short, "[t]he rifle is a superior tool" for law enforcement officers in many situations. *Id.* Law-abiding citizens use the rifles for the same purposes.

Under the Supreme Court's test articulated in *Heller* and expanded on in *Bruen*, MSRs are in common use for lawful purposes. While the government will point to crimes being committed with MSRs, that criminals misuse weapons for horrible crimes does not negate the millions of people who use the guns responsibly and legally. The question the Supreme Court has directed courts to ask is whether the weapons are "*typically* possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625 (emphasis added).

### B. The Arms Singled Out by Washington's Ban Are Standard Semiautomatic Rifles with Characteristics that Make Them More Effective for Lawful Uses

As discussed above, a type of weapon that outnumbers one of the most popular cars in the country should be considered in "common use." Yet while the raw numbers show that Washington's ban targets commonly used weapons, the banned guns should be considered part of an even bigger category of weapons—semiautomatic rifles—that are even more commonly used. The proper category for constitutional analysis is not simply so-called "assault weapons" or "modern sporting rifles"—or whatever rhetoric is used to define the category—but whether the prohibited weapons have characteristics that make them uniquely suitable for unlawful purposes and unsuitable for lawful purposes.

AMICUS BY WGR & AFA
NO. 3:23-cv-05364-RJB

11

ANGUS LEE LAW FIRM, PLLC
9105A NE Hwy 99, Suite 200
Vancouver, WA 98665
T: 360-635-6464

TREVOR BURRUS
2301 S. June
Arlington, VA 22202
T: 720.231.4899

While the term "assault weapon" is a gun-control advocate's rhetorical invention, *see*, Blake, *supra*, *amici* acknowledge that the term "modern sporting rifle" is also a rhetorical invention used to counter the erroneous term "assault weapon." The important question for Second Amendment analysis is whether such terms articulate a constitutionally relevant category of firearms that is not in "common use" for lawful purposes. Mere rhetoric can't trump constitutional text or the Supreme Court's interpretation of that text. To determine whether a certain firearm is commonly used for lawful purposes, the firearm should be properly defined with relevant characteristics.

For example, a semiautomatic rifle that is painted hot pink would not be considered "in common use" if the color is regarded as a salient feature (based on the presumably safe assumption that relatively few people own hot pink semiautomatic rifles). Yet a ban on a certain color of weapon should not survive even rational basis review—a standard of review much lower than the Supreme Court has dictated for the Second Amendment. *Bruen*, 142 S. Ct. 2127–28. This only underscores the obvious fact that the function of any feature singled out for prohibition is relevant to analyzing a law. In other words, the Second Amendment prohibits the government from inventing a category of weapons—e.g. "hot pink semiautomatic rifles"—and then declaring such weapons are not in "common use." More is required to clear the Second Amendment's hurdle.

Washington's ban is not so transparently cosmetic as to ban certain colors of weapons, yet the ban focuses on characteristics that are either mostly cosmetic or

AMICUS BY WGR & AFA
NO. 3:23-cv-05364-RJB

12

ANGUS LEE LAW FIRM, PLLC
9105A NE Hwy 99, Suite 200
Vancouver, WA 98665
T: 360-635-6464

TREVOR BURRUS
2301 S. June
Arlington, VA 22202
T: 720.231.4899

1  characteristics that make the gun more effective for lawful uses. For example, Section
2  (iv)(D) bans semiautomatic rifles that accept detachable magazines that have a
3  forward pistol grip, described as a "[f]orward pistol, vertical, angled, or other grip
4  designed for by the nonfiring hand to *improve control*." S.H.B. 1240 § (iv)(D)
5  (emphasis added). The odd implication here is that law-abiding citizens should
6  apparently have guns that are less easy to control, while criminals evidently prefer
7  more accurate guns. Similarly, Section (iv)(F) bans semiautomatic rifles with a
8  "[m]uzzle brake, recoil compensator, or any item designed to be affixed to the barrel
9  to reduce recoil or muzzle rise." S.H.B. 1240 § (iv)(F). Again, reducing recoil and
10 muzzle rise makes the weapon more accurate. The law also bans semiautomatic rifles
11 with pistol grips, defined as "[a] grip that is independent or detached from the stock
12 that protrudes conspicuously beneath the action of the weapon." S.H.B. 1240 § (iv)(D).
13 Such grips help the shooter pull the weapon comfortably against his/her shoulder for
14 better control. Halbrook, *America's Rifle*, *supra*, at 14. Any law-abiding gun owner
15 cares about accuracy because shooting an inaccurate gun is both dangerous to others
16 and relatively ineffective for law-abiding uses.

17     It's an interesting world Washington wants to bring about: a world where
18 criminals who acquire and use the banned guns are better equipped with more
19 accurate guns than law-abiding citizens. If a law-abiding citizen diligently obeys the
20 Washington ban, they will be deprived of more accurate and effective weapons for
21 authorized purposes like self-defense, hunting, target shooting, and defense against

AMICUS BY WGR & AFA
NO. 3:23-cv-05364-RJB

13

ANGUS LEE LAW FIRM, PLLC
9105A NE Hwy 99, Suite 200
Vancouver, WA 98665
T: 360-635-6464

TREVOR BURRUS
2301 S. June
Arlington, VA 22202
T: 720.231.4899

oppressive government. A criminal who chooses to disobey the ban—as a criminal is more likely to do—will have a more effective weapon for criminal activities.

Rather than identifying uniquely dangerous characteristics for prohibition, Washington's ban singles out aspects that help make a standard semiautomatic rifles more reliable, accurate, and comfortable for law-abiding users.

### III. "Modern Sporting Rifles" Are Not "Dangerous and Unusual" Compared to Other Common Firearms

As described above, the Supreme Court has been clear that weapons that are commonly owned by law-abiding citizens for lawful purposes cannot be banned under the Second Amendment. Weapons that can be banned are those that are "dangerous *and* unusual," which also means they are not in common use for law abiding purposes. *Bruen*, 142 S. Ct. at 2143; *Heller*, 554 U.S. at 627 (emphasis added). MSRs are normal, commonly owned semiautomatic rifles that are neither dangerous nor unusual.

MSRs are semiautomatic—or "self-loading"—meaning they discharge a single shot per trigger pull and the next round loads into the chamber without any intervening action—such as cocking—by the user, at least until the gun jams or the ammunition is depleted. Some activists and judges have claimed that a semiautomatic rifle like the AR-15 can fire at essentially the same rate as a fully automatic machine gun. *See, e.g.*, *Kolbe*, 849 F.3d at 136 (claiming that the firing rate of the AR-15 is "nearly identical" to a fully automatic M-16). This is false and doesn't stand up to cursory scrutiny. To fire 300 to 500 rounds in a minute, as a fully automatic M-16 can do, a shooter would have to pull the trigger five to eight times a second for 60 seconds, something beyond the capabilities of the human body. E.

AMICUS BY WGR & AFA
NO. 3:23-cv-05364-RJB

14

ANGUS LEE LAW FIRM, PLLC
9105A NE Hwy 99, Suite 200
Vancouver, WA 98665
T: 360-635-6464

TREVOR BURRUS
2301 S. June
Arlington, VA 22202
T: 720.231.4899

1   Gregory Wallace, *"Assault Weapon" Lethality*, 88 Tenn. L. Rev 1, 20 (2020). Rather
2   than being uniquely dangerous, "[t]here is little if any difference between the rates of
3   fire for the semiautomatic AR-15 and a semiautomatic handgun." *Id.* at 25.

4   While it is difficult to estimate how many semiautomatic weapons there are in
5   the country, they are extremely common and equally—rather than uniquely—
6   dangerous. Most pistols are semiautomatic, as is any rifle that is not single shot, bolt
7   action, lever action, slide action, or pump action, which are the most common forms
8   of non-semiautomatic rifle. The total number of semiautomatics is likely more than
9   200 million, and all can fire as quickly as the user can pull the trigger.

10  Nor are the rounds fired from an MSR uniquely dangerous compared to other
11  commonly owned weapons, despite numerous claims to the contrary. *See, e.g.*, Glenn
12  Kessler, "Biden bungled talking point on the muzzle velocity of AR-15s," Wash. Post
13  (Sept. 2, 2022), (noting that President Biden was "clearly wrong" in his claim that
14  AR-15s fire five times faster than any other gun), https://tinyurl.com/jjxx3s6t. In fact,
15  the round that most MSRs fire, the .223 Remington, is considered by many states to
16  be too weak to hunt deer because the round will only cruelly injure rather than kill
17  the animal. Wallace, *"Assault Weapon" Lethality*, *supra* at 54. Military analysts have
18  long complained that the near-identical military analog of the .223 Remington—
19  5.56x45mm NATO, which is used in the military's M-16 and M-4 rifles—is
20  insufficient to use in combat because it is based off "a commercial Remington rifle
21  cartridge that had been designed to kill small varmints." Robert H. Scales, "Gun
22  Trouble," Atlantic (Jan./Feb. 2015), https://tinyurl.com/bddah2n2.

AMICUS BY WGR & AFA
NO. 3:23-cv-05364-RJB

15

ANGUS LEE LAW FIRM, PLLC
9105A NE Hwy 99, Suite 200
Vancouver, WA 98665
T: 360-635-6464

TREVOR BURRUS
2301 S. June
Arlington, VA 22202
T: 720.231.4899

When looking at crime rates, MSRs are also not uniquely dangerous. As mentioned *supra*, according to the National Shooting Sports Foundation (NSSF), there are approximately 24.4 million MSRs in the country, which is about 6 percent of all weapons, including both rifles and handguns. *Commonly Owned*, *supra*; Christopher Ingram, "There are more guns than people in the United States, according to a new study of global firearm ownership," Wash. Post (June 19, 2018), https://tinyurl.com/3k9vunum. MSRs are a subset of rifles, and it is difficult to estimate how many rifles there are in the country because there are few updated statistics and gun owners don't like to tell the government what they have. Nevertheless, a 2012 estimate found 110 million rifles out of the approximately 310 million total guns at the time, or 35 percent. William J. Krouse, "How Many Guns Are in the United States?—Number," U.S. Cong. Res. Serv. (2012), https://tinyurl.com/bdf5dhkr. Although there is a paucity of recent numbers, it is reasonable to assume that the ratio of 35 percent would hold true just over a decade later. Currently, it's estimated that there are approximately 400 million guns in the country, meaning approximately 140 million rifles. Ingram, *supra*. The NSSF estimate of 24.4 million MSRs would equate to about 17 percent of all rifles.

Rifles, in general, are used in very few crimes. In 2019, according to FBI crime statistics, rifles of any kind—of which MSRs are a subset—were used to kill 364 people.[1] Handguns killed 6,368. FBI, "2019 Crime in the United States: Expanded

---

[1] 2019 is the most recent year there is a reliable breakdown of weapons used in crime. The FBI changed how it tracks crime data starting in 2020, and "[l]aw enforcement agencies covering just over half of the population reported a full year's

AMICUS BY WGR & AFA
NO. 3:23-cv-05364-RJB

16

ANGUS LEE LAW FIRM, PLLC
9105A NE Hwy 99, Suite 200
Vancouver, WA 98665
T: 360-635-6464

TREVOR BURRUS
2301 S. June
Arlington, VA 22202
T: 720.231.4899

Homicide Data Table 8—Murder Victims by Weapon 2015–2019," https://tinyurl.com/33vcyyfd. In the four previous years, starting in 2015, rifles killed 215, 300, 389, and 305 people, respectively, and handguns in those years killed a similar number, between 6,000–7,000. *Id.* Each of those years, about 1,500 people were killed with "knives and cutting instruments," and around 600–700 were killed with "personal weapons" such as fists and feet. *Id.*

While the data are not deep enough to determine how many murders with rifles were committed with MSRs, it's reasonable to assume something around 17 percent, the same ratio of MSRs to total rifles. That would be 62 murders. If we double that percentage and round up—40 percent of murders with rifles were perpetrated with MSRs—then we get 146 murders.

One hundred and forty-six has to be looked at comparatively and with the question of whether the data show the guns are uniquely dangerous.

In 2019, there were 10,258 total homicides with firearms. Assuming the higher estimate of how many murders were caused by MSRs—146—means that 1.4 percent of murders in 2019 were perpetrated with MSRs. With 24.4 million MSRs and approximately 146 murders, and assuming one gun per homicide, means that around 0.000006 percent of MSRs are used to kill.

Of course, raw numbers of crimes committed don't entirely explain whether a type of firearm can be considered uniquely dangerous. Some firearms may have

---

worth of data to the FBI in 2021." Ames Grawert & Noah Kim, "Understanding the FBI's 2021 Crime Data," Brennan Ctr. for Justice (Oct. 4, 2022), https://tinyurl.com/bdezhk29.

AMICUS BY WGR & AFA
NO. 3:23-cv-05364-RJB

17

ANGUS LEE LAW FIRM, PLLC
9105A NE Hwy 99, Suite 200
Vancouver, WA 98665
T: 360-635-6464

TREVOR BURRUS
2301 S. June
Arlington, VA 22202
T: 720.231.4899

particularly lethal capabilities and are essentially never used for crime. A grenade launcher, for example, is a bearable arm that is distinct in how it operates—a wide explosion rather than a targeted bullet—and *amici* were unable to find one instance of a crime being committed with the weapon. That is one reason the Supreme Court's test is conjunctive—"*both* dangerous *and* unusual," *Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment)—and why the "common use" test makes conceptual sense.

MSRs are both extremely commonly used for lawful purposes and neither dangerous nor unusual, thus meriting the full protection of the Second Amendment.

## V.     CONCLUSION

For the forgoing reasons, S.H.B. 1240 unconstitutionally bans firearms that are commonly used by law-abiding persons for lawful reasons. The Court should grant the Plaintiffs' preliminary injunction and preserve Washingtonians' constitutional rights.

DATED: Friday, May 19, 2023.

ANGUS LEE LAW FIRM, PLLC

*/s/ D. Angus Lee*
D. Angus Lee, WSBA# 36473
*Attorneys for Attorneys for Amici Curiae*
9105A NE HWY 99, Suite 200
Vancouver, WA 98665
P: 360.635.6464 F: 888.509.8268
Angus@AngusLeeLaw.com

TREVOR BURRUS

*/s/ Trevor Burrus*
Trevor Burrus, DCBA#1048911
*Pro Hac Vice*
*Attorneys for Attorneys for Amici Curiae*
2301 S. June
Arlington, VA 22202
P: 720.231.4899
Trevorburrus@gmail.com

AMICUS BY WGR & AFA
NO. 3:23-cv-05364-RJB

18

ANGUS LEE LAW FIRM, PLLC
9105A NE Hwy 99, Suite 200
Vancouver, WA 98665
T: 360-635-6464

TREVOR BURRUS
2301 S. June
Arlington, VA 22202
T: 720.231.4899