1

2

3

4

5

6

7

8

The Honorable Robert J. Bryan

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

9

10

11

12

13

14

15

16

17

LAWRENCE HARTFORD; DOUGLAS MITCHELL; BRETT BASS; SPORTING SYSTEMS VANCOUVER, INC.; SECOND AMENDMENT FOUNDATION, INC.; AND FIREARMS POLICY COALITION, INC.,

Plaintiffs,

v.

BOB FERGUSON, in his official capacity as Washington State Attorney General, et al.,

Defendants.

NO. 3:23-cv-05364-RJB

STATE DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

NOTED FOR: May 26, 2023

## I.    INTRODUCTION

18

19

20

21

22

23

24

25

26

Responding to an epidemic of gun violence, the Washington Legislature enacted Substitute House Bill (SHB) 1240 to limit the manufacture and sale of firearms that have a disproportionate and deadly role in mass shootings: assault weapons. Even though assault weapons make up less than five percent of all guns owned by Americans, they caused *over half* of mass shooting fatalities in the past decade.

Plaintiffs seek to overturn this common-sense law, and request the extraordinary remedy of a preliminary injunction, but their legal theory lacks merit. As the Supreme Court reiterated in *Bruen*, the Second Amendment does not guarantee civilians the "right to keep and carry any

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

1

1  weapon whatsoever in any manner whatsoever and for whatever purpose." *New York State Rifle*

2  *& Pistol Association, Inc. v. Bruen*, __ U.S. __, 142 S. Ct. 2111, 2128 (2022). Just like bazookas,

3  machine guns, and grenade launchers, assault weapons are not covered by the Second

4  Amendment because they are not tools of self-defense; rather, they are designed to injure and

5  kill as many people as possible as quickly as possible in a military-style assault. Moreover,

6  Washington's regulation of assault weapons fits comfortably within the long historical tradition

7  of regulating dangerous and unusual weapons to promote public safety.

8          Following *Bruen*, federal courts have overwhelmingly rejected Second Amendment

9  challenges to assault weapons restrictions (and the closely related restrictions on large capacity

10  magazines (LCMs)). *See Bevis v. City of Naperville*, 2023 WL 2077392, *16 (N.D. Ill. Feb. 17,

11  2023) ("Because assault weapons are particularly dangerous weapons ..., their regulation

12  accords with history and tradition."); *Herrera v. Raoul*, 2023 WL 3074799, at *4 (N.D. Ill. Apr.

13  25, 2023) (concluding Illinois' prohibition on assault weapons is "consistent with 'the Nation's

14  historical tradition of firearm regulation,' namely the history and tradition of regulating

15  particularly 'dangerous' weapons"); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety &*

16  *Homeland Sec*., 2023 WL 2655150, at *13 (D. Del. Mar. 27, 2023) (concluding Delaware's

17  prohibition on assault weapons is "consistent with the Nation's historical tradition of firearm

18  regulation"); *see also Hanson v. District of Columbia.*, 2023 WL 3019777, at *12 (D.D.C.

19  Apr. 20, 2023) ("[Large capacity magazines] fall outside of the Second Amendment's scope

20  because they are most useful in military service and because they are not in fact commonly used

21  for self-defense."); *Ocean State Tactical, LLC v. Rhode Island*, 2022 WL 17721175, at *15

22  (D.R.I. Dec. 14, 2022) ("[P]laintiffs have failed to establish that they have a likelihood of success

23  in demonstrating that LCMs are weapons of self-defense, such that they would enjoy Second

24  Amendment protection."); *Ore. Firearms Fed'n, v. Brown*, 2022 WL 17454829, at *11 (D. Or.

25  Dec. 6, 2022) ("while large-capacity magazines are rarely used by civilians for self-defense, they

26  are often used in law enforcement and military situations" and "disproportionately used in crimes

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    involving mass shootings"); *see also Kolbe v. Hogan*, 849 F.3d 114, 144 (4th Cir. 2017) (pre-

2    *Bruen* case holding that "[b]ecause … assault weapons … are most useful in military service,

3    they are not protected by the Second Amendment"); *Friedman v. City of Highland Park*, 784

4    F.3d 406, 412 (7th Cir. 2015) (pre-*Bruen* casing upholding ban on assault weapons based on

5    legislature's conclusion they are not "appropriate for self-defense"). Plaintiffs' challenge is

6    nothing new. Just as court after court has already done, this Court should reject Plaintiffs'

7    dangerous misinterpretation of the Second Amendment and their effort to undermine the

8    common-sense regulation of military-style weapons.

9    Plaintiffs are also not entitled to an injunction because they fail to demonstrate irreparable

10   harm: Plaintiffs may continue to possess their existing collections of assault weapons under

11   Washington's law, and Plaintiffs' ability to purchase many other alternative firearms with which

12   to defend themselves remains intact. Nor can Plaintiffs show that the public interest favors a

13   statewide injunction: to the contrary, SHB 1240 was enacted to save lives and prevent gun

14   violence, and does not in any way affect Plaintiffs' right to self-defense or to use the assault

15   weapons they already own. Plaintiffs fail to meet their burden, and their request for a preliminary

16   injunction should be denied.

17                    **II.    BACKGROUND**

18   **A.    SHB 1240 Prohibits the Manufacture and Sale of Assault Weapons**

19   The Legislature passed Substitute House Bill 1240 to address the epidemic of gun

20   violence that "threat[ens] … the public health and safety of Washingtonians." 2023 Wash. Sess.

21   Laws, ch. 162, § 1. The Legislature found assault weapons are not "well-suited for self-defense,

22   hunting, or sporting purposes," but "are designed to kill humans quickly and efficiently." *Id.*

23   Citing the use of assault weapons "in the deadliest mass shootings in the last decade," the

24   Legislature found that "[a]n assailant with an assault weapon can hurt and kill twice the number

25   of people [as] an assailant" without, and "during the period the federal assault weapon ban was

26   in effect, mass shooting fatalities were 70 percent less likely to occur." *Id.* Accordingly, the

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   Legislature concluded restricting the sale of assault weapons, "while allowing existing legal

2   owners to retain the assault weapons they currently own," "is likely to have an impact on the

3   number of mass shootings committed in Washington" without interfering with lawful self-

4   defense. *Id.*

5         To achieve this goal, SHB 1240 prohibits the "manufacture, importation, distribution,

6   offer for sale, or sale [of] any assault weapon." *Id.* § 3. "Assault weapon" is specifically defined,

7   as discussed below, to encompass firearms with combat-specific features. *Id.* § 2(2). SHB 1240

8   does not prohibit the possession of assault weapons. Thus, current owners can still keep and use

9   these firearms for lawful purposes. *See generally* 2023 Wash. Sess. Laws, ch. 162.

10   **B.   Assault Weapons Are Uniquely Deadly Military-Style Weapons**

11         Assault weapons' disproportionate role in the deadliest mass shootings in recent memory

12   stems directly from their uniquely deadly capabilities. Assault weapons are designed to be "more

13   accurate, more portable, and more specifically tailored to produce lethal outcomes." Busse Decl.,

14   ¶ 29. According to Marine Corps combat veteran and military policy analyst, Kyleanne Hunter,

15   the M-16—the fully automatic version of the AR-15—is a "near perfect weapon of war" due to

16   its light weight, maneuverability, and ability to accept lightweight, high-velocity ammunition.

17   Kyleanne Hunter, *An American Problem: Weapons of War in Places of Peace*,

18   TEDxBend                 (May                    14,                  2018),

19   https://www.ted.com/talks/kyleanne_hunter_an_american_problem_weapons_of_war_in_place

20   s_of_peace. M-16s and AR-15s are equally deadly: for example, bullets shot from either can

21   shoot through both sides of a standard-issue military helmet at 500 meters. *Id.* Further, the

22   ammunition used in both guns is designed so bullets ricochet upon entering the body causing far

23   more damage than handgun ammunition. *Id.*

24         "The difference between the fully automatic and semiautomatic versions of those

25   firearms is slight." *Kolbe*, 849 F.3d at 125. For example, "the automatic firing of all the

26   ammunition in a large-capacity thirty-round magazine takes about two seconds, whereas a

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

semiautomatic rifle can empty the same magazine in as little as five seconds." *Id.* Assault weapons can be easily converted into fully automatic weapons, virtually indistinguishable in practice from weapons actually in use by the U.S. military. *See Bevis*, 2023 WL 2077392, at *15. "Some of these 'fixes' are as simple as stretching a rubber band from the trigger to the trigger guard of an AR-15." *Id.* (cleaned up). Other "conversion devices" include "bump stocks and trigger cranks, both of which allow an assault weapon to fire at a rate several times higher than it could otherwise." *Id.*; *see also* Busse Decl., ¶ 47. Indeed, "in many cases, U.S. civilians can now outfit rifles in a manner more lethal than the rifles carried by the military." Busse Decl., ¶ 47.

The features that define assault weapons in SHB 1240 (and that distinguish them from other semiautomatic firearms) are specifically designed to "increase the effectiveness of killing enemy combatants in offensive battlefield situations"—or, in the hands of a mass shooter, innocent civilians. *Id.* ¶ 32; *see* 2023 Wash. Sess. Laws, ch. 162, § 1. These include:

- Pistol grips. These grips, located beneath the action of a rifle or shotgun, permit "the shooter to control and aim the rifle during periods of rapid fire." Busse Decl., ¶ 34. A pistol grip is "useful during military operations because it helps the shooter stabilize the weapon and reduce muzzle rise during rapid fire" but "is not necessary to operate a firearm safely in self-defense situations." *Id.*

- Forward grips. These grips "aid in firearm stabilization during the rapid firing of assault rifles and assault pistols." *Id.* ¶ 35. "[F]orward grips can be an effective feature for troops charged with fast and efficient killing of enemy combatants in warfare" but are unnecessary for self-defense. *Id.*

- Folding, telescoping, and thumbhole stocks. Folding and telescoping stocks permit a portion of a rifle to collapse, and shorten its length. *Id.* ¶ 36. A thumbhole stock, meanwhile, permits the shooter's trigger hand to extend through the stock (effectively creating a pistol grip, described above). These stocks are unnecessary for self-defense. *Id.*

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

- Barrel shrouds. A barrel shroud enables "the shooter to grasp the barrel during firing without burning the non-trigger hand and as the rifle heats up in rapid-fire and continuous-fire situations." *Id.* ¶ 37. Barrel shrouds are unnecessary for self-defense. *Id.*

- Flash suppressors, muzzle brakes, and muzzle compensators. These devices reduce recoil and muzzle rise in rapid-fire situations, prevent night blindness during nighttime firefights, and help misdirect enemy forces in nighttime battlefield scenarios, but lack self-defensive applications. *Id.* ¶ 38

- Detachable magazines, or fixed magazines with capacities larger than 10 rounds. These devices are designed to permit a shooter to fire rapidly in succession, which is unnecessary for self-defensive purposes. Allen Decl., ¶ 12; Busse Decl., ¶ 39.

## C.    Assault Weapons Are Not Commonly Used in Self-Defense

While the AR-15 dates to the 1950s, assault weapon sales in the United States remained very low until the aftermath of the Sandy Hook Elementary massacre, when a shooter used an AR-15 to murder 26 people, including 20 children. *Id.* at 5, ¶ 12; *Access to weapons made tragedy possible*, CT POST (Mar. 28, 2013), https://www.ctpost.com/news/article/Access-to-weapons-made-tragedy-possible-4392681.php. Before Sandy Hook, the gun industry considered AR-15s to be military assault weapons, not suitable for sale or marketing to civilians. Busse Decl., ¶¶ 7-8, 18, 20-22. In the last decade, however, the gun industry has undertaken aggressive marketing to sell more assault weapons to civilians. Busse Decl., ¶¶ 17-31; 2023 Wash. Sess. Laws, ch. 162, § 1.

As the Legislature found, this aggressive marketing has led to an uptick in assault weapons sales, even though they are not "well-suited for self-defense, hunting, or sporting purposes" and "not commonly used in self-defense." 2023 Wash. Sess. Laws, ch. 162, § 1; *see also* Busse Decl., ¶¶ 23, 30-39. As discussed above, the combat-specific features that define assault weapons are, at best, unhelpful for self-defense, and, at worst, actively *increase* the danger to innocent bystanders. For example, just as bullets fired from assault rifles pierce

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   military helmets, they also pierce walls and can strike people beyond attackers, including

2   responding law enforcement and innocent bystanders. Hunter, *supra* § II.B.

3       Unsurprisingly, then, data confirms that assault weapons are not commonly used for self-

4   defense. An analysis of The Heritage Foundation's "Defensive Gun Uses in the U.S." database—

5   a database designed to *promote* the notion that guns are necessary for self-defense— shows that

6   of the 1,241 recorded incidents of armed self-defense nationwide between 2019 and 2022 in

7   which the type of gun used is known, only 4% involved some type of rifle (of which assault

8   rifles are only a subset). Allen Decl., ¶¶ 23-28.

9       The gun industry understands assault weapons are assaultive/offensive—not defensive—

10  weapons, and they market them as such. Despite faddish claims that "assault weapon" is a

11  misnomer made up by anti-gun activists, "[t]he firearms industry openly referred to these …

12  weapons as 'assault weapons' and 'assault rifles' as late as 2008." Busse Decl., ¶ 27 (citing Gun

13  Digest's "Buyer's Guide to Assault Weapons"). To this day, the ads for these guns stress their

14  appropriateness for use in wartime, civil unrest, or vigilante scenarios. *Id.* ¶¶ 50-55;

15  2023 Wash. Sess. Laws, ch. 162, § 1. One typical advertisement by the weapons company Daniel

16  Defense—whose gun was used in the Uvalde massacre—features a soldier and prominently

17  encourages consumers to "use what they use":

18  ///

19

20

21

22

23

24

25

26

STATE DEFENDANTS' OPPOSITION                    7
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



20   Busse Decl., ¶¶ 50-51.

21   Smith & Wesson—whose assault weapons were used in, among others, the Parkland

22 massacre and the Highland Park 4th of July shooting—sells civilians an AR-15 variant called

23 the "Military and Police AR-15." *Id.* ¶ 52. Bushmaster, whose rifle was used in the Sandy Hook

24 shooting, "describes its Adaptive Combat Rifle as 'the ultimate military combat weapons

25 system' that is '[b]uilt specifically for law enforcement and tactical markets.'" *Kolbe*, 849 F.3d

26 at 125 (quoting record). Wilson Combat markets one AR-15 as the "Urban Super Sniper."

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Busse Decl., ¶ 56. "[S]maller AR-15 manufacturers now regularly seek to grow their market by advertising in ways that depict young men with AR-15s inciting or engaging in armed urban warfare" and "armed offensive vigilante actions." *Id.* ¶¶ 53-54.

Firearms manufacturers market assault weapons based on their offensive and military style characteristics because that is what separates them from other arms more suited for self-defense. Busse Decl., ¶¶ 13, 20, 38, 50, 56

### D. Assault Weapons Are Dangerous Weapons Used in Mass Shootings and in the Deaths of Police Officers

Assault weapons "are often used in public mass shootings." Allen Decl., ¶ 34. At least 31% of all public mass shootings in the last 25 years, and 50% in the last five years, involved an assault weapon. Klarevas Decl., ¶ 12. This is highly disproportionate since assault weapons make up, at most, around five percent of all guns owned by Americans. *Id.* ¶ 13.

And because assault weapons are so much deadlier than other weapons, their use in mass shootings leads to much higher casualty rates. Over the past decade, six people on average have been killed in public mass shootings that do not involve an assault weapon, but that number *more than doubles* to almost 13 deaths for public mass shootings involving assault weapons. *Id.* ¶ 15. In fact, all seven of the deadliest acts of criminal violence since the September 11, 2001, terrorist attack were mass shootings, and six of those were perpetrated with assault weapons. *Id.* ¶ 14.

Unfortunately, "the problem of mass shooting violence is on the rise." *Id.* ¶ 11. Since the 1980s, "the rise in mass shooting violence has far outpaced the rise in national population." *Id.* The first mass shooting incident that resulted in ten or more deaths in America's history happened in 1949, the next in 1966, then in 1975. *Id.* ¶¶ 17-18. After the 1994 federal Assault Weapons Ban expired in 2004, the average rate of these incidents increased "over six-fold" when compared to the time period of 1949 to 2004. *Id.* ¶ 20.

The danger of assault weapons is not limited to mass shootings. "Criminals armed with … assault weapons possess a military-style advantage in firefights with law enforcement

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

officers, as such weapons allow criminals to effectively engage law enforcement officers from great distances and their rounds easily pass through the soft body armor worn by most law enforcement officers." *Kolbe*, 849 F.3d at 127 (cleaned up). Accordingly, "assault weapons are used disproportionately in … police killings..." *Bevis*, 2023 WL 2077392 at *15. "About 20 percent of officers were killed with assault weapons from 1998 to 2001 and again from 2016 to 2017." *Id.* Again, this is despite assault weapons making up only five percent of guns owned by Americans. Klarevas Decl., ¶ 13.

The recent mass shooting in Uvalde, Texas, provides a gut-wrenching case-in-point on the unique dangers of assault weapons. After an active shooter entered the local elementary school, ultimately shooting and killing 19 children and two teachers, the Uvalde Police Department was unwilling to enter the school for an hour because the destructive power of the shooter's assault weapon rendered police intervention *too dangerous*. Zach Despart, *"He has a battle rifle": Police feared Uvalde gunman's AR-15*, The Texas Tribune (March 20, 2023), https://www.texastribune.org/2023/03/20/uvalde-shooting-police-ar-15/. Police had to wait for more protective body armor, stronger shields, and units with more tactical training. *Id.* Uvalde Police Department Sgt. Donald Page told investigators later: "You knew that it was definitely an AR … There was no way of going in. … We had no choice but to wait and try to get something that had better coverage where we could actually stand up to him." *Id.*

**E.     This Lawsuit**

Governor Inslee signed SHB 1240 into law on April 25, 2023. That same day, Plaintiffs filed this lawsuit challenging SHB 1240 on its face. Plaintiffs now seek to preliminarily enjoin this lifesaving and common-sense safety measure in its entirety.

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

### III.    ARGUMENT

2

**A.    Legal Standard**

3       "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*

4  *v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Its purpose is "to preserve the status quo

5  ante litem," and "it is not usually proper to grant the moving party the full relief to which he

6  might be entitled if successful at the conclusion of a trial." *Tanner Motor Livery, Ltd. v. Avis,*

7  *Inc.*, 316 F.2d 804, 808 (9th Cir. 1963). Plaintiffs seeking a preliminary injunction must establish

8  that: (1) their claims are likely to succeed on the merits; (2) they will likely suffer irreparable

9  harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an

10  injunction is in the public interest. *Winter*, 555 U.S. at 20. To succeed, Plaintiffs must satisfy all

11  four *Winter* factors, even under the Ninth Circuit's alternative sliding scale test. *All. for the Wild*

12  *Rockies v. Cottrell*, 632 F.3d 1127, 1132, 1135 (9th Cir. 2011).

13       To carry the "heavy burden" of their facial challenge, Plaintiffs must "establish that no

14  set of circumstances exists under which [SHB 1240] would be valid." *United States v. Salerno*,

15  481 U.S. 739, 745 (1987). Where a statute has a "plainly legitimate sweep," a facial challenge

16  must fail. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).

17

**B.    Plaintiffs Are Unlikely to Succeed on the Merits**

18       In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court

19  announced a new test for evaluating firearm regulations under the Second Amendment. 142 S.

20  Ct. 2111 (2022). *Bruen* rejected the intermediate-scrutiny analysis adopted by nearly every

21  Circuit (including the Ninth Circuit), in lieu of a text-and-history analysis. *Id.* at 2126. Under the

22  new test, a plaintiff challenging a firearm regulation must first show that "the Second

23  Amendment's plain text covers an individual's conduct" as relevant to the regulation. *Id*. If a

24  plaintiff can make this showing, the burden then shifts to the defendant to "justify its regulation

25  by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."

26  *Id.* at 2130.

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   Plaintiffs cannot prove a likelihood of success on the merits because their claim fails at
2   both steps. First, the Second Amendment does not guarantee the right to keep or bear military-
3   style weapons that are not appropriate for lawful self-defense. Second, Washington's law is part
4   of a robust historical tradition of limiting the manufacture and sale of the weapons most
5   commonly and destructively used for lawless interpersonal violence.

6   **1.      The Second Amendment does not protect military-style assault weapons**

7   Plaintiffs' Second Amendment claim fails at *Bruen*'s first step because the Second
8   Amendment does not afford a right to keep and bear military-style weapons that are not
9   commonly used for self-defense. Under the first step of the *Bruen* analysis, Plaintiffs must show
10  that "the Second Amendment's plain text" protects their possession of assault weapons.
11  142 S. Ct. at 2129-30. Thus, in *Bruen*, before turning to whether New York's restriction was
12  "consistent with the Nation's historical tradition of firearm regulation," *id.* at 2130, the Court
13  confirmed that "handguns are weapons in common use today for self-defense." *Id.* at 2134
14  (cleaned up). Plaintiffs fail to show, however, that assault weapons are "commonly used" for
15  self-defense, *id.* at 2128, skipping this step entirely aside from a breezy discussion of the word
16  "arms." Mot. at p. 5.

17  Plaintiffs primarily try to shift their burden to the State. *See, e.g.*, Mot. at pp. 10-11. But
18  as *Bruen* makes clear, Second Amendment plaintiffs, just like any other plaintiffs asserting
19  constitutional violations, must first show their claims implicate the constitutional provision at
20  issue. *Bruen*, 142 S. Ct. at 2126, 2134; *see also Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct.
21  2407, 2421 (2022). Because the Second Amendment does not protect military-style weapons
22  that are not suitable for self-defense, SHB 1240 does not implicate the Second Amendment.

23  "'[L]ike most rights, the right secured by the Second Amendment is not unlimited … [it]
24  was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for
25  whatever purpose.'" *Bruen*, 142 S. Ct. at 2128 (quoting *District of Columbia v. Heller*, 554 U.S.
26  570, 626 (2008)). Textually, the *Heller* Court held, "self-defense" is the "*central component of*"

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    the Second Amendment right to "bear arms." 554 U.S. at 599. As such, "the Second Amendment

2    right … extends only to certain types of weapons." *Id.* at 623; *see also id.* at 625. As the *Heller*

3    Court explained, at the time of the Founding, "[t]he traditional militia was formed from a pool

4    of men bringing arms 'in common use at the time' for lawful purposes like self-defense." 554

5    U.S. at 624. It was "these kinds of weapons (which have changed over the years) [that] are

6    protected by the Second Amendment in private hands, while military-grade weapons (the sort

7    that would be in a militia's armory), such as machine guns, and weapons especially attractive to

8    criminals … are not." *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015)

9    (citing *Heller*, 554 U.S. at 624-25). Thus, as *Heller* made clear, "weapons that are most useful

10   in military service—M-16 rifles and the like—may be banned." 554 U.S. at 627; *see also Kolbe*,

11   849 F.3d at 131 (same; upholding ban on assault weapons).

12        This textual-historical limitation is fatal to Plaintiffs' argument. *Kolbe*, 849 F.3d at 135;

13   *Friedman*, 784 F.3d at 412; *see also Bevis v. City of Naperville*, 22 C 4775, 2023 WL 2077392,

14   at \*9 (N.D. Ill. Feb. 17, 2023) ("The text of the Second Amendment is limited to only certain

15   arms, and history and tradition demonstrate that particularly 'dangerous' weapons are

16   unprotected.").[1]

17        Assault weapons are not merely "like" M-16s: they are fundamentally the same sort of

18   gun. Indeed, the most popular assault weapon, the AR-15, *is* an M-16, just without the ability to

19   fire automatically or in three-round bursts. Busse Decl., ¶ 12. AR-15s preserve the features that

20   make the M-16 such a devastating combat weapon, and can easily be converted to near-automatic

21   rates of fire. *Supra* at II.B. Plaintiffs' focus on automatic fire as the *sine qua non* of military

22   weapons, Mot. at p. 13, is misplaced because "the line that *Heller* drew" is "not … between fully

23   automatic and semiautomatic firearms, but between weapons that are most useful in military

---

25       [1] The *Kolbe* court held "[i]n the alternative" that even if assault weapons were covered by the Second
     Amendment's plain text, as informed by its history, Maryland's assault weapons ban was justified under
26   intermediate scrutiny. *Kolbe*, 849 F.3d at 138. While this alternative holding was abrogated by *Bruen*, the court's
     primary holding anticipates and survives *Bruen*.

---

STATE DEFENDANTS' OPPOSITION                    13                    ATTORNEY GENERAL OF WASHINGTON
TO MOTION FOR PRELIMINARY                                                    Complex Litigation Division
INJUNCTION                                                                   800 Fifth Avenue, Suite 2000
NO. 3:23-cv-05364-RJB                                                        Seattle, WA 98104-3188
                                                                             (206) 464-7744

1    service and those that are not." *Kolbe*, 849 F.3d at 137. And indeed, "soldiers and police officers

2    are often advised to choose and use semiautomatic fire, because it is more accurate and lethal

3    than automatic fire in many combat and law enforcement situations." *Kolbe*, 849 F.3d at 125.

4    Assault weapons regulated by SHB 1240, and especially the AR-15, are the types of the weapons

5    the Supreme Court has specifically identified as outside the protection of the Second

6    Amendment.

7         Beyond their functional equivalence to M-16s, assault weapons are not covered by the

8    Second Amendment because they are not "in common use … for lawful purposes like self-

9    defense." *Heller*, 554 U.S. at 624; *see also Bruen*, 142 S. Ct. at 2134. This "important limitation

10   on the right to keep and carry arms" remains a critical part of the Second Amendment following

11   *Bruen. See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). Befitting their role as tools of

12   war, designed to kill as many enemies as possible, assault weapons have limited—if any—utility

13   for self-defense. Assault weapons are essentially military weapons of war and are designed for

14   offensive use. 2023 Wash. Sess. Laws, ch. 162, § 1; Hunter, *supra* § II.B.; Busse Decl., ¶¶ 32-41.

15   They are not commonly used for self-defense. To the contrary, assault weapons are almost never

16   used in self-defense. Allen Decl., ¶¶ 23-28. A study of active shooter incidents using FBI data

17   shows that, of the 456 active shooter situations between 2000 and 2022, only 18 involved

18   defensive gun uses by a private citizen, and only *one*—0.2%—is known to have involved an

19   assault weapon. Klarevas Decl., ¶ 24. This makes sense: as one court found, in the type of close-

20   range encounters in which one is likely to need to defend oneself, "handguns are most useful."

21   *Bevis*, 2023 WL 2077392, at *16; *see also id.* (quoting expert testimony that "shotguns and 9mm

22   pistols are generally recognized as the most suitable and effective choices for armed defense.'").

23   Indeed, as the Legislature found, the recent increase in sales of assault weapons stems not from

24   their utility in self-defense, but from aggressive marketing by gun makers touting their combat

25

26

1  capabilities. Busse Decl., ¶¶ 49-55; 2023 Wash. Sess. Laws, ch. 162, § 1.[2] By contrast, assault

2  weapons *are* disproportionately used in mass shootings and other high-profile criminal activity,

3  and they make those shootings vastly more lethal. *Supra* § II.D.; *see also* Klarevas Decl.,

4  Table 2, at 13.

5       Assault weapons are combat weapons designed to kill as many enemies on the battlefield

6  as quickly as possible. And it is "[t]he very features that qualify a firearm as a[n] … assault

7  weapon—such as flash suppressors, barrel shrouds, folding and telescoping stocks, pistol grips,

8  grenade launchers, night sights, and the ability to accept bayonets and large-capacity

9  magazines"—that give them a "capability for lethality—more wounds, more serious, in more

10 victims—far beyond that of other firearms[.]" *Kolbe*, 849 F.3d at 137 (cleaned up). Accordingly,

11 following *Bruen*, federal courts considering assault weapons restrictions have had no difficulty

12 concluding that assault weapons are especially dangerous weapons that fall outside the text of

13 the Second Amendment, as informed by history. *Herrera*, 2023 WL 3074799, at *4; *Bevis*, 2023

14 WL 2077392, at *16; *see also Hanson v. D.C.*, CV 22-2256 (RC), 2023 WL 3019777, at *12

15 (D.D.C. Apr. 20, 2023) ("[Large capacity magazines] fall outside of the Second Amendment's

16 scope because they are most useful in military service and because they are not in fact commonly

17 used for self-defense."); *Ocean State Tactical*, 2022 WL 17721175, at *15 ("[P]laintiffs have

18 failed to establish … that LCMs are weapons of self-defense, such that they would enjoy Second

19 Amendment protection."); *Oregon Firearms Fed'n, v. Brown*, 2:22-CV-01815-IM, 2022 WL

20 17454829, at *11 (D. Or. Dec. 6, 2022) (concluding LCMs are not covered by the Second

21 Amendment because they "are rarely used by civilians for self-defense").[3]

---

22  [2] To the extent Plaintiffs might suggest that assault weapons are used for lawful purposes *besides* self-
23  defense, that is irrelevant to the constitutional question because "individual self-defense is 'the *central component*'
    of the Second Amendment right.'" *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald v. City of Chicago*, 561 U.S. 742,
24  767 (2010) (emphasis in original).
         [3] The State Defendants are aware of only a single post-*Bruen* district court concluding that restrictions on
25  assault weapons likely violate the Second Amendment, but that opinion—*Barnett v. Raoul*, 2023 WL 3160284 (S.D.
    Ill. Apr. 28, 2023), on which Plaintiffs rely (Mot. at pp. 6, 14)—was stayed by the Seventh Circuit. *Barnett v. Raoul*,
26  No. 23-1825 (7th Cir. May 4, 2023) (Dkt. # #9). Plaintiffs cite another order—*Rocky Mountain Gun Owners v.*

1    Plaintiffs respond with the same handful of arguments that every prior, unsuccessful

2    plaintiff has raised. They assert assault weapons should be protected by the Second Amendment

3    simply because there are a lot of them. Mot. at pp. 9-10. Yet "only 5 percent of firearms" in the

4    U.S. "are assault weapons," and—according to a survey on which Plaintiffs rely—"[a]s a

5    percentage of the total population, less than 2 percent of all Americans own assault weapons."

6    *Bevis*, 2023 WL 2077392, at *16; Mot. at p. 9 (citing the same source); *see also* Klarevas Decl.,

7    ¶ 26.[4] And as Plaintiffs admit, of the tiny percentage of Americans who own assault weapons,

8    only a fraction cite self-defense as a major reason. Mot. at p. 10. Meanwhile, almost a third of

9    Americans live in states that restrict them. Klarevas Decl., ¶ 37. In any case, whether assault are

10   commonly *possessed* is irrelevant. The question under *Heller* and *Bruen* is whether assault

11   weapons are "in common *use* … for self-defense today." *Bruen*, 142 S. Ct. at 2143 (emphasis

12   added). Here, the evidence shows they are not. Allen Decl., ¶¶ 23-28.

13   Besides being factually overstated, Plaintiffs' popularity-contest argument also fails as a

14   legal matter. As the Seventh Circuit pointed out in *Friedman*, Tommy guns were "all too

15   common" during Prohibition, but this "popularity d[oes]n't give" dangerous military weapons

16   "constitutional immunity." 784 F.3d at 408. Rather, *Heller* makes clear "[t]here is no Second

17   Amendment protection for …. 'weapons that are most useful in military service'"; it does not

18   "make[] an exception for such weapons if they are sufficiently popular." *Kolbe*, 849 F.3d at 142

19   (quoting *Heller*, 554 U.S. at 627). Plaintiffs' argument leads to the absurd conclusion that a

20   firearm's constitutional status turns on whether the gun industry chooses to engage in mass

21   campaigns to flood the market. *See* Busse Decl., ¶¶ 31 (quoting a Palmetto Armory

22

23   *Town of Superior, Colo.*, No. 1:22-cv-01685 (D. Col. July 22, 2022)—but that was a TRO granted without briefing
     by defendants, and plaintiffs voluntarily dismissed that case less than three months later, before the Court could
24   consider whether to convert the TRO to a preliminary injunction.
       [4] Plaintiffs, like other anti-gun-control litigants, rely on the "2021 National Firearms Survey" by William
25   English, which has never been accepted for publication anywhere. Among other issues, Mr. English has never
     disclosed his survey questions or his funding source, casting significant doubt on the credibility of his findings.
26   Klarevas Decl., ¶ 26 fn.18. The State Defendants do not concede that the survey or any data therein are reliable.

1   advertisement: "we want to sell as many AR-15 and AK-47 rifles as we can and put them into

2   common use in America today"). Moreover, "relying on how common a weapon is at the time

3   of litigation would be circular" because a weapon's popularity (or not) often depends on whether

4   it is banned or not. *Friedman*, 784 F.3d at 409; *see also Kolbe*, 849 F.3d at 141.

5       Additionally, like the unsuccessful plaintiffs in *Kolbe* and other cases, Plaintiffs attempt

6   to read *Caetano v. Massachusetts*, 577 U.S. 411 (2016)—a five-paragraph, *per curiam* opinion

7   about non-lethal stun guns—as conclusively establishing an unbounded right to acquire as many

8   assault weapons as they want. Mot. at pp. 11-12. *Caetano* is irrelevant: it is a narrow opinion

9   that rejects three arguments no one makes here. Plaintiffs rely on the concurring opinion of

10   Justice Alito, joined by only one other Justice, asserting that "the relative dangerousness of a

11   weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful

12   purposes." *See Caetano*, 136 S. Ct. at 1031 (Alito, J., concurring). "Of course, that reading of

13   *Heller* failed to garner a Court majority in *Caetano*." *Kolbe*, 849 F.3d at 142.

14       Adopting a new standard whereby any weapon would be immune from regulation as long

15   as enough people bought one would also "upend settled law" because the number of stun guns

16   owned by Americans is roughly equal to the number of "legal civilian-owned machine guns in

17   the United States." *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,

18   2023 WL 2655150, at *5 (D. Del. Mar. 27, 2023). Thus, under Plaintiffs' reasoning, "the

19   National Firearms Act's restrictions on machineguns" would be unconstitutional, a suggestion

20   the Supreme Court itself called "startling." *Heller*, 554 U.S. at 624.

21       Beyond *Caetano*, Plaintiffs also rely on Justice Thomas' lone dissent from denial of

22   certiorari in *Friedman*, but that opinion suffers the same infirmity as *Caetano's* two-Justice

23   concurrence, as the eight other Justices *declined* to reverse the Seventh Circuit's opinion

24   upholding a ban on assault weapons. *Contra* Mot. at pp. 12-13.

25       In short, none of Plaintiffs' arguments establish that assault weapons are the type of

26   commonly used self-defense weapons covered by the Second Amendment. Rather, like M-16s,

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

assault weapons are the type of "weapons that are most useful in military service" that "may be banned" consistent with the Second Amendment. *Heller*, 554 U.S. at 627.

**2.     SHB 1240 Fits Well Within the Robust History and Tradition of Regulating Weapons Used in Interpersonal Violence in the United States**

Even if assault weapons were covered by the Second Amendment's text, Plaintiffs' challenge would fail at *Bruen* step two because SHB 1240 "is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. In a case like this, where government regulation responds to technological change and unprecedented social concerns, this analysis requires a "nuanced approach," focusing on "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2132-33. The "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.*

SHB 1240 responds to the recent proliferation of assault weapons, driven primarily by aggressive gun-industry marketing over the past decade. This proliferation has increased the rate of mass shootings and, even more dramatically, increased mass shooting lethality. Even at this early stage, on a preliminary record, it is apparent that the history and tradition of the United States is replete with examples of government regulation responding to new social harms by restricting the use of weapons disproportionately used in criminal violence. Thus, courts around the country have repeatedly concluded that even if assault weapons were protected by the text of the Second Amendment (which they are not) prohibiting their manufacture, import, and sale is well within the historical tradition of the United States. Plaintiffs entirely fail to grapple with this historical tradition. *See* Mot. at pp. 5-14.

1

       **a.**    **SHB 1240 responds to dramatic technological developments and unprecedented social change**

2

Obviously, the sort of weapon regulated by SHB 1240 did not exist in 1791 when the

3 Second Amendment was ratified, or in 1868 when the Fourteenth Amendment was ratified.

4 Semi-automatic weapons, of which assault weapons are a sub-group, first became

5 technologically feasible in the early twentieth century, and were sold primarily to the military.

6 Spitzer Decl., at p. 25. The AR-15, which typifies the sort of weapon regulated by SHB 1240,

7 was invented in the late 1950s. Busse Decl., ¶ 8. But it was not until the late 2000s, and after the

8 massacre at Sandy Hook Elementary, that assault weapons gained significant market share in

9 America. Busse Decl., ¶ 15. This proliferation was the direct result of marketing efforts by gun

10 manufacturers and retailers to sell firearms that were previously considered too dangerous for

11 civilian use. *Id.* ¶¶ 17-23.

12

These developments, which enabled civilians to wield weaponry capable of killing more

13 people more quickly than ever before, contributed directly to unprecedented increases in

14 frequency and lethality of mass shootings. Klarevas Decl., ¶¶ 13-18.

15

The creation of assault weapons in the second half of the 20th century, their proliferation

16 in the civilian market through gun industry efforts, and the consequent prevalence of mass

17 shooting deaths that now terrorize Americans are the kind of technological and social changes

18 that warrant a "nuanced approach" under *Bruen*. 142 S. Ct. at 2132; *see Herrera*, 2023 WL

19 3074799 at *7; *Del. State Sportsmen's Ass'n*, 2023 WL 2655150 at *10; *Hanson*, 2023 WL

20 3019777 at *13; *Ore. Firearms Fed'n*, 2022 WL 17454829 at *12-13.

21

       **b.**    **States have long regulated weapons used for lawless violence**

22

SHB 1240 follows a long American tradition of regulating weapons associated with

23 interpersonal violence. Since the Founding, the same basic pattern has repeated itself. First,

24 someone invents a weapon which initially has no significant impact on society. Spitzer Decl., at

25 pp. 2-3. If the technology can be readily manufactured and works as intended, the military will

26

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    often adopt it. *Id.* Afterward, military-style weapons often wind up on the commercial market
2    and pass into civilian use. *Id.* If so, they sometimes contribute to criminal violence that terrorizes
3    the public. *Id.* Here is where, time and again, states decide to regulate the weapons. *Id.* at pp.
4    33-47 (firearms capable of automatic and semi-automatic fire), 7-14 (Bowie knives), 14-17
5    (clubs and other blunt weapons); 18-19 (pistols); 19-20 (trap guns).

6          This pattern shows how weapons have typically been regulated when their proliferation
7    leads to widespread societal problems. Weapons regulations that follow this pattern are useful
8    analogues because they are "comparably justified" as a response to changing technology and
9    new threats of violence and terror, and they "impose a comparable burden on the right of armed
10   self-defense" by regulating especially dangerous weapons while leaving law-abiding citizens
11   free to possess other weapons appropriate for self-defense. *Bruen*, 142 S. Ct. at 2133.

12                        **(1)     Regulations on trap guns and clubs**

13         Some of America's earliest weapons regulations concerned "trap guns," which were
14   "devices or contraptions rigged in such a way as to fire when the owner need not be present."
15   Spitzer Decl., at p. 19. New Jersey prohibited setting trap guns in 1771, and 15 more states
16   followed between then and 1925. *Id.*, Ex. B. New Jersey enacted its early law because the "most
17   dangerous Method of setting Guns has too much prevailed in this Province," and set a penalty
18   of six pounds or six months' incarceration for violating the law. *Id.* at p. 19.

19         Even older are laws regulating clubs and other bludgeoning instruments. Perhaps the
20   simplest weapon technologically, these sorts of arms include billy clubs (a heavy hand-held rigid
21   club), slungshots (a flexible strap with rock or piece of metal at one end), and sandbags (a fabric
22   bag filled with sand or rocks). *Id.* at pp. 15-17. American restrictions on these sorts of weapons
23   date to 1664 at the latest, when the Colony of New York prohibited their public carry. *Id.* at p.
24   16; Ex. C. In the following centuries, "every state in the nation had laws restricting one or more
25   types of clubs," owing to their widespread use in criminality and interpersonal violence. *Id.* at
26   p. 14; Ex. C. Slungshots in particular "were viewed as especially dangerous or harmful when

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

they emerged in society, given the ubiquity of state laws enacted after their invention and their spreading use by criminals and as fighting implements." *Id.* at p. 16.

### (2)     Regulations on Bowie knives and pistols

The history and tradition of regulating weapons associated with interpersonal violence continued into the 19th and 20th centuries with regulations of Bowie knives and pistols, among others.

Knives are obviously very old, with a wide variety of knives having been utilized throughout human history for various purposes. But in the 1830s, the "Bowie knife" became popular in the U.S. after Jim Bowie used the distinctive knife to kill one man and injure another in a duel. Spitzer Decl., at p. 7; Rivas Decl., ¶ 13. The knives "were widely used in fights and duels, especially at a time when single-shot pistols were often unreliable and inaccurate." Spitzer Decl., at p. 7; *see also* Rivas Decl., ¶ 14. Like assault weapons today, the demand for Bowie knives was partly fueled by their notorious reputation. Spitzer Decl., at p. 8. The proliferation of the knives, and their subsequent widespread criminal usage, prompted states to restrict them. *Id.* Starting in the 1830s and ending around the start of the twentieth century, "every state" except New Hampshire "restricted Bowie knives." *Id.* at p. 9. Fifteen states "all but banned the possession of Bowie knives outright (by banning both concealed and open carry)," while others taxed their acquisition or possession, often prohibitively. *Id.*; *see also id.,* Exs. C, E, H. "[T]hese taxes were clearly designed to discourage trade in and public carry of" Bowie knives. Rivas Decl., ¶ 26.

The regulatory pattern repeated when multi-shot revolvers appeared. While Colt's revolver achieved the technological capability of firing multiple shots without reloading as early as the 1830s, the gun did not become popular until after the Civil War, once it reached the civilian market. Spitzer Decl., at pp. 26-27; Rivas Decl., ¶ 16. When that happened, and Colt revolvers became associated with increasing rates of interpersonal violence and crime, states passed laws regulating them. Spitzer Decl., at p. 27; Rivas Decl., ¶ 29. Tennessee and Arkansas completely

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    prohibited the sale of easily concealed pistols in the late 1800s, complementing the public-carry

2    restrictions that were common throughout the United States. Rivas Decl., ¶ 29-30; *see also*

3    Spitzer Decl. Ex. B.

4             **(3)       Early twentieth century regulations on automatic and semi-automatic weapons**

5         Automatic and semi-automatic weapons were introduced into America's civilian

6    marketplace after being adopted by the military during World War I, and quickly became the

7    subject of a nationwide effort to restrict their possession and use. Spitzer Decl., at pp. 33-47. The

8    Thompson submachine gun (Tommy Gun) was first marketed to civilians in the United States

9    starting in the 1920s, and it was advertised as the "ideal weapon for the protection of large

10   estates, ranches, plantations, etc." *Id.* at pp. 34-36. Despite its marketing as a defensive weapon,

11   the Tommy Gun became known for its ability to murder a large number of people quickly, most

12   infamously in the St. Valentine's Day massacre of 1929. *Id*. at pp. 34, 37.

13         Reacting to these new, dangerous, and suddenly widely available weapons, 32 states

14   enacted anti-machine gun laws between 1925 and 1934. *Id.* at pp. 40-41. Many of these laws

15   regulated semi-automatic weapons in addition to automatics. *Id.* at pp. 43-45. Ten jurisdictions

16   had laws of this kind. *Id.* This flurry of legislative activity culminated in the 1934 National

17   Firearms Act, which imposed strict requirements on automatic firearms nationwide. *Id.* at p. 42.

18   "Machine guns" (i.e. automatic weapons) remain strictly regulated in the United States to this

19   day. *See, e.g.*, 18 U.S.C. § 922(o).

20            **c.      SHB 1240 is consistent with the historical tradition of weapons regulation**

21

22        SHB 1240 was enacted for similar reasons as historical weapons regulations, and any

23   burden on the right to bear arms in self-defense is similarly minimal.

24        The machine-gun bans of the 1920s and 1930s are particularly apt comparators. While

25   *Bruen* stated that "not all history is created equal," 142 S. Ct. at 2136, it did not hold that more

26   modern history was irrelevant, especially when it is consistent with earlier American traditions.

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

*See Hanson*, 2023 WL 3019777 at *16 ("*Bruen* left open the possibility that in an appropriate case, 20th century history that is not contradicted by earlier evidence can illuminate a modern-day regulation's constitutional vitality."). Prohibition-era machine-gun bans were a natural outgrowth of earlier laws restricting trap guns, clubs, Bowie knives, and pistols—just as modern assault-weapon restrictions are. And SHB 1240, just like its historical analogues, was enacted specifically to reduce incidents of high-fatality violence. *See, e.g.*, *Hanson*, 2023 WL 3019777 at *15. Likewise, just like its historical analogues, SHB 1240 does not burden the right to armed self-defense. The Tommy Gun is a weapon of war, unsuited for self-defense. Spitzer Decl., at pp. 34-35. Assault weapons, too, are offensive, military-style weapons not useful for self-defense. *See supra* §§ II.B-D. Just as the machine-gun bans and other historical weapons regulations are consistent with the history and tradition of the United States—as *Heller* confirmed, 554 U.S. at 624—SHB 1240 is too, as courts have consistently found. *See Del. State Sportsmen's Ass'n*, 2023 WL 2655150 at *11; *Bevis*, 2023 WL 2077392 at *10-11; *Herrera*, 2023 WL 3074799, at *4; *see also Ore. Firearms Fed'n, Inc.*, 2022 WL 17454829 at *13; *Hanson*, 2023 WL 3019777 at *15-16 (upholding regulation on large-capacity magazines as relevantly similar to Prohibition-era machine-gun regulations).

## C.    Plaintiffs Face No Irreparable Harm

Plaintiffs' extraordinary request for preliminary injunctive relief must also be denied because they will not suffer any irreparable harm while this litigation is pending. Plaintiffs' sole asserted claim of harm is a constitutional violation (Mot. at p. 14), but as detailed above, they cannot show a likelihood of success on their facial challenge to SHB 1240.

Plaintiffs are also incorrect that a constitutional violation, standing alone, automatically establishes irreparable harm. Plaintiffs' preferred rule is specifically limited to the First Amendment context. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("*The loss of First Amendment freedoms*, for even minimal periods of time, unquestionably constitutes irreparable injury."). In other constitutional contexts, courts "require[] more than a constitutional claim to find

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    irreparable harm." *Great N. Res. v. Coba*, 3:20-CV-01866-IM, 2020 WL 6820793, at *2 (D. Or.

2    Nov. 20, 2020) (discussing *Melendres v. Arpaio*, 695 F.3d 990, 997 (9th Cir. 2012); *Hernandez*

3    *v. Sessions*, 872 F.3d 976, 986 (9th Cir. 2017); *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053,

4    1068 (9th Cir. 2014); and *Am.Trucking Assn's v. City of Los Angeles*, 559 F.3d 1046, 1057 (9th

5    Cir. 2009)); *see also Allen v. County of Lake*, No. 14-CV-03934-TEH, 2014 WL 4380297, at *2

6    (N.D. Cal. Sept. 4, 2014); *Poder in Action v. City of Phoenix*, 481 F. Supp. 3d 962 (D. Ariz.

7    2020); *Mendoza v. Garrett*, 358 F. Supp. 3d 1145, 1180-81 (D. Or. 2018).[5]

8         Here, Plaintiffs cannot show irreparable harm because nothing in SHB 1240 impinges on

9    their individual rights to bear arms in self-defense. Even taking at face value Plaintiffs' claim

10   that they own assault weapons for self-defense purposes (despite their unsuitability for this

11   purpose), SHB 1240 does not affect the individual Plaintiffs' ability to use the assault weapons

12   they *already own*. *See* Dkt. #1 (Compl.), ¶¶ 11-13. Furthermore, plenty of firearms are lawfully

13   for sale in Washington that Plaintiffs can use for self-defense. Though Plaintiffs may not sell

14   their existing assault weapons within the State or add to their collections, those inconveniences

15   pose no constitutional emergency warranting the "extraordinary remedy" of a preliminary

16   injunction. *Winter*, 555 U.S. at 24.

17        Nor can Plaintiffs bootstrap their irreparable harm argument by alleging lost sales by

18   Plaintiff Sporting Systems Vancouver because "monetary damages" are not irreparable. *Fox*

19   *Broad. Co. v. Dish Network*, 747 F.3d 1060, 1073 (9th Cir. 2014). Nor has Sporting Systems

20   Vancouver suffered any constitutional injury, because even if the Second Amendment

21   guaranteed the unrestricted right to buy assault weapons, "the Second Amendment does not

22   independently protect a proprietor's right to sell firearms." *Teixeira v. County of Alameda*, 873

23   F.3d 670, 690 (9th Cir. 2017). Because Sporting System Vancouver has no Second Amendment

24   right to sell weapons, or at least no greater right than its customers' right to acquire weapons for

25

26   _____
     [5] To the extent individual Plaintiffs assert harm based on "fears [of] prosecution" under SHB 1240,
     causation is lacking because SHB 1240 does not prohibit possessing or "acquir[ing]" assault weapons. Mot. at p. 2.

1 | self-defense, *id.* at 682, it suffers no irreparable harm.

2 | **D.      The Equities and Public Interest Weigh Heavily against an Injunction**

3 |          Finally, the Court should deny Plaintiffs' Motion because the equities and public

4 | interest—which merge here—are resoundingly in the State's favor. *See Drakes Bay Oyster Co.*

5 | *v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Plaintiffs' only interest is in being able to buy

6 | *more* assault weapons than they already have, or to sell them to a broader market than SHB 1240

7 | permits, while this litigation is pending. By contrast, the Legislature found that SHB 1240 will

8 | likely save lives. This is no contest.

9 |          As explained above, assault weapons are particularly deadly, military-style firearms that

10 | act as force multipliers in mass shootings, are disproportionately used to kill police, and are

11 | disproportionately owned by gang members. The types of weapons and accessories available

12 | today, and the ease with which items can be purchased to render these arms fully automatic, have

13 | given civilians weapons that are *more* lethal than what is carried by the military. Busse Decl.,

14 | ¶¶ 44, 47; *Bevis*, 2023 WL 2077392, at *15. Our Legislature concluded that "gun violence is a

15 | threat to the public health and safety of Washingtonians" and that restricting the sale of assault

16 | weapons would likely reduce that violence. 2023 Wash. Sess. Laws, ch. 162 § 1. It would be a

17 | mistake for this Court to overturn the judgment of the People's representatives, especially on a

18 | preliminary basis without a fully developed factual record.

19 | **E.      Neither an Accelerated Trial on the Merits Nor Summary Judgment Is Appropriate**
   | **at this Early Juncture.**

20 |          Under Fed. R. Civ. P. 65(a)(2), "the [C]ourt may advance the trial on the merits and

21 | consolidate it with the hearing" on a motion for preliminary injunction. But this is disfavored:

22 | "[I]t is generally inappropriate for a federal court at the preliminary-injunction stage to give a

23 | final judgment on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

24 |          If this Court reaches the second step of the *Bruen* analysis, the parties will need to engage

25 | in discovery to develop evidence establishing and illuminating the relevant historical tradition

26 |

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   of weapons regulation, including laws and regulatory practices throughout our history and the

2   historical contexts in which they arose. *See* Mot. at p. 5 (agreeing that historical tradition must

3   be factually "prove[d]"). But by seeking consolidation with the merits or summary judgment,

4   Plaintiffs seek to effectively deny the State Defendants the opportunity to develop and submit

5   this evidence. Plaintiffs' previous efforts to do so have appropriately been rejected. *See*

6   Declaration of Andrew Hughes, Ex. A at 12-13 (Chief Judge Estudillo rejecting Plaintiffs'

7   request to dispense with discovery, concluding that *Bruen's* second step requires "historical

8   research done by historians" and so "discovery does need to be had … to help the Court out with

9   the historical contexts" in *Sullivan v. Ferguson*, Case No. 3:22-cv-5403-DGE (Oct. 3, 2022). So

10  too here: if the Court concludes that it must reach step two of the *Bruen* analysis, discovery is

11  necessary and summary adjudication on an undeveloped record is inappropriate.

## IV.   CONCLUSION

13  Plaintiffs' Motion for Preliminary Injunction should be denied.

15  DATED this 22nd day of May, 2023.

16  ROBERT W. FERGUSON
    Attorney General

18  *s/Andrew R.W. Hughes*
    KRISTIN BENESKI, WSBA #45473
19  First Assistant Attorney General
    ANDREW R.W. HUGHES, WSBA #49515
20  R. JULY SIMPSON, WSBA #45869
    WILLIAM MCGINTY, WSBA #41868
21  Assistant Attorneys General
22  *Attorneys for State Defendants*

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

## **DECLARATION OF SERVICE**

2

I hereby declare that on this day I caused the foregoing document to be electronically

3

filed with the Clerk of the Court using the Court's CM/ECF System which will serve a copy of

4

this document upon all counsel of record.

5

DATED this 22nd day of May, 2023, at Seattle, Washington.

6

7

*s/ Andrew R.W. Hughes*
ANDREW R.W. HUGHES, WSBA #49515
Assistant Attorney General

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

STATE DEFENDANTS' OPPOSITION
TO MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364-RJB

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744