The Honorable Robert J. Bryan

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA**

LAWRENCE HARTFORD; DOUGLAS MITCHELL; BRETT BASS; SPORTING SYSTEMS VANCOUVER, INC.; SECOND AMENDMENT FOUNDATION, INC.; AND FIREARMS POLICY COALITION, INC.,

Plaintiffs,

v.

BOB FERGUSON, in his official capacity as Washington State Attorney General, et al.,

Defendants.

NO. 3:23-cv-05364-RJB

DECLARATION OF LOUIS KLAREVAS, PHD, IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

I.     **PROFESSIONAL QUALIFICATIONS**

1.      I am a security policy analyst and, currently, Research Professor at Teachers College, Columbia University, in New York. I am also the author of the book *Rampage Nation*, one of the most comprehensive studies on gun massacres in the United States.[1]

2.      I am a political scientist by training, with a B.A. from the University of Pennsylvania and a Ph.D. from American University. During the course of my nearly 25-year career as an academic, I have served on the faculties of George Washington University, the City University of New York, New York University, and the University of Massachusetts. I have also served as Defense Analysis Research Fellow at the London School of Economics and Political

---

[1] Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016).

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Science and as United States Senior Fulbright Scholar in Security Studies at the University of Macedonia.

3.      My current research examines the nexus between American public safety and gun violence, including serving as an investigator in a study funded by the National Institutes of Health that focuses on reducing intentional shootings at elementary and secondary schools.

4.      In addition to having made over 100 media and public-speaking appearances, I am the author or co-author of more than 20 scholarly articles and over 70 commentary pieces. In 2019, my peer-reviewed article on the effectiveness of restrictions on LCMs in reducing high-fatality mass shootings that result in six or more victims killed was published in the *American Journal of Public Health*.[2] This study found that jurisdictions with LCM bans experienced substantially lower gun massacre incidence and fatality rates when compared to jurisdictions not subject to similar bans. Despite being over 3 years old now, this study continues to be one of the highest-impact studies in academia. It was recently referred to as "the perfect gun policy study," in part due to the study's "robustness and quality."[3]

5.      Since January 1, 2019, I have been deposed, testified in court, or testified by declaration in the following cases (all in federal court), listed alphabetically by state:

**California – Central District**
*Rupp v. Bonta*                                             8:17-cv-00746-JLS-JDE
**California – Eastern District**
*Wiese v. Bonta*                                           2:17-cv-00903-WBS-KJN

---

[2] Louis Klarevas, et al., "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings," 109 *American Journal of Public Health* 1754 (2019), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed February 11, 2023).

[3] Lori Ann Post and Maryann Mason, "The Perfect Gun Policy Study in a Not So Perfect Storm," 112 *American Journal of Public Health* 1707 (2022), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2022.307120 (last accessed February 11, 2023). According to Post and Mason, "Klarevas et al. employed a sophisticated modeling and research design that was more rigorous than designs used in observational studies. Also, they illustrated the analytic steps they took to rule out alternative interpretations and triangulate their findings, for example examining both state bans and federal bans. They helped build the foundation for future studies while overcoming the limitations of previous research." *Id.*

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

2

**California – Southern District**

| | |
|---|---|
| *Duncan v. Bonta* | 17-cv-1017-BEN-JLB |
| *Jones v. Bonta* | 19-cv-01226-L-AHG |
| *Miller v. Bonta* | 3:19-cv-1537-BEN-JBS |
| *Nguyen v. Bonta* | 3:20-cv-02470-WQH-MDD |

**Colorado**

| | |
|---|---|
| *Gates v. Polis* | 1:22-cv-01866-NYW-SKC |

**Connecticut**

| | |
|---|---|
| *National Association for Gun Rights v. Lamont* | 3:22-cv-01118-JBA |

**Hawaii**

| | |
|---|---|
| *National Association for Gun Rights v. Lopez* | 1:22-cv-404-DKW-RT |

**Illinois – Northern District**

| | |
|---|---|
| *Viramontes v. Cook County* | 1:21-cv-04595 |
| *National Association for Gun Rights v. Highland Park* | 22-cv-04774 |
| *Herrera v. Raoul* | 1:23-cv-00532 |

**Illinois – Southern District**

| | |
|---|---|
| *Harrel v. Raoul*[*] | 23-cv-141-SPM |
| *Langley v. Kelly*[*] | 23-cv-192-SPM |
| *Barnett v. Raoul*[*] | 23-cv-209-SPM |
| *Federal Firearms Licensees of Illinois v. Pritzker*[*] | 23-cv-215-SPM |
| *Kenneally v. Raoul* | 3:23-cv-50039 |

**Massachusetts**

| | |
|---|---|
| *National Association for Gun Rights v. Campbell* | 1:22-cv-11431-FDS |

**Oregon**

| | |
|---|---|
| *Oregon Firearms Federation v. Kotek*[†] | 2:22-cv-01815-IM |
| *Fitz v. Rosenblum*[†] | 3:22-cv-01859-IM |
| *Eyre v. Rosenblum*[†] | 3:22-cv-01862-IM |
| *Azzopardi v. Rosenblum*[†] | 3:22-cv-01869-IM |

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Washington – Eastern District**

*Brumback v. Ferguson*                                                    1:22-cv-03093-MKD

**Washington – Western District**

*Sullivan v. Ferguson*                                                    3:22-cv-5403-DGE

*Hartford v. Ferguson* (Present Case)                                     3:23-cv-05364-RJB

[*]Non-Consolidated Cases on the Same Briefing Schedule / [†]Consolidated Cases

6.      In 2021, I was retained by the Government of Canada in the following cases which involved challenges to Canada's regulation of certain categories of firearms: *Parker and K.K.S. Tactical Supplies Ltd. v. Attorney General of Canada*, Federal Court, Court File No.: T-569-20; *Canadian Coalition for Firearm Rights, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-577-20; *Hipwell v. Attorney General of Canada*, Federal Court, Court File No.: T-581-20; *Doherty, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-677-20; *Generoux, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-735-20; and *Eichenberg, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-905-20. I testified under oath in a consolidated court proceeding involving all six cases in the Federal Court of Canada.

7.      I have also submitted declarations in the following state court cases: *People of Colorado v. Sgaggio*, District Court, El Paso County, Colorado, 2022M005894 (Criminal); and *Guardian Arms v. Inslee*, Superior Court, Grant County, Washington, 23-2-00377-13 (Civil).

8.      A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this Declaration.

9.      I have been retained by the State Defendants to render expert opinions in this case. I am being compensated at a rate of $480/hour for my work on this Declaration, $600/hour for any testimony (including deposition testimony) in connection with this matter, and $120/hour for travel required to provide testimony.

DECLARATION OF LOUIS KLAREVAS,
PHD
NO. 3:23-cv-05364                                4                  ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

## II.    OPINIONS

10.    It is my professional opinion, based upon my analysis of the data reviewed herein, that (1) in terms of individual acts of intentional criminal violence, mass shootings presently pose the deadliest threat to the safety of American society in the post-9/11 era, and the problem is growing nationwide; (2) mass shootings involving assault weapons, on average, have resulted in a substantially larger loss of life than similar incidents that did not involve assault weapons; (3) mass shootings resulting in double-digit fatalities are relatively modern phenomena in American history, often related to the use of large-capacity magazines and assault weapons; (4) assault weapons are used by private citizens with a far greater frequency to perpetrate mass shootings than to stop mass shootings; (5) handguns, as opposed to rifles (let alone rifles that qualify as assault weapons), are the most commonly owned firearms in the United States; and (6) jurisdictions that restrict assault weapons experience fewer mass shooting incidents and fatalities, per capita, than jurisdictions that do not restrict assault weapons. Based on these findings, it is my opinion that restrictions on assault weapons have the potential to save lives by reducing the frequency and lethality of mass shootings.[4]

---

[4] For purposes of this Declaration, I employ two prominent definitions of mass shootings from the field of firearm violence research. "High-fatality mass shootings" (also referred to as "gun massacres") are shootings resulting in 6 or more fatalities, not including the perpetrator(s), regardless of location or underlying motive. "Mass public shootings" are shootings resulting in 4 or more fatalities, not including the perpetrator(s), occurring largely in a public setting and not undertaken in pursuit of an underlying criminal objective (e.g., robbery, illicit trafficking, organized crime, gang violence, or domestic violence). Unfortunately, long-term, publicly-available, exhaustive data on all mass shootings resulting in 4 or more fatalities, not including the perpetrator(s), regardless of location or underlying motive, are presently not available. This limits comprehensive scholarly analyses over a long period of time to the above two types of mass shooting violence: high-fatality mass shootings and mass public shootings. The data on high-fatality mass shootings is from a data set that I maintain and continuously update. This data set is reproduced in **Exhibit B**. The data set of mass public shootings that I analyzed is publicly available from The Violence Project. The creation of this data set was funded by the National Institute of Justice, which is part of the U.S. Department of Justice. In addition to basic variables, such as incident dates and locations, casualty counts, and information on offenders, The Violence Project data set also identifies whether an assault weapon was used to perpetrate a mass public shooting. The Violence Project data set is available at https://www.theviolenceproject.org/mass-shooter-database (last accessed December 27, 2022). The Violence Project data set is reproduced in **Exhibit C**. Unless stated otherwise, all of the data used to perform original analyses and to construct tables and figures in this Declaration are drawn from **Exhibits B and C**.

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**A.      Mass Shootings Are a Growing Threat to Public Safety**

11.    Examining mass-casualty acts of violence in the United States points to two disturbing patterns. First, as demonstrated in Table 1, the deadliest individual acts of intentional criminal violence in the United States since the terrorist attack of September 11, 2001, have all been mass shootings. Second, as displayed in Figures 1-4, the problem of mass shooting violence is on the rise. To put the increase over the last 50 years into perspective, between the ten-year-period of 1973-1982 and the ten-year-period of 2013-2022, the average population of the United States increased approximately 47%. However, the number of people killed in high-fatality mass shootings and mass public shootings between these two ten-year-periods, respectively, reflect 178% and 523% increases. In other words, the rise in mass shooting violence has far outpaced the rise in national population. The obvious takeaway from these patterns and trends is that mass shootings pose a significant—and growing—threat to American public safety.

**Table 1. The Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11**

|   | Deaths | Date | Location | Type of Violence |
|---|--------|------|----------|------------------|
| 1 | 60 | October 1, 2017 | Las Vegas, NV | Mass Shooting |
| 2 | 49 | June 12, 2016 | Orlando, FL | Mass Shooting |
| 3 | 32 | April 16, 2007 | Blacksburg, VA | Mass Shooting |
| 4 | 27 | December 14, 2012 | Newtown, CT | Mass Shooting |
| 5 | 25 | November 5, 2017 | Sutherland Springs, TX | Mass Shooting |
| 6 | 23 | August 3, 2019 | El Paso, TX | Mass Shooting |
| 7 | 21 | May 24, 2022 | Uvalde, TX | Mass Shooting |

*///*

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Figure 1. Annual Trends in High-Fatality Mass Shooting Incidents, 1973-2022**



Note: The dotted line is a linear trendline. A linear trendline is a straight line that captures the overall pattern of the individual data points. When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right. When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

**Figure 2. Annual Trends in High-Fatality Mass Shooting Fatalities, 1973-2022**



Note: The dotted line is a linear trendline. A linear trendline is a straight line that captures the overall pattern of the individual data points. When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right. When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Figure 3. Annual Trends in Mass Public Shooting Incidents, 1973-2022**



Note: The dotted line is a linear trendline. A linear trendline is a straight line that captures the overall pattern of the individual data points. When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right. When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

**Figure 4. Annual Trends in Mass Public Shooting Fatalities, 1973-2022**



Note: The dotted line is a linear trendline. A linear trendline is a straight line that captures the overall pattern of the individual data points. When there is a positive relationship between the x-axis and y-axis variables, the trendline moves upwards from left to right. When there is a negative relationship between the x-axis and y-axis variables, the trendline moves downwards from left to right.

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**B.    The Use of Assault Weapons Is a Major Factor in the Rise of Mass Shooting Violence**

12.    In addition to showing that the frequency and lethality of mass shootings are on the rise nationally, the data point to another striking pattern: the use of assault weapons in the commission of mass shootings has grown in vast proportions. In both high-fatality mass shootings and mass public shootings, assault weapons have been used with increased frequency. As shown in Figures 5 and 6, the pattern is particularly marked of late, with at least half of high-fatality mass shooting incidents and mass public shooting incidents in the last five years involving assault weapons. A similar, albeit more pronounced, pattern is found when examining fatalities in the last five years, with approximately 6-in-10 high-fatality mass shooting deaths and mass public shooting deaths resulting from incidents involving assault weapons, as shown in Figures 7 and 8. These trends clearly demonstrate that, among mass shooters, there is a growing preference for using assault weapons to perpetrate their attacks.

**Figure 5. Share of High-Fatality Mass Shootings Involving Assault Weapons**



Note: The calculations in Fig. 5 exclude two high-fatality mass shootings (3/15/2020, Moncure, NC, 6 deaths; and 9/7/2020, Aguanga, CA, 7 deaths) in which the firearms used are unknown.

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

9

**Figure 6. Share of Mass Public Shootings Involving Assault Weapons**



Note: The calculations in Fig. 6 exclude one mass public shooting (2/6/17, Yazoo City, MS, 4 deaths) in which the firearms used are unknown.

**Figure 7. Share of High-Fatality Mass Shooting Deaths Resulting from Incidents Involving Assault Weapons**



Note: The calculations in Fig. 7 exclude two high-fatality mass shootings (3/15/2020, Moncure, NC, 6 deaths; and 9/7/2020, Aguanga, CA, 7 deaths) in which the firearms used are unknown.

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744



**Figure 8. Share of Mass Public Shooting Deaths Resulting from Incidents Involving Assault Weapons**



Note: The calculations in Fig. 8 exclude one mass public shooting (2/6/17, Yazoo City, MS, 4 deaths) in which the firearms used are unknown.

13.     The growing use of assault weapons to carry out mass shootings is an obvious theme reflected in the data. The *disproportionate* resort to assault weapons by perpetrators of mass shootings is another clear theme. The National Sport Shooting Foundation (NSSF) estimates that there are approximately 24.4 million "modern sporting rifles"—which is a firearm industry term for AR-15-platform and AK-47-platform firearms— in civilian hands as of the end of 2020.[5] Based on federal government data, it appears that modern sporting rifles make up approximately 5.3% of all firearms in circulation in American society (24.4 million out of an estimated 461.9 million firearms).[6] And, in all likelihood, the NSSF's estimate of 24.4 million

---

[5] NSSF, *Commonly Owned: NSSF Announces over 24 Million MSRs in Circulation*, July 20, 2022, *available at* https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation (last accessed January 3, 2023).

[6] The 5.3% ownership rate for modern sporting rifles was calculated using NSSF and Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) data. The NSSF estimates that there are approximately 24.4 million modern sporting rifles in civilian hands as of the end of 2020 (when the most recent data is available). In a 2020 report that captured data through the end of 2018, the NSSF estimated that there were 433.9 million total firearms in civilian circulation. NSSF, *Industry Intelligence Reports: Firearm Production in the United States with Firearm Import and Export Data, 2020*, at 18, *available at* https://www.nssf.org/wp-content/uploads/2020/11/IIR-2020-Firearms-Production-v14.pdf (last accessed January 3, 2023). According to ATF data, in 2019 and 2020, an

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    modern sporting rifles is an over-estimation because it appears to include firearms in the

2    possession of domestic law enforcement agencies and firearm retailers (as well as possibly

3    prohibited owners).[7] But, even using this estimate, if assault weapons were used in proportion to

4    the percentage of modern sporting rifles in circulation, approximately 5% of all mass shootings

5    would involve assault weapons. However, as seen in Figures 5-6 above, civilian ownership rates

6    and mass-shooter use rates are not similar. Indeed, the current difference is approximately ten-

7    fold, with the rate at which assault weapons are now used to commit mass murder far outpacing

8    the rate at which modern sporting rifles circulate amongst civilians in the United States.

9         14.    Another pattern that stands out when examining the relationship between assault

10   weapons use and mass shooting violence reflects the disproportionately greater lethality

11   associated with the use of assault weapons. For instance, returning to the aforementioned list of

12   the seven deadliest individual acts of intentional criminal violence in the United States since the

13   coordinated terrorist attack of September 11, 2001, besides all seven of the incidents being mass

14   shootings, six of the seven incidents (86%) involved assault weapons, as shown in Table 2. When

15   mass shooting fatalities are examined on a rising scale, the relationship between assault weapons

16   use and higher death tolls is striking. In the past 50 years, assault weapons have been used in

17   28% of all high-fatality mass shootings and mass public shootings. However, as the fatality

18   threshold of such incidents increase, so too does the share of incidents involving assault weapons.

19   For instance, assault weapons were used in 80% of all mass public shootings resulting in more

20   than 24 deaths and 100% of all high-fatality mass shootings resulting in more than 40 deaths

21

22

---

23   additional 28.0 million firearms entered the civilian stock nationwide. ATF, *National Firearms Commerce and
     Trafficking Assessment: Firearms in Commerce, 2022*, at 181, 188, 193, *available at*

24   https://www.atf.gov/firearms/docs/report/national-firearms-commerce-and-trafficking-assessment-firearms-
     commerce-volume/download (last accessed January 3, 2023). Assuming these figures reported by the NSSF and the

25   ATF are accurate, this brings the estimated number of firearms in civilian circulation through the end of 2020 to
     approximately 461.9 million. The ownership rate is calculated as follows: 24.4 million modern sporting rifles

26   divided by 461.9 million total firearms equals 5.3%.
          [7] ATF, 2022, *supra* note 6, at 12; NSSF, 2020, *supra* note 6, at 2-3.

(Figures 9-10). As the data show, there is an association between assault weapons use and mass shooting lethality.

**Table 2. The Use of Assault Weapons in the Deadliest Acts of Intentional Criminal Violence in the U.S. since 9/11**

| Deaths | Date | Location | Involved Assault Weapon(s) |
|--------|------|----------|---------------------------|
| 60 | October 1, 2017 | Las Vegas, NV | ✓ (AR-15) |
| 49 | June 12, 2016 | Orlando, FL | ✓ (AR-15) |
| 32 | April 16, 2007 | Blacksburg, VA | |
| 27 | December 14, 2012 | Newtown, CT | ✓ (AR-15) |
| 25 | November 5, 2017 | Sutherland Springs, TX | ✓ (AR-15) |
| 23 | August 3, 2019 | El Paso, TX | ✓ (AK-47) |
| 21 | May 24, 2022 | Uvalde, TX | ✓ (AR-15) |

**Figure 9. Percentage of High-Fatality Mass Shootings Involving Assault Weapons by Fatality Threshold, 1973-2022**



Note: The calculations in Fig. 9 exclude two high-fatality mass shootings (3/15/2020, Moncure, NC, 6 deaths; and 9/7/2020, Aguanga, CA, 7 deaths) in which the firearms used are unknown.

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744



**Figure 10. Percentage of Mass Public Shootings Involving Assault Weapons by Fatality Threshold, 1973-2022**



Note: The calculations in Fig. 10 exclude one mass public shooting (2/6/17, Yazoo City, MS, 4 deaths) in which the firearms used are unknown.

15.     Of the 134 high-fatality mass shootings in that last 50 years in which the type of firearm used is known, 38 involved assault weapons, resulting in 491 deaths. The average death toll for these 38 incidents is 12.9 fatalities per shooting. By contrast, the average death toll for the 96 incidents in which it is known assault weapons were not used (which resulted in 749 fatalities) is 7.8 fatalities per shooting (Table 3). Of the 174 mass public shootings in that last 50 years in which the type of firearm used is known, 48 involved assault weapons, resulting in 496 deaths. The average death toll for these 48 incidents is 10.3 fatalities per shooting. By contrast, the average death toll for the 126 incidents in which it is known assault weapons were not used (which resulted in 759 fatalities) is 6.0 fatalities per shooting (Table 4). In other words, in the last 50 years, the use of assault weapons in high-fatality mass shootings and mass public shootings has resulted, respectively, in 65% and 72% increases in average fatalities per incident (Tables 3 and 4). In the last 10 years, the differences in average fatality rates per incident are even more pronounced—more than double: 8.0 versus 16.7 deaths per high-fatality mass

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

shooting and 6.2 versus 12.8 deaths per mass public shooting. These amount, respectively, to 109% and 106% increases in the average death tolls, associated with the use of assault weapons (Tables 3 and 4).

16.     This review of the data suggests that assault weapons are force multipliers when used to perpetrate mass shootings.

**Table 3. The Average Death Tolls Associated with the Use of Assault Weapons in High-Fatality Mass Shootings in the U.S., 1973-2022**

|  | Average Death Toll for Incidents That Did Not Involve the Use of Assault Weapons | Average Death Toll for Incidents That Did Involve the Use of Assault Weapons | Percent Increase in Average Death Toll Associated with the Use of Assault Weapons |
|---|---|---|---|
| **Last 50 Years** | 7.8 Deaths | 12.9 Deaths | 65% |
| **Last 10 Years** | 8.0 Deaths | 16.7 Deaths | 109% |

Note: The calculations in Table 3 exclude two high-fatality mass shootings (3/15/2020, Moncure, NC, 6 deaths; and 9/7/2020, Aguanga, CA, 7 deaths) in which the types of firearms used are unknown.

**Table 4. The Average Death Tolls Associated with the Use of Assault Weapons in Mass Public Shootings in the U.S., 1973-2022**

|  | Average Death Toll for Incidents That Did Not Involve the Use of Assault Weapons | Average Death Toll for Incidents That Did Involve the Use of Assault Weapons | Percent Increase in Average Death Toll Associated with the Use of Assault Weapons |
|---|---|---|---|
| **Last 50 Years** | 6.0 Deaths | 10.3 Deaths | 72% |
| **Last 10 Years** | 6.2 Deaths | 12.8 Deaths | 106% |

Note: The calculations in Table 4 exclude one mass public shooting (2/6/17, Yazoo City, MS, 4 deaths) in which the types of firearms used are unknown.

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

2

**C.      Double-Digit-Fatality Mass Shootings Are a Post-World War II Phenomenon in American History And They Often Involve Assault Weapons**

3

4      17.      I have also examined the historical occurrence and distribution of mass shootings resulting in 10 or more victims killed since 1776 (Table 5 and Figure 11).[8] In terms of the origins of this form of extreme gun violence, there is no known occurrence of a mass shooting resulting in double-digit fatalities during the 173-year period between the nation's founding in 1776 and 1948. The first known mass shooting resulting in 10 or more deaths occurred in 1949. In other words, for 70% of its 247-year existence as a nation, the United States did not experience a mass shooting resulting in double-digit fatalities, making them relatively modern phenomena in American history.[9]

5

6

7

8

9

10

11      18.      After the first such incident in 1949, 17 years passed until a similar mass shooting occurred in 1966. The third such mass shooting then occurred nine years later, in 1975. And the fourth such incident occurred seven years after, in 1982. Basically, the first few mass shootings resulting in 10 or more deaths did not occur until the post-World War II era. Furthermore, these first few double-digit-fatality incidents occurred with relative infrequency, although the temporal gap between these first four incidents shrank with each event (Table 5 and Figure 12).[10]

12

13

14

15

16

17      ///

18

19

20

21

22      [8] I searched for firearm-related "murders," using variations of the term, setting a minimum fatality threshold of 10 in the Newspaper Archive online newspaper repository, *available at* www.newspaperarchive.com (last accessed October 2, 2022). The Newspaper Archive contains local and major metropolitan newspapers dating back to 1607. Consistent with other analyses on mass murder, incidents of large-scale, inter-group violence such as mob violence, rioting, combat or battle skirmishes, and attacks initiated by authorities acting in their official capacity were excluded.

23

24

25      [9] Using the Constitution's effective date of 1789 as the starting point would lead to the conclusion that, for 68% of its 234-year existence as a nation, the United States did not experience a mass shooting resulting in double-digit fatalities.

26      [10] Figures 11–12 are reproduced in larger form as **Exhibit D** of this Declaration.

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Table 5. Mass Shootings Resulting in Double-Digit Fatalities in American History (1776-2022)**

| | Date | Location | Deaths | Involved Assault Weapon(s) | Involved Large-Capacity Magazine(s) |
|---|---|---|---|---|---|
| 1 | 9/6/1949 | Camden, NE | 13 | N | N |
| 2 | 8/1/1966 | Austin, TX | 14 | N | Y |
| 3 | 3/30/1975 | Hamilton, OH | 11 | N | N |
| 4 | 9/25/1982 | Wilkes-Barre, PA | 13 | Y | Y |
| 5 | 2/18/1983 | Seattle, WA | 13 | N | N |
| 6 | 4/15/1984 | Brooklyn, NY | 10 | N | N |
| 7 | 7/18/1984 | San Ysidro, CA | 21 | Y | Y |
| 8 | 8/20/1986 | Edmond, OK | 14 | N | N |
| 9 | 10/16/1991 | Killeen, TX | 23 | N | Y |
| 10 | 4/20/1999 | Littleton, CO | 13 | Y | Y |
| 11 | 4/16/2007 | Blacksburg, VA | 32 | N | Y |
| 12 | 3/10/2009 | Geneva County, AL | 10 | Y | Y |
| 13 | 4/3/2009 | Binghamton, NY | 13 | N | Y |
| 14 | 11/5/2009 | Fort Hood, TX | 13 | N | Y |
| 15 | 7/20/2012 | Aurora, CO | 12 | Y | Y |
| 16 | 12/14/2012 | Newtown, CT | 27 | Y | Y |
| 17 | 9/16/2013 | Washington, DC | 12 | N | N |
| 18 | 12/2/2015 | San Bernardino, CA | 14 | Y | Y |
| 19 | 6/12/2016 | Orlando, FL | 49 | Y | Y |
| 20 | 10/1/2017 | Las Vegas, NV | 60 | Y | Y |
| 21 | 11/5/2017 | Sutherland Springs, TX | 25 | Y | Y |
| 22 | 2/14/2018 | Parkland, FL | 17 | Y | Y |
| 23 | 5/18/2018 | Santa Fe | 10 | N | N |
| 24 | 10/27/2018 | Pittsburgh, PA | 11 | Y | Y |
| 25 | 11/7/2018 | Thousand Oaks, CA | 12 | N | Y |
| 26 | 5/31/2019 | Virginia Beach, VA | 12 | N | Y |
| 27 | 8/3/2019 | El Paso, TX | 23 | Y | Y |
| 28 | 3/22/2021 | Boulder, CO | 10 | Y | Y |
| 29 | 5/14/2022 | Buffalo, NY | 10 | Y | Y |
| 30 | 5/24/2022 | Uvalde, TX | 21 | Y | Y |

Note: Death tolls do not include perpetrators. An incident was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 federal Assault Weapons Ban; (2) the statutes of the state where the gun massacre occurred; or (3) a legal or judicial declaration issued by a state official. An incident was coded as involving a large-capacity magazine if at least one of the firearms discharged was armed with a detachable ammunition-feeding device holding more than 10 bullets.

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744



**Figure 11. Mass Shootings Resulting in Double-Digit Fatalities in American History (1776-2022)**

**Figure 12. Mass Shootings Resulting in Double-Digit Fatalities in American History (1949-2022)**

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

19.    The distribution of double-digit-fatality mass shootings changes in the early 1980s, when five such events took place in a span of just five years (Table 5 and Figure 12). This timeframe also reflects the first time that assault weapons were used to perpetrate mass shootings resulting in 10 or more deaths: the 1982 Wilkes-Barre, PA, massacre (involving an AR-15 rifle and resulting in 13 deaths) and the 1984 San Ysidro, CA, massacre (involving an Uzi pistol and resulting in 21 deaths). But this cluster of incidents was followed by a 20-year period in which only two double-digit-fatality mass shootings occurred (Figure 12). This period of time from 1987-2007 correlates with three important federal firearms measures: the 1986 Firearm Owners Protection Act, the 1989 C.F.R. "sporting use" importation restrictions, and the 1994 Federal Assault Weapons Ban.

20.    It is well-documented in the academic literature that, after the Federal Assault Weapons Ban expired in 2004, mass shooting violence increased substantially.[11] Mass shootings that resulted in 10 or more deaths were no exception, following the same pattern. In the 56 years from 1949 through 2004, there were a total of 10 mass shootings resulting in double-digit fatalities (a frequency rate of one incident every 5.6 years). In the 18 years since 2004, there have been 20 double-digit-fatality mass shootings (a frequency rate of one incident every 0.9 years). In other words, the frequency rate has increased over six-fold since the Federal Assault Weapons Ban expired (Table 5 and Figure 12). (The 1994 Federal Assault Weapons Ban and its impact on mass shooting violence is discussed in further detail in Section F of this Declaration.)

21.    Over three-quarters of mass shootings resulting in 10 or more deaths involved assault weapons and/or LCMs. As also shown in the analyses of mass shootings in Section B,

---

[11] *See*, for example, Klarevas, *Rampage Nation*, *supra* note 1 (Relevant Excerpt Attached as **Exhibit E**); Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings*, *supra* note 2 (Attached as **Exhibit F**); Charles DiMaggio, et al., *Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data*, 86 Journal of Trauma and Acute Care Surgery 11 (2019) (Attached as **Exhibit G**); Lori Post, et al., *Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis*, 7 JMIR Public Health and Surveillance (2021) (Attached as **Exhibit H**); and Philip J. Cook and John J. Donohue, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 JAMA, September 27, 2022 (Attached as **Exhibit I**).

death tolls in double-digit-fatality mass shootings are related to the use of firearms technologies like assault weapons that, in terms of mass shootings, serve as force multipliers.

**D.   Assault Weapons Are Almost Never Used by Private Citizens in Self-Defense during Active Shootings**

22.     An important question that, until now, has gone unanswered is: Are assault weapons used as frequently to stop mass shootings as they are to perpetrate them? As shown above in Section B, assault weapons have been used in approximately one-third of mass shootings in the past 25 years (Figures 5-6). And in the past five years, the share of mass shootings that have involved assault weapons has risen to approximately half (Figures 5–6).

23.     The Federal Bureau of Investigation (FBI) has been documenting active shooter incidents since 2000.[12] According to the FBI, active shootings are violent attacks that involve "one or more individuals actively engaged in killing or attempting to kill people in a populated area."[13] A simple way to conceptualize active shooter incidents is to think of them as attempted mass shootings. As part of its analysis of attempted mass shootings, the FBI identifies incidents that involved armed civilians using their personal firearms to intervene, regardless of whether the interventions were successful in stopping the attacks and/or neutralizing the perpetrator(s).

24.     In the 23 years between January 1, 2000, and December 31, 2022, the FBI has identified 456 active shootings occurring in the United States. Out of these 456 active shooter incidents, 18 incidents (3.9%) involved defensive gun uses (DGUs) by civilians, excluding law

---

[12] All of the information in this section, including definitions and data, are publicly available from the FBI. *See* FBI, *Active Shooter Safety Resources*, *available at* https://www.fbi.gov/how-we-can-help-you/safety-resources/active-shooter-safety-resources (last accessed May 4, 2023).

[13] FBI, *Active Shooter Incidents in the United States in 2022*, April 2023, at 1, *available at* https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2022-042623.pdf/view (last accessed May 4, 2023). The FBI adds, "Implicit in this definition is the shooter's use of one or more firearms. The *active* aspect of the definition inherently implies the ongoing nature of the incidents, and thus the potential for the response to affect the outcome." *Id.* (emphasis in original). In addition to the report on incidents in 2022, the FBI has published seven other reports on active shooter incidents covering the following seven time-periods: 2000-2013, 2014-2015, 2016-2017, 2018, 2019, 2020, and 2021. All of these reports are available at the FBI's Active Shooter Safety Resources website, *supra* note 12.

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364                           20                   ATTORNEY GENERAL OF WASHINGTON
                                                                         Complex Litigation Division
                                                                         800 Fifth Avenue, Suite 2000
                                                                           Seattle, WA 98104-3188
                                                                               (206) 464-7744

enforcement or armed security.[14] Of these 18 DGUs, the firearm used by an armed private citizen intervening was identifiable in 17 incidents; 14 involved handguns and the remaining three involved long guns (one shotgun, one bolt-action rifle, and one assault rifle).[15] In other words, out of the 17 incidents where an armed civilian intervened and it was possible to identify the DGU firearm, only one incident (5.9%) involved an assault weapon.[16] Within the broader context of all active shooter incidents, only one incident out of 456 in the past 23 years (0.2%) is known to have involved an armed civilian intervening with an assault weapon.[17]

25.     The bottom line is that assault weapons are used by civilians with a far greater frequency to perpetrate mass shootings than to stop mass shootings.

**E.     Ownership Rates of "Modern Sporting Rifles" in the U.S.**

26.     As noted above in Para. 13, based on the most recent, publicly-available NSSF and federal government data, modern sporting rifles—such as AR- and AK-platform firearms— appear to make up approximately 5.3% of all firearms in circulation in American society (24.4

---

[14] In 17 of the 18 DGU-involved active shooter incidents, there was an exchange of gunfire. For the one incident that did not involve an exchange of gunfire, the gun (a handgun) was used to detain the active shooter after the shooting had ceased. FBI, *supra* notes 12 and 13.

[15] All 14 DGU incidents that involved handguns also involved armed civilians who held valid concealed-carry permits or were legally carrying their handguns. *Id.* In 12 of these 14 incidents, details about the types of handguns used in self-defense were available in news media accounts or in news media photographs from the crime scene. In two of the 14 incidents, the use of concealed handguns was inferred based on details about the shooting reported in news media accounts. There is no evidence that either of these two DGU incidents involved an assault pistol.

[16] The FBI also identifies an incident in which an armed individual (a local firefighter) subdued and detained a school shooter, but there is no evidence that the armed firefighter drew his handgun during the incident. *Id.* Moreover, local authorities have refused to comment on whether the firefighter ever drew his handgun. *See* Carla Field, *Firefighter Was Armed During Takedown of Shooting Suspect, Sheriff Says*, WYFF, October 3, 2016, *available at* https://www.wyff4.com/article/firefighter-was-armed-during-takedown-of-shooting-suspect-sheriff-says/7147424 (last accessed January 3, 2023). Adding this incident to the 17 DGU-involved incidents where the type of firearm was identifiable would mean that 5.6% (as opposed to 5.9%) of the active shooter incidents, where an armed civilian intervened, involved an assault weapon.

[17] FBI, *supra* notes 12 and 13. The one DGU that involved an assault weapon was the 2017 church massacre in Sutherland Springs, Texas. In that incident, an armed private citizen used an AR-15-style assault rifle to wound the perpetrator as he was attempting to flee the scene. While the perpetrator was still able to flee the scene despite being shot, minutes later, he crashed his vehicle trying to escape and then took his life with his own firearm before law enforcement could apprehend him. *See* Adam Roberts, *Man Who Shot Texas Gunman Shares His Story*, KHBS/KHOG, November 7, 2017, *available at* https://www.4029tv.com/article/man-who-shot-texas-church-gunman-shares-his-story/13437943 (last accessed January 3, 2023).

---

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

million out of an estimated 461.9 million firearms), although this likely includes modern sporting rifles possessed by law enforcement agencies, firearm retailers, and possibly prohibited possessors (e.g., criminals).[18] Furthermore, in its most recent survey data (2022), the NSSF found that civilian owners of modern sporting rifles own, on average, 3.8 such rifles, with 24% of these owners possessing only one such rifle.[19] Based on this data, only 6.4 million gun owners—out

---

[18] In addition to the NSSF's estimate that there are 24.4 million modern sporting rifles in civilian circulation in the United States as of the end of 2020, the Plaintiffs draw on a survey conducted by William English to support their estimates about the number of AR-15-style rifles in American society. Plaintiffs' Motion for Preliminary Injunction, *Hartford, et al. v. Ferguson, et al.*, 3:23-cv-05364-RJB (W.D. Wash.), Dkt. # 10 at p. 9, citing William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Unpublished Paper (May 13, 2022; Revised September 22, 2022), *available at* https://papers.ssrn.com/sol3/cf_dev/AbsByAuth.cfm?per_id=4283305 (last accessed March 7, 2023). According to English, "about 24.6 million people" have owned "an AR-15 or similar styled rifle." However, in calculating his estimated ownership rates, English notes that "*we disregard the 0.3%* that indicate owning over 100" AR-15 styled rifles. Assuming English correctly estimates that 24.6 million people have owned an AR-15 or similarly styled rifle, his survey found that approximately 74,000 people own over 100 such rifles. Moreover, English also reports that 1.3% of all AR-15 style rifle owners (approximately 320,000 people) own between 11 and 100 such rifles. Even if, for the sake of argument, these 74,000 people all owned only 101 AR-15s and these additional 320,000 people all owned 11 AR-15s—the lowest possible number in the range that they identified as best capturing the number of AR-15 styled rifles they own—that would mean that, *at the very least, approximately 11 million AR-15 styled rifles are concentrated in the hands of 1.6% of AR-15 owners*. As a reminder, 11 million AR-15 style rifles is a conservative estimate calculated using the absolute minimum numbers in the reported ranges of 11-to-100 and 101-or-more. While the English survey is discussed in an unpublished academic paper that is publicly available online, there are significant concerns with the study, which call into question all of the findings reported in the paper. For instance, English does not cite any scholarship or authority that advises analysts to exclude certain respondents due to the magnitude of their scaled responses. English also does not explain who "we" refers to in his paper, when stating that data exclusions were made. But a natural set of questions follows. Was the decision to exclude certain people and their responses from the analysis made by a group of people? If so, who were the people involved? And what criteria did they use to determine what got included and what got excluded? None of the answers to these questions can be answered from the publicly available paper relating to the survey. Arguably, the biggest problem with the English survey (as reported in the unpublished paper) is that it appears to be in serious violation of the Code of Professional Ethics and Practices of the American Association for Public Opinion Research (AAPOR). *See* "AAPOR Code of Professional Ethics and Practices," April 2021 (Attached as **Exhibit J**). Among the ways that the English survey seemingly runs afoul of AAPOR canons, it fails to identify the source of sponsorship funding and it fails to fully disclose the measurement tools (Rules III.A.2-3). The former is vital to assuring that the survey was not designed and conducted to further the political or economic interests of particular people or organizations. The latter allows independent observers and researchers to assess if, among other factors, question order, question wording, or answer options biased responses. The latter is also crucial to assuring that select findings were not suppressed because they would, if publicized, undermine the agenda of the survey's sponsor(s). Without release of the entire questionnaire and the full results, it cannot be confirmed that questions and corresponding responses were not suppressed.

[19] NSSF, *Modern Sporting Rifle: Ownership, Usage and Attitudes Toward AR- and AK-Platform Modern Sporting Rifles*, Comprehensive Consumer Report, 2022, at 12, *available at* https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-Report.pdf (last accessed January 16, 2023). While the NSSF, unlike the English survey, does not report whether respondents in its surveys of modern sporting rifle owners happen to own more than 10, let alone more than 100, modern sporting rifles, NSSF has detected a growing trend toward increased ownership of multiple modern sporting rifles. For instance, in its 2010

---

1    of an estimated 81 million Americans who own at least one personal firearm—own modern

2    sporting rifles.[20] In other words, less than 8% of all civilian gun owners in the United States own

3    modern sporting rifles.[21] In terms of the total population of the United States, estimated by the

4    Census Bureau to be approximately 333 million people in 2022, less than 2% of all Americans

5    own a modern sporting rifle.[22]

6         27.     In deriving its estimates, the NSSF often relies on United States government data,

7    particularly ATF data.[23] According to the ATF, from 1986 through 2020 (which reflects the most

8    currently-available data), the civilian stock of firearms in the United States has been made up

9    predominantly of handguns.[24] As Figure 13 shows, handguns account for 50% of the civilian

10   stock of firearms, rifles account for 33%, and shotguns account for 17%.

11

12   survey, it found that 40% of modern sporting rifle owners owned only 1 modern sporting rifle and 60% owned
     multiple modern sporting rifles, with the average number of modern sporting rifles owned being 2.6. In its 2013

13   survey, it found that 35% of modern sporting rifle owners owned only 1 modern sporting rifle and 65% owned
     multiple modern sporting rifles, with the average number of modern sporting rifles owned increasing to 3.1. In its

14   most recent, 2021 survey, the NSSF found that 24% of modern sporting rifle owners owned only 1 modern sporting
     rifle and 76% owned multiple modern sporting rifles, with the average number of modern sporting rifles owned

15   increasing yet again to 3.8. This speaks to a growing trend in which modern sporting rifles are being purchased by
     gun owners who already own an modern sporting rifle, resulting in modern sporting rifles being concentrated,

16   relatively speaking, in the hands of those who already own modern sporting rifles. *Id.*
         [20] The estimate that approximately 6.4 million gun owners possess what the NSSF considers to be modern

17   sporting rifles is calculated by dividing the 3.8 average number of such rifles that each modern sporting rifle owner
     possesses into the 24.4 million such rifles estimated to be in civilian circulation. This calculation (24.4 million

18   divided by 3.8) equals 6.4 million. Based on survey data, 81 million American adults are estimated to own guns.
     Andy Nguyen, *Proposed Assault Weapons Ban Won't Turn Gun Owners into Felons Overnight*, PolitiFact, The
     Poynter Institute, August 3, 2022, *available at* https://www.politifact.com/factchecks/2022/aug/03/instagram-

19   posts/proposed-assault-weapons-ban-wont-turn-gun-owners- (last accessed January 16, 2023).
         [21] The finding that less than 8% of all gun owners possess modern sporting rifles is calculated by dividing

20   the 6.4 million modern sporting rifle owners by the 81 million American adults estimated to be gun owners. Taking
     6.4 million and dividing it by 81 million equals 7.9%.

21       [22] The Census Bureau's total population estimate for 2022 is 333,287,557 persons. U.S. Census Bureau,
     *Growth in U.S. Population Shows Early Indication of Recovery Amid COVID-19 Pandemic* (December 22, 2022),

22   *available at* https://www.census.gov/newsroom/press-releases/2022/2022-population-
     estimates.html#:~:text=DEC.,components%20of%20change%20released%20today (last accessed January 16,

23   2023). The finding that less than 2% of all Americans possess modern sporting rifles is calculated by dividing the
     6.4 million modern sporting rifle owners by the 333 million persons in United States. Taking 6.4 million and

24   dividing it by 333 million equals 1.9%.
         [23] NSSF, 2020, *supra* note 6.

25       [24] For data on the number of firearms manufactured, imported, and exported, by category of firearm, from
     2000-2020, *see* ATF, *supra* note 6. For similar data covering 1986-1999, *see* ATF, *Firearms Commerce in the*

26   *United States: Annual Statistical Update, 2021*, *available at* https://www.atf.gov/firearms/docs/report/2021-
     firearms-commerce-report/download (last accessed January 16, 2023).

DECLARATION OF LOUIS KLAREVAS,
PHD
NO. 3:23-cv-05364          23          ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

28.     According to ATF data, handguns are the most common firearms in civilian circulation; not rifles, and most certainly not modern sporting rifles that qualify as assault weapons.

**Figure 13. Share of Firearms in Civilian Circulation in the United States, 1986-2020**



**F.     Restrictions on Assault Weapons and LCMs Reduce the Incidence of Gun Massacres, Resulting in Lives Saved**

**F.1.     Bans in Theory**

29.     As conceptualized in the Trinity of Violence model that I developed in my book on mass shootings, every act of violence involves three elements: a perpetrator, a weapon, and a target (Figure 14).[25] The key to mitigating violence is to "break the trinity" by hindering at least one of the three elements. This is accomplished by dissuading the potential offender(s), denying the potential instrument(s) of violence, or defending the potential victim(s).[26]

---

[25] Klarevas, *supra* note 1, at 27–29, 229–238.
[26] *Id.*

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Figure 14. The Trinity of Violence**



30.     Bans are law-based concepts that prohibit certain behaviors by criminalizing them.[27] Bans on assault weapons generally make it illegal to manufacture, import, transfer, own, or possess certain firearms. Bans work in relation to two of the three elements of the Trinity of Violence: dissuasion and denial. With regard to perpetrators, bans use the threat of criminal penalty to *deter potential offenders* from engaging in the prohibited behavior. In the case of bans on assault weapons, they threaten conviction, imprisonment, and/or fines should an individual manufacture, import, transfer, or possess a prohibited assault weapon. One mechanism at work here centers around dissuading potential shooters from trying to build or otherwise acquire banned firearm technologies. But another mechanism at work focuses on the assault weapon itself: *deprive potential instruments of violence*. Knowing that someone who is willing to commit murder might not be deterred from violating another criminal law, like possessing a prohibited item, bans on assault weapons also threaten punishment against anyone who tries to transfer (through sale, gift, or loan) a restricted item to someone who is prohibited from acquiring it. In essence, the former strategy seeks to dissuade the offenders and the latter strategy seeks to deny the instruments of violence.

---

[27] Philip J. Cook, *Research in Criminal Deterrence: Laying the Groundwork for the Second Decade*, 2 *Crime and Justice* 211 (1980); and Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 *Crime and Justice* 199 (2013).

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

31.     Ideally, someone intent on committing a mass shooting with an assault weapon would be dissuaded from going on a rampage by the fact that their means of choice are not available. In such a scenario, the attack would be quashed. This *suppression effect* is akin to what economists and psychologists refer to as a positive spillover effect, where one desirable outcome produces a second, loosely-related desirable outcome.[28] A real-world example of this is the so-called "Matrix Killings," where a 19-year-old Virginia man blamed *The Matrix* film for driving him to murder his parents with a shotgun. At the time of the crime in 2003, the Federal Assault Weapons Ban was in effect, preventing him from obtaining an assault rifle. In a 2013 jailhouse interview, he told CNN, "If I had an assault weapon, things would have been much worse." He added that had he had an AR-15 instead of a shotgun, he is positive that, after killing his parents, he would have gone on a rampage and "killed as many people as I possibly could." As he noted, "because I didn't have an assault weapon, that didn't happen."[29] In this case, the unavailability of an assault weapon due to the federal ban appears to have suppressed the perpetrator's impulse to commit a mass shooting.

32.     Of course, some potential mass shooters will not be discouraged from going on a killing spree just because their means of choice are unavailable. They will instead replace their desired instruments of violence with available alternatives. This is commonly referred to as the *substitution effect*, wherein an act of violence is still perpetrated, but with a different, less lethal instrument of violence.[30] A real-world example of the substitution effect at work is the 2019 synagogue rampage in Poway, California. In that attack, the gunman appears to have been unable

---

[28] Paul Dolan and Mateo M. Galizzi, *Like Ripples on a Pond: Behavioral Spillovers and Their Implications for Research and Policy*, 47 *Journal of Economic Psychology* 1 (2015); K. Jane Muir and Jessica Keim-Malpass, *Analyzing the Concept of Spillover Effects for Expanded Inclusion in Health Economics Research*, 9 *Journal of Comparative Effectiveness Research* 755 (2020).

[29] *Inside the Mind of a Killer*, CNN (Transcripts), August 23, 2013, *available at* https://transcripts.cnn.com/show/pmt/date/2013-08-23/segment/01 (last accessed January 24, 2023).

[30] Philip J. Cook, *The Effect of Gun Availability on Violent Crime Patterns*, 455 *Annals of the American Academy of Political and Social Science* 63 (1981); Anthony A. Braga, et al., *Firearm Instrumentality: Do Guns Make Violent Situations More Lethal?*, 4 *Annual Review of Criminology* 147 (2021), https://www.annualreviews.org/doi/abs/10.1146/annurev-criminol-061020-021528.

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

to acquire an assault rifle and LCMs due to California's ban on both. Instead, he acquired what is known as a California-compliant semiautomatic rifle (which lacked features such as a pistol grip and a forward hand grip) and 10-round magazines. As a result, the gunman quickly ran out of bullets, and while pausing to reload—which appears to have been extremely difficult given that he did not have assault weapon features on his rifle that facilitated fast reloading—a congregant chased him away, preventing him from continuing his attack.[31] In this incident, which resulted in one death, California's ban on assault weapons and LCMs worked exactly as intended. It deprived the active shooter of the mechanisms that might have allowed him to kill enough people to surpass the fatality threshold of a mass shooting. Stated differently, if you examine data sets that identify shootings resulting in mass murder, you will not find the Poway synagogue attack on their lists.

33.     It might seem perverse to think that restrictions on certain instruments of violence operate on the premise that, if an act of violence cannot be averted, then it will proceed with an alternative instrument. Nevertheless, this is exactly how bans on assault weapons work in theory. They suppress the inclinations of potential mass shooters to go on killing rampages in the first place because their means of choice are unavailable. And, should deterrence fail, bans force perpetrators to substitute less lethal instruments for more dangerous, prohibited ones, reducing the casualty tolls of attacks when they do occur.

F.2.     Bans in Practice

34.     In light of the growing threat posed by mass shootings, legislatures have enacted restrictions on assault weapons in an effort to reduce the occurrence and lethality of such acts of firearm violence. Prominent among these measures was the 1994 Federal Assault Weapons Ban. In September 1994, moved to action by high-profile shooting rampages that occurred the

---

[31] Elliot Spagat and Julie Watson, *Synagogue Shooter Struggled with Gun, Fled with 50 Bullets*, Associated Press, April 30, 2019, *available at* https://apnews.com/article/shootings-north-america-us-news-ap-top-news-ca-state-wire-8417378d6b934a8f94e1ea63fd7c0aea (last accessed January 24, 2023).

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364                          27          ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

previous year at a San Francisco law firm and on a Long Island Rail Road commuter train, the U.S. Congress enacted a ban on assault weapons (as well as LCMs) that applied to all 50 states plus the District of Columbia, bringing the entire country under the ban.[32]

35.     Like the state bans on assault weapons that were implemented before it, the federal ban was aimed primarily at reducing mass shooting violence—an objective the ban sought to achieve by prohibiting the manufacture, importation, possession, and transfer of assault weapons and LCMs not legally owned by civilians prior to the date of the law's effect (September 13, 1994).[33] Congress, however, inserted a sunset provision in the law which allowed the federal ban to expire in exactly 10 years, if it was not renewed beforehand. As Congress ultimately chose not to renew the law, the federal ban expired on September 13, 2004. In the aftermath of the federal ban's expiration, mass shooting violence in the United States increased substantially.[34]

36.   The legislative intent of the State of Washington in enacting the laws being challenged in the present case is similar to that of other legislative bodies that have restricted assault weapons: reducing gun violence, especially the frequency and lethality of mass shootings. Because, on average, the use of assault weapons results in higher death tolls in mass shootings, the rationale for imposing restrictions on assault weapons is to reduce the loss of life associated with the increased kill potential of such firearm technologies.

37.     Currently, 32% of the U.S. population is subject to a ban on both assault weapons. The following is a list of the 11 state-level jurisdictions that presently restrict both assault weapons and LCMs: California (January 1, 1990); New Jersey (September 1, 1990); Hawaii

---

[32] Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (codified as former 18 U.S.C. § 922(v), (w)(1) (1994)).

[33] Christopher Ingraham, *The Real Reason Congress Banned Assault Weapons in 1994—and Why It Worked*, Washington Post, February 22, 2018, *available at* https://www.washingtonpost.com/news/wonk/wp/2018/02/22/the-real-reason-congress-banned-assault-weapons-in-1994-and-why-it-worked (last accessed January 2, 2023).

[34] *See* sources cited *supra* note 11.

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364                                                     28                    ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  (July 1, 1992, assault pistols only); Connecticut (October 1, 1993); Maryland (June 1, 1994,

2  initially assault pistols but expanded to long guns October 1, 2013); Massachusetts (July 23,

3  1998); New York (November 1, 2000); the District of Columbia (March 31, 2009); Delaware

4  (June 20, 2022); Illinois (January 10, 2023); and Washington (April 25, 2023).[35] As a reminder,

5  from September 13, 1994 through September 12, 2004, the entire country was also subject to

6  federal ban on assault weapons.

7        38.    In the field of epidemiology, a common method for assessing the impact of laws

8  and policies is to measure the rate of onset of new cases of an event, comparing the rate when

9  and where the laws and policies were in effect against the rate when and where the laws and

10  policies were not in effect. This measure, known as the incidence rate, allows public health

11  experts to identify discernable differences, while accounting for variations in the population,

12  over a set period of time. Relevant to the present case, calculating incidence rates across states,

13  in a manner that captures whether or not bans on assault weapons were in effect during the period

14  of observation, allows for the assessment of the effectiveness of such bans. In addition, fatality

15  rates—the number of deaths, per population, that result from particular events across different

16  jurisdictions—also provide insights into the impact bans on assault weapons have on mass

17  shooting violence.[36]

18        39.    Since January 1, 1990, when the first state ban on assault weapons took effect,

19  through December 31, 2022, there have been 94 high-fatality mass shootings and 145 mass

20  public shootings in the United States (**Exhibits B and C**).[37] Calculating incidence and fatality

21  rates for this time-period, across jurisdictions with and without bans on assault weapons, reveals

22

23        [35] The dates in parentheses mark the effective dates on which the listed states became subject to bans on assault weapons.

24        [36] For purposes of this Declaration, incidence and fatality rates are calculated using methods and principles endorsed by the Centers for Disease Control. *See* Centers for Disease Control and Prevention, *Principles of Epidemiology in Public Health Practice: An Introduction to Applied Epidemiology and Biostatistics* (2012),

25  *available at* https://stacks.cdc.gov/view/cdc/13178 (last accessed January 3, 2023).
        [37] There were no state bans on assault weapons in effect prior to January 1, 1990. Therefore, January 1,

26  1990, is the logical starting point for an analysis of the impact of assault weapons bans.

DECLARATION OF LOUIS KLAREVAS,
PHD
NO. 3:23-cv-05364

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

that states that prohibited assault weapons experienced 46% and 16% decreases, respectively, in the high-fatality mass shooting and mass public shooting incidence rates. They also experienced 54% and 37% decreases, respectively, in the high-fatality mass shooting and mass public shooting fatality rates, regardless of the weaponry used by the mass murderers (Tables 6-7).[38]

40.     When calculations go a step further and are limited to mass shootings involving assault weapons, the difference between the two jurisdictional categories (non-ban states and ban states) is even more pronounced. In the time-period between January 1, 1990, and December 31, 2022, accounting for population, states with assault weapons bans in place experienced 59% fewer high-fatality mass shootings involving the use of assault weapons and 35% fewer mass public shootings involving the use of assault weapons. Similarly, jurisdictions with bans in effect experienced 68% fewer deaths resulting from high-fatality mass shootings perpetrated with assault weapons and 58% fewer deaths resulting from mass public shootings perpetrated with assault weapons (Tables 6-7).

41.     All of the above epidemiological calculations lead to the same conclusion: when bans on assault weapons are in effect, per capita, fewer high-fatality mass shootings occur and fewer people die in such shootings—especially incidents involving assault weapons, where the impact is most striking.

42.     The main purpose of bans on assault weapons is to restrict the availability of assault weapons. The rationale is that, if there are fewer assault weapons in circulation, then potential mass shooters will either be dissuaded from attacking or they will be forced to use less-lethal firearm technologies, resulting in fewer lives lost. The epidemiological data lend support to the policy choices of the State of Washington that seek to enhance public safety through restrictions on civilian access to certain firearms. While imposing constraints on assault weapons

---

[38] For purposes of coding, between September 13, 1994, and September 12, 2004, the federal assault weapons ban was in effect. During that 10-year period, all 50 states and the District of Columbia were under legal conditions that prohibited assault weapons. As such, the entire country is coded as being under an assault weapons ban during the timeframe that the federal assault weapons ban was in effect.

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  will not prevent every mass shooting, the data suggest that legislative efforts to restrict such

2  instruments of violence should result in lives being saved.

3  **Table 6. Incidence and Fatality Rates for High-Fatality Mass Shootings, by Whether or**
4  **Not Assault Weapons Bans Were in Effect, 1990-2022**

|  | Annual Average Population (Millions) | Total Incidents | Annual Incidents per 100 Million Population | Total Deaths | Annual Deaths per 100 Million Population |
|---|---|---|---|---|---|
| All High-Fatality Mass Shootings |  |  |  |  |  |
| Non-AW Ban States | 159.2 | 64 | 1.22 | 673 | 12.81 |
| AW Ban States | 137.1 | 30 | 0.66 | 264 | 5.84 |
| Percentage Decrease in Rate for AW Ban States |  |  | 46% |  | 54% |
| High-Fatality Mass Shootings Involving Assault Weapons |  |  |  |  |  |
| Non-AW Ban States | 159.2 | 23 | 0.44 | 333 | 6.34 |
| AW Ban States | 137.1 | 8 | 0.18 | 92 | 2.03 |
| Percentage Decrease in Rate for AW Ban States |  |  | 59% |  | 68% |

Note: Population data are from U.S. Census Bureau, "Population and Housing Unit Estimates Datasets," *available at* https://www.census.gov/programs-surveys/popest/data/data-sets.html (last accessed January 3, 2023).

///

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

31

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Table 7. Incidence and Fatality Rates for Mass Public Shootings, by Whether or Not Assault Weapons Bans Were in Effect, 1990-2022**

| | Annual Average Population (Millions) | Total Incidents | Annual Incidents per 100 Million Population | Total Deaths | Annual Deaths per 100 Million Population |
|---|---|---|---|---|---|
| All Mass Public Shootings | | | | | |
| Non-AW Ban States | 159.2 | 84 | 1.60 | 694 | 13.21 |
| AW Ban States | 137.1 | 61 | 1.35 | 375 | 8.29 |
| Percentage Decrease in Rate for AW Ban States | | | 16% | | 37% |
| Mass Public Shootings Involving Assault Weapons | | | | | |
| Non-AW Ban States | 159.2 | 27 | 0.51 | 325 | 6.19 |
| AW Ban States | 137.1 | 15 | 0.33 | 119 | 2.63 |
| Percentage Decrease in Rate for AW Ban States | | | 35% | | 58% |

Note: Population data are from U.S. Census Bureau, "Population and Housing Unit Estimates Datasets," *available at* https://www.census.gov/programs-surveys/popest/data/data-sets.html (last accessed January 3, 2023).

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED this 22nd day of May , 2023, at Nassau County,   NY        .

LOUIS KLAREVAS, PHD

DECLARATION OF LOUIS KLAREVAS, PHD
NO. 3:23-cv-05364

32

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

### DECLARATION OF SERVICE

2    I hereby declare that on this day I caused the foregoing document to be electronically

3  filed with the Clerk of the Court using the Court's CM/ECF System which will serve a copy of

4  this document upon all counsel of record.

5    DATED this 22nd day of May, 2023, at Seattle, Washington.

6

7    *s/ Andrew R. W. Hughes*
     ANDREW R.W. HUGHES, WSBA #49515
     Assistant Attorney General

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26