The Honorable Robert J. Bryan

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LAWRENCE HARTFORD; DOUGLAS MITCHELL; BRETT BASS; SPORTING SYSTEMS VANCOUVER, INC.; SECOND AMENDMENT FOUNDATION, INC.; AND FIREARMS POLICY COALITION, INC.,

Plaintiffs,

v.

BOB FERGUSON, in his official capacity as Washington State Attorney General, et al.,

Defendants.

NO. 3:23-cv-05364-RJB

DECLARATION OF BRENNAN RIVAS

I, Brennan Rivas, declare as follows:

1. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2. I have been asked by State of Washington defendants in this matter to render an opinion on the history of firearms restrictions enacted in the nineteenth century, especially as it relates to weapons deemed especially dangerous. For my work in this case, I am being compensated at a rate of $175 per hour for research, $225 per hour for writing, and $325 per hour for testimony.

3. I am an Historian and Independent Scholar. During the 2021–2022 academic year, I was the Lloyd Lewis Fellow in American History at The Newberry Library. From 2020 to 2021, I was a Bill & Rita Clements Fellow for the Study of Southwestern America within the Clements

DECLARATION OF BRENNAN RIVAS
NO. 3:23-cv-05364-RJB

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  Center for Southwest Studies at Southern Methodist University. From 2019 to 2020, I was a
2  Lecturer in American History at Texas Christian University.

3  4.   My educational background includes a Ph.D. in History from TCU, where my
4  dissertation was on the development, evolution, and enforcement of gun and weapon policy in
5  Texas from the era of Mexican independence to the 1930s.

6  5.   My expertise includes historical weapon regulations in the United States. I have
7  authored multiple publications on this topic, including peer-reviewed articles in the Southwestern
8  Historical Quarterly, and a chapter in an edited collection forthcoming by Oxford University Press;
9  in 2022, my article, *Enforcement of Public Carry Restrictions: Texas as a Case Study* (June 2022),
10 was published in the UC Davis Law Review. I am currently completing a book manuscript based
11 upon my dissertation research.

12 6.   I have provided expert witness testimony in *Miller v. Bonta*, No. 19-cv-01537
13 (S.D. Cal.); *Angelo v. District of Columbia*, No. 22-cv-01878 (D.D.C); *Duncan v. Bonta*,
14 17-cv-1017 (S.D. Cal.); Brumback v. Ferguson, No. 22-cv-03093 (E.D. Wash.); *Christian v.
15 Nigrelli*, No. 22-cv-00695 (W.D.N.Y.); *National Shooting Sports Foundation v. Jennings*,
16 No. 22-cv-01499 (D. Del.); *Hanson v. District of Columbia*, No. 22-cv-2256 (D.D.C.); *National
17 Association for Gun Rights v. Campbell*, No. 22-cv-11431 (D. Mass.); *Oregon Firearms
18 Federation, Inc. v. Kotek, Oregon*, No. 2:22-cv-01815-IM (D. Ore.); and *Jones v. Bonta*, No.
19 3:19-cv-01226-L-AHG (S.D. Cal). I am currently working on potential expert witness testimony
20 that may be provided in other jurisdictions.

21 7.   A true and correct copy of my current curriculum vitae is attached as Exhibit A.

22              **I.   SUMMARY OF OPINIONS**

23 8.   My exploration of historical weapon regulations for this case, in conjunction with
24 my ongoing research dating back to 2015, shows that Americans have a long tradition of regulating
25 weapons considered especially dangerous to the peace and safety of their communities. The
26 weapons which nineteenth-century Americans focused on were not semiautomatic firearms with

large-capacity, detachable magazines, as we are familiar with today, but newly developed or newly popular weapons that reached American consumers and were associated with unnecessary violence. Often grouped together as deadly weapons, these instruments were mainly large fighting knives and pocket-sized revolvers, but could include others like sword-canes, slung shots, and metal knuckles. Public outcry at the social cost of deadly weapons was common, and governments targeted them for regulation through taxation, public carry laws, and point-of-sale restrictions that sometimes prohibited their sale altogether. This report identifies and explains this history, focusing specifically on state laws that restricted the sale or manufacture of deadly weapons through sales bans or prohibitive taxation.

## II.   DEFINING DEADLY WEAPONS

9.   Americans living in the nineteenth century generally distinguished between two types of weapons: arms suitable for militia service or hunting, and concealable weapons associated with interpersonal violence and known as deadly weapons.[1] In the decentralized, agricultural environments that characterized early American life, hunting knives, rifles, muskets, and shotguns were important tools present in most rural homes. Men used these firearms for militia service and for the occasions when they were required to participate in local policing efforts through the *posse comitatus*; they would have much more frequently used such weapons for hunting—be it killing predatory animals, driving birds away from their crops, or hunting for meat. Rifles, muskets, and shotguns were not likely to be used in the commission of crimes, especially crimes of passion that resulted in murder or manslaughter. Those offenses were much more likely to be committed with

---

[1] There are some exceptions to this tendency, such as sales restrictions that applied to all firearms rather than just pistols, or certain sensitive place laws that prohibited all firearms in addition to deadly weapons. *See* S.B. 80, 1st Sess., at 79 (Ohio 1880), establishing a minimum age for the sale of "any air-gun, musket, rifle-gun, shot-gun, revolver, pistol, or other firearm, of any kind or description whatever, or ammunition for the same." *See also* John A. Hockaday, *et al.*, *Revised Statutes of the State of Missouri* 224, §1274 (1879) (prohibiting the carrying of "any firearms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon" at "public assemblages,"). Nonetheless, this distinction between deadly weapons and militia or hunting weapons was foundational to nineteenth-century regulatory policies.

DECLARATION OF BRENNAN RIVAS
NO. 3:23-cv-05364-RJB

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  bare hands, blunt instruments, or other types of weapons such as concealable knives and pistols.[2]

2  10. As rates of homicide, violence, and crime rose in tandem with developments in weapon technology during the nineteenth century, American people across the country turned to weapon regulations as a solution. These regulations tended to focus upon readily concealable "deadly weapons" like knives and pistols, because those were the weapons associated with lawless interpersonal violence, rather than the firearms used for militia and hunting purposes. Deadly weapons were associated with crime and needless bloodshed, and the people habitually carrying them were presumed to be ruffians, burglars, and assassins—those ready to settle personal difficulties with blood rather than by reason and law. Some states listed and defined deadly weapons by code or statute. For example, an 1892 edition of the Mississippi Penal Code carried forward a public carry law from 1888 as Sec. 1026, entitled "Deadly weapons; carrying of concealed."[3] Other states defined deadly weapons by their suitability for concealment; in fact, deadly weapons were often referred to as "concealed weapons" for the straightforward reason that they were designed to be carried concealed.[4] Article 47, Chapter 25 of the Oklahoma Territory Penal Code, for instance, was titled "Concealed Weapons" and its first two sections enumerated "prohibited weapons" that were not to be carried upon the person or concealed.[5]

11. Some of these weapons, and the regulations governing them, are discussed below.

### III.  LARGE KNIVES

12. Prior to the widespread availability of revolvers near the mid-nineteenth century, large knives were considered the most dangerous weapon around. There were so many different

---

[2] Guns were used in less than half of the murders of unrelated adults, and less than ten percent of marital murders during the seventeenth and eighteenth centuries. *See* Randolph Roth, *American Homicide* 115 (2009).

[3] R. H. Thompson, et al, *Annotated Code of the General Statute Laws of the State of Mississippi* 326, § 1026 (1892).

[4] For example, *see What They Think of It: The State Press on the Carrying of Concealed Weapons*, Daily Constitution (Atlanta, Georgia), April 11, 1879, at 4; and *Concealed Weapons: What Is Thought of the Practice by the Press of the State*, Daily Constitution (Atlanta, Georgia), March 27, 1879, at 1. The articles quote numerous other newspapers from Georgia which condemn carrying deadly weapons in terms that associate going armed and carrying deadly weapons with the habit of carrying concealed weapons.

[5] Concealed Weapons, 1890 Okla. Sess. Laws, ch. 25, art. 47, §§ 1–2, at 412.

DECLARATION OF BRENNAN RIVAS  
NO. 3:23-cv-05364-RJB

4

ATTORNEY GENERAL OF WASHINGTON  
Complex Litigation Division  
800 Fifth Avenue, Suite 2000  
Seattle, WA 98104-3188  
(206) 464-7744

styles and names of knives that Americans sometimes struggled to define them and distinguish them from one another. The "dirk knife" originated in Scotland as a knife carried into battle or for martial ornamentation by soldiers. It has come to be identified as having a straight blade.[6] "Dagger" is an older word, and generally connotes a double-edged blade. Bowie knives were often associated with long blades that curved and became double-edged near the tip. An "Arkansas toothpick," on the other hand, was more likely to be a knife that was as long as a bowie, double-edged, and sharply tapered. The narvaja was of Spanish origin and tended to refer to a large folding blade. To make matters even more complicated, these definitions might vary geographically, change over time, and were not set in stone during the nineteenth century.

13. By far the Bowie knife became the style most widely known, used, and discussed by Americans in the nineteenth century. The blade took its name from a man named Jim Bowie who was born in Kentucky in 1796 and died at the Alamo during the Texas Revolution in 1836.[7] He began carrying a large hunting knife in a leather scabbard in 1826, after an enemy tried to assassinate him in the street.[8] The following year, Bowie used it to great effect in a duel that turned into a melee and became the subject of nationwide news coverage.[9] His death at the Alamo cemented the legend of his namesake knife. As the legend spread, the Bowie knife became one of the most widely denounced deadly weapons of the antebellum nineteenth century.

14. Fighting knives were certainly not new in the 1830s, and the exact styling of the original Bowie knife remains unknown, but Bowie's life story became a vehicle for Americans to discuss and address the growing problem of knife violence. As rates of violence rose during the nineteenth century, people were more likely to carry and use large knives; the increased presence

---

[6] William B. Worthen, *Arkansas Made: A Survey of the Decorative, Mechanical, and Fine Arts Produced in Arkansas through 1950* at 267–268, Vol. 1 (2nd ed. University of Arkansas Press, 2021).
[7] William R. Williamson, *Bowie, James*, Handbook of Texas Online, Texas State Historical Association, https://www.tshaonline.org/handbook/entries/bowie-james (last accessed February 25, 2023).
[8] Clifford Hopewell, *James Bowie, Texas Fighting Man: A Biography* 25–30 (1994).
[9] *Terrible Rencontre*, Niles' Register (Baltimore, Maryland), November 17, 1827, at 182. https://archive.org/details/sim_niles-national-register_1827-11-17_33_844/page/182/mode/1up, *reprinted at* : https://chroniclingamerica.loc.gov/lccn/sn83045110/1827-10-31/ed-1/seq-2/

of knives—even if ostensibly carried for personal defense—had the regrettable consequence of exacerbating the problem.[10] This was especially notable in southern areas, where "so certain, indeed, is the bowie-knife to appear in a quarrel, that the great anxiety of a disputant in the South seems to be always to strike the first blow."[11]

15. The response on the part of Americans confronting knife-violence was the regulation of such weapons. Going back to 1801, nineteenth-century weapon restrictions regulated the presence of knives larger than a regular pocket knife in public places.[12] As homicide rates increased and the popularity of bowie knives grew, so did laws restricting bowie knives, as discussed more fully below.[13]

### IV.   POCKET PISTOLS

16. Another weapon that came to be associated with lawless violence was the "pocket pistol." Prior to the mid-nineteenth century, most of the pistols available on the American consumer market were single-shot, muzzle-loading pistols modeled after designs that appeared in the eighteenth century.[14] After being fired, they were useful only as clubs until they could be reloaded

---

[10] *See Another Victim of the Bowie Knife*, Cheraw Gazette (South Carolina), September 6, 1837, at 3, *available at* https://chroniclingamerica.loc.gov/lccn/sn88084121/1837-09-06/ed-1/seq-3/

[11] *The Bowie-Knife In the South*, San Francisco Evening Bulletin, October 18, 1861.

[12] 1801 Tenn. Laws, ch. 22, § 6 (prohibiting "privately" carrying "any dirk, large knife, pistol or any other dangerous weapon."). Similar laws existed in numerous states during the antebellum nineteenth century, including: Florida, which clearly distinguished between fighting knives and pocket knives, *see* 1846 Fla. Laws, ch. 75 ("any dirk, pistol or other arm or weapon, except a common pocket knife . . . ." *See also* 1838 Va. Acts, ch. 101 ("any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue . . ."; 1840 Ala. Laws, ch. 7 ("a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of fire arms, or air gun . . ."; 1819 Ind. Acts, ch. 23 ("any dirk pistol, sword in cane, or any other unlawful weapon . . ."); 1821 Miss. Laws, ch. 49 ("any pistols, dirk or other such offensive weapons . . ."); 1812 Ky. Acts, ch. 89 ("a pocket pistol, dirk, large knife, or sword in a cane "; 1813 La. Acts, ch. 5 ("any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon,"; *Of Proceedings to Prevent the Commission of Crime,* in THE REVISED STATUTES OF THE STATE OF WISCONSIN, Title XXXI, ch. 144, § 18, 719 (1849), ("a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon . . ."); *Of Proceedings to Prevent the Commission of Crime,* in THE REVISED STATUTES OF THE STATE OF MICHIGAN, Title II, Ch. 1, § 16 (1846) ("a dirk, dagger, sword, pistol, or other offensive and dangerous weapon . . ."). This is not an exhaustive list.

[13] As a general rule, public carry laws included knives within their purview, and some jurisdictions prohibited the sale of bowie knives as well. *See infra*, at 17–24, 29, 36–39.

[14] *Pollard's History of Firearms* 114–16 (Claude Blair, ed. 1983).

DECLARATION OF BRENNAN RIVAS
NO. 3:23-cv-05364-RJB

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

through a process that took upwards of fifteen seconds.[15] In 1836, Samuel Colt patented the design for a revolver, which ultimately became more widely used than single-shot devices or other types of repeating pistols. Still, it took until the Civil War Era for the revolver to become a commercial success and widely available to Americans. In 1857, Colt's patent expired, which opened the door for other manufacturers to produce revolvers. The rising number of pistols available for sale contributed to their growing presence in American homes and communities.

17.  Pistols both before and after the advent of the revolver tended to be produced in three sizes. The largest were called "horse," "holster," and later "army" pistols, and they descended from large handguns conducive to mounted warfare that were kept in saddle holsters. By about the 1870s, these firearms were called "army" pistols and had been scaled down somewhat in such a way that they were more conducive to being carried on the person. But in the early nineteenth century, "horse" or "holster" pistols were decidedly large and not designed to be carried on the person.[16]

18.  The second size was the "belt" or "navy" pistol, which was somewhat smaller and carried a lower caliber. These firearms were designed to be carried either on the belt (sometimes attached by a ring on the firearm), in the pocket of a greatcoat, or in a portable case. One of the main uses of these seven-to-ten-inch pistols prior to the nineteenth century was for defensive purposes while traveling.[17] The mid-sized navy revolvers produced by Colt's were one of the more successful models produced and may have been the most common type of revolver among American consumers at the start of the Civil War.

19.  The smallest size, measuring approximately five or six inches in length, was the pocket pistol. As the name suggests, these firearms were purposefully designed to be carried within

---

[15] For example, see the websites: https://timothyrjeveland.com/how-to-load-and-fire-a-musket-or-flintlock-pistol-explained-briefly-with-appropriate-jargon/; and https://www.quora.com/How-long-did-it-take-to-load-a-flintlock-pistol.
[16] *Pollard's History*, *supra* note 14 at 104, 119.
[17] *Id.* at 117–18.

the pockets of everyday attire.[18] The most famous of these was the Deringer pistol, named for its designer, Henry Deringer, and notorious as the gun used to assassinate Abraham Lincoln. Deringers (often misspelled as "Derringers") were capable of firing large calibers, which made them exceedingly lethal at close range—often more lethal than mid-sized navy revolvers.[19] Other pocket revolvers, on the other hand, carried smaller calibers and might only hold four or five shots. As the United States military demobilized after the Civil War and ceased purchasing large numbers of revolvers, the manufacturers in the business turned toward civilian sales to continue their profitability. Pocket revolvers, which could be had for a few dollars or less, were marketed heavily.[20]

20. Even though pocket pistols were less frequently the targets of popular outrage in the early nineteenth century than were large knives, they were still regulated alongside them. Small, concealable pistols lent themselves to the same violent ends as fighting knives, and it was a single-shot, muzzle-loading pocket pistol used in the assassination of Abraham Lincoln in 1865. Public carry laws generally included "pistols" within their purview, and other regulatory strategies attempted to discourage their presence in public spaces. The proliferation of pocket revolvers after the Civil War catapulted them to centerstage for regulation during the postbellum era.

## V.    SLUNG SHOTS & OTHER DEADLY WEAPONS

21. There were other deadly weapons which Americans tended to regulate in the nineteenth century. These included sword-canes and loaded canes, as well as metal knuckles (often referred to as "knucks") and slung shots. A slung shot was a makeshift weapon associated with organized crime and street gangs. Unlike a sling shot that we might think of today, a slung shot was

---

[18] *Id.* at 116–18 ("These [pocket pistols] were intended to be carried in the pocket of a person wearing normal civilian attire,").

[19] Lee A. Silva, *Henry Deringer's Popular 'Pocket Cannons' Packed a Wallop from California to Washington, D.C.*, Wild West, April 2002, at 12–13.

[20] On size, variability, and manufacture of Colt pistols, *see* Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (2021); Martin Rywell, *Colt Guns* 66–67, 84-93 (1953); R. L. Wilson, *The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present* 173 (1979).

DECLARATION OF BRENNAN RIVAS
NO. 3:23-cv-05364-RJB

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

"a shot, piece of metal, stone, etc., fastened to a strap or thong, and used as a weapon."[21] Like large knives and pocket pistols, slung shots, sword-canes, and metal knuckles were weapons associated with crime and interpersonal violence rather than militia service or communal policing.

## VI. VIOLENCE & USE OF DEADLY WEAPONS IN THE 19TH CENTURY

22. Rates of violence and homicide fluctuated during the nineteenth century, largely as a result of political and socio-economic factors. Where Americans failed to unite together based upon common interests and principles, and where they viewed governing institutions with skepticism, violence tended to rise. The southern society predicated upon racial slavery made slaveholding states more violent places than northern counterparts. Areas that were isolated from governing officials or on the fringe of Anglo-American settlement also experienced more violence than the more established parts of the country closer to the Atlantic seaboard.[22] After the Civil War, pervasive racism, rural poverty, and unrepresentative state and local governments meant that violence remained a staple of southern life. Northern cities and states were not immune from high levels of homicide and crime, either. They saw a sharp uptick in violence and homicide from about 1840 through the end of the Civil War, and then again in the closing decades of the century. Ethnic tension, political conflict, and the effects of industrialization (urbanization, poverty, lack of resources, etc.)—all of which eroded the cohesion of communities and citizens—fueled this trend.[23]

23. Americans North and South criticized the everyday carrying of deadly weapons, particularly the concealment of them beneath one's clothes. Such behavior belonged to "ruffians"— bullies who imposed their will on others through force or intimidation, and who engaged in

---

[21] This is the definition of the nineteenth-century American phrase from the *Oxford English Dictionary*.
[22] Historian Randolph Roth has shown that four correlates contribute to rates of homicide: stability of government; confidence in government and officials; a sense of patriotism or kinship; and a legitimate social hierarchy. See Roth, *supra* note 2, at 17–26.
[23] On homicide in American history, particularly as broken down into northern and southern regions, *see id.* at 297–326, 386–88 (for trends in northern areas); at 185 (for data-supported charts showing trends in homicide for large cities across the entire nineteenth century); at 184 (complicating data from pp. 185 by showing that some rural northern areas experienced sharp rise in crime after 1865 and therefore emulated what took place in the American South during that time).

DECLARATION OF BRENNAN RIVAS
NO. 3:23-cv-05364-RJB

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

unforgivably brutal behavior in order to do so. Ruffians carried bowie knives and used them to stab someone who insulted them, and ruffians turned a minor conflict into a melee by drawing a pocket revolver and shooting their opponents.[24] To carry weapons was also described as a relic of barbarism—"that most barbarous of all customs, the habit of wearing concealed weapons."[25] Commentators later in the century described pistol-toting as a "relic of barbarism"[26] and rallied to the cry, "The revolver must go!"[27]

24. Widespread criticism of deadly weapons and the bloody toll which they exacted upon American society prompted state and local governments to enact regulations. Some of the earlier statutes and ordinances originated in southern and southwestern[28] areas and spread across much of the country by the Civil War Era. Regulations carried on unabated in the postbellum era, often turning to the same strategies of public carry, taxation, and sales restriction laws.

### VII. WEAPON REGULATIONS

25. There were several different regulatory strategies which nineteenth-century Americans pursued in order to stem the tide of violence associated with deadly weapons. These ranged from public carry laws to taxes and sales restrictions. Sales restrictions grew in number and importance as the century wore on, but they dated back to the antebellum nineteenth century.

26. Sometimes taxes were straightforward attempts to prohibit the carrying of weapons

---

[24] For example, *see The 'Science of Defence,'* Public Ledger (Philadelphia, PA) August 5, 1840 (carrying swords as "refined ruffianism."); *The Ruffian Foote*, Barre Patriot (Boston, MA) April 26, 1846 (Sen. Henry S. Foote of Mississippi as a "ruffian" for being armed in the Senate chamber, bullying an enemy, and pulling a knife on him in the presence of the full Senate); *Shocking Outrage*, The Miners' Express (Dubuque, Iowa) September 24, 1851, at 2 ("some ruffian or ruffians unknown" stabbed a pair of stabled horses, killing one). *See* https://chroniclingamerica.loc.gov/lccn/sn86083363/1851-09-24/ed-1/seq-2/.

[25] *Concealed Weapons*, Daily Picayune (New Orleans, Louisiana) February 28, 1845, at 2.

[26] *The Cattlemen*, Fort Worth Daily Democrat, March 5, 1883. *See also Brenham Daily Banner* (Texas), March 7, 1883.

[27] *See The Revolver Must Go*, Clarksville Weekly Chronicle (Tennessee) May 24, 1884, at 1 (reprinted from *Gainesville Register* (Texas)): https://chroniclingamerica.loc.gov/lccn/sn88061082/1884-05-24/ed-1/seq-1/ ; *Personals*, Chicago Daily Tribune, March 29, 1879, at 5 (mocking the movement developing in the South by saying, "Southern papers say the revolver must go—go off?") https://chroniclingamerica.loc.gov/lccn/sn84031492/1879-03-29/ed-1/seq-5/; *Current Opinion*, Rocky Mountain News (Colorado) March 26, 1879 ("If the west and south would rally around the sentiment, 'The revolver must go,' it would be one more step in the interests of civilization.").

[28] In the antebellum era, the Old Southwest stretched from Louisiana to Missouri, Kentucky, and Alabama.

DECLARATION OF BRENNAN RIVAS
NO. 3:23-cv-05364-RJB

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

without saying so explicitly. This approach was practiced in Florida during its territorial phase and remained a policy option for much of the nineteenth century.[29] In 1835, the territorial government enacted a public carry law with a steep fine of $50 to $500 for violations and an exemption for "carrying arms openly, outside of all their clothes."[30] Unsatisfied with the public carry law, leaders established a new series of prohibitive taxes designed to further reduce the presence of deadly weapons in public. This 1838 enactment held that anyone who chose "to vend dirks, pocket pistols, sword canes, or bowie knives" had to first pay an annual tax of $200, "and all persons carrying said weapons openly shall pay . . . a tax of ten dollars annually."[31] In 2023 dollars, the annual occupation tax would amount to approximately $6,300, and the annual open carry tax would amount to approximately $320.[32] In a sparsely populated, rural environment, these taxes were clearly designed to discourage trade in and public carry of deadly weapons. The architects of the statute saw it as intrinsically connected to the previously enacted concealed carry restriction—as a way of more effectively reducing the number of weapons carried in public spaces.[33]

27.     Antebellum lawmakers also restricted the sale of certain problematic weapons. As bowie knives, pocket pistols, and other deadly weapons were becoming more popular and more prevalent, Tennessee and Georgia prohibited their sale. In 1837, Georgia passed a statute combining a public carry law with a sales restriction. It was unlawful "for any merchant, or vender of wares or

---

[29] In some ways, possession taxes came close to being carry taxes or even proto-licensing policies. 1866 Ga. Laws §§ 3–4, 27–28, (assessing a tax of $1 for each "gun or pistol, musket or rifle over the number of three kept or owned on any plantation" in select counties.). Taxation as a form of public carry regulation was considered in Texas in 1866 as well as in Tennessee in 1893. *See* Brennan Gardner Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 Southwestern Historical Quarterly 290 (2018); Tennessee State News, *Bolivar Bulletin* (Bolivar, Tennessee) Feb. 10, 1893, 1, https://chroniclingamerica.loc.gov/lccn/sn89058007/1893-02-10/ed-1/seq-1/.

[30] John P. Duval, *Compilation of the Public Acts of the Legislative Council of the Territory of Florida* 423 (1839) *available at* The Making of Modern Law: Primary Sources (*Source entitled* Passed Prior to 1840, Image 425).

[31] 1838 Fla. Laws, ch. 24.

[32] The amounts reach $319.14 and $6,382.73. *See* https://www.in2013dollars.com/us/inflation/1838?amount=200.

[33] The title of the 1838 tax was "An Act in addition to An Act, (approved January 30, 1835,) entitled An Act to prevent any person in this Territory from carrying arms secretly."

DECLARATION OF BRENNAN RIVAS
NO. 3:23-cv-05364-RJB

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kind of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence."[34] The statute further held that "pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used, as horseman's pistols."[35] The following year (1838), Tennessee lawmakers did much the same with an updated public carry law that included a section prohibiting "any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person" to sell "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or knives, or Arkansas tooth pick."[36] In 1849, Vermont lawmakers prohibited the manufacture and sale of slung shots, which were makeshift weapons associated with organized crime and street gangs.[37] New York did the same.[38] Kentucky lawmakers enacted a law that prohibited "vending, buying, selling, or dealing in the weapons popularly known as colts, brass knuckles, slung-shots, or any imitation or substitute therefor,"—essentially adopting the policies all these states into one catch-all statute.[39]

28.     These sales restrictions were not challenged in the antebellum era the way that public carry laws sometimes were.[40] The public carry portion of the Georgia statute was challenged

---

[34] 1837 Ga. Laws, ch. 90; https://dlg.usg.edu/record/dlg_zlgl_16741934#text.
[35] *Id.*
[36] 1838 Tenn. Laws, ch. 137. This law was temporarily suspended during part of the Civil War. *See* 1862 Tenn. Laws, ch. 23.
[37] 1849 Vt. Acts & Resolves, ch. 36, § 1, 26. Slung shots were not like slingshots as we understand the term today. The *Oxford English Dictionary* identifies this as a nineteenth-century American phrase referring to "a shot, piece of metal, stone, etc., fastened to a strap or thong, and used as a weapon."
[38] Hiram Denio, et al, *Revised Statutes of the State of New York* § 52, 880 (1852) (*see* Part IV, Title 6, *Misdemeanors*; the code section cites 1849 NY Laws ch. 278.)
[39] 1855 Ky. Acts, ch. 636, § 1, 96.
[40] Some southern appellate courts weighed the constitutionality of public carry laws in light of their view of the Second Amendment and particularly in light of their state analogues. The regional understanding that emerged was that legislatures could prohibit the concealed carrying of deadly weapons, but not the open carrying of them. This understanding coexisted with a general disdain for the habitual carrying of weapons in public spaces, and was likely a way of protecting the open carrying of deadly weapons at times of emergency rather than carte blanche to carry openly at all times. Eric Ruben and Saul A. Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, in Yale Law Journal Forum 121–135 (Summer 2015). For more on the distinction between open and concealed carry, *see id.*, at 21–24.

DECLARATION OF BRENNAN RIVAS
NO. 3:23-cv-05364-RJB

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

in 1844, when a man named Hawkins Nunn appealed his conviction. Nunn had been seen carrying a pistol (not a horseman's pistol) openly in his hand, and a grand jury issued a presentment against him. The Georgia Supreme Court ultimately struck down the portions of the law in question that prohibited keeping and openly carrying certain kinds of weapons and criticized the poor construction of the statute. But the decision in the case did not actually address the constitutionality of the sales restriction.[41] The *Nunn* decision, far from a full-throated defense of limitless gun rights, in fact reiterated states' authority to prohibit the concealed carrying of deadly weapons in the name of public safety and set no precedent regarding weapon-specific sales bans.

29.   Sales restrictions continued to be placed upon certain deadly weapons even in the post-Civil War period. By the 1870s, Tennessee had long prohibited the sale of bowie knives and Arkansas toothpicks,[42] but in 1879 lawmakers strengthened their sales restriction by placing pistols within its purview.[43] The statute in question criminalized the sale of "belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol."[44] When a Tennessee merchant named Burgoyne challenged the law, the state supreme court decided that it was well within the police powers of the legislature to "put down the pernicious habit of going armed"[45] by declining

---

[41] *Nunn v. State*, 1 Ga. 243 (1846).

[42] An Act to suppress the sale and use of Bowie Knives and Arkansas Toothpicks in this State, 1838 Tenn. Laws, ch. 137, 200–201. There was a brief period in which the law was not enforced during the Civil War. Tennessee was the first Confederate state to be reconquered and begin the process of political reconstruction (in 1863), so it is likely that this wartime hiatus of enforcement lasted less than two years. 1862 Tenn. Laws, ch. 23.

[43] Between 1871 and 1879, Tennessee lawmakers made substantial changes to their state weapons policy, of which the 1879 sales restriction forms only a part. An 1870 statute prohibited "publicly or privately" carrying "a dirk, sword cane, Spanish stiletto, belt or pocket pistol or revolver." When the state Supreme Court struck the measure down as unconstitutional for prohibiting the open carrying of militia arms known as "repeaters" (referring to army-sized revolvers), lawmakers quickly added an exception for army/navy pistols carried "openly in his hands." In 1879, lawmakers prohibited the sale of "belt or pocket pistols, or revolvers, or any other kind f pistols, except army or navy pistols." *See* 1870 Tenn. Laws ch. 13, 28–29; 1871 Tenn. Laws ch. 90, 81–82; *Andrews v. State*, 50 Tenn. 165 (1871); 1879 Tenn. Laws, ch. 96, 135–36.

[44] 1879 Tenn. Laws, ch. 96 § 1 ("That it shall be a misdemeanor for any person to sell, or offer to sell, or to bring into the State for the purpose of selling, giving away, or otherwise disposing of belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol; *Provided*, that this Act shall not be enforced against any person now having license to sell such articles until the expiration of such present license,"). The associated fine was $25 to $100 and imprisonment at the court's discretion.

[45] *State v. Burgoyne*, 75 Tenn. 173 (1881).

DECLARATION OF BRENNAN RIVAS
NO. 3:23-cv-05364-RJB

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

to issue licenses to firearm dealers. When the justices considered whether the law deprived Burgoyne of his property rights, they determined that the state's allowance for licensed dealers to dispose of their stock prior to the expiration of their licenses was sufficient protection. In explaining that the harm posed by the traffic in pistols justified the sales restriction, the court quoted Thomas Cooley, one of the more influential legal scholars of the time. Cooley wrote that sometimes a tax "has not for its object the raising of revenue, but looks rather to the regulation of relative rights, privileges and duties, as between individuals, to the conservation of order in the political society, to the encouragement of industry, and the discouragement of pernicious employments."[46] The legislation was "being made in the exercise of that authority which is inherent in every sovereignty, to make all such rules and regulations as are needful to secure and preserve the public order, and to protect each individual in the enjoyment of his own rights and privileges by requiring the observance of rules of order, fairness and good neighborhood, by all around him."[47] The Tennessee justices summed up the concept by saying that "the private interests of the few must yield to the welfare of the many and good order in society."[48]

30. Arkansas lawmakers followed the pattern set by their peers in Tennessee by enacting a statute in 1881 that combined an updated public carry law with a similar sales restriction.[49] Not only did it prohibit carrying pistols, knives, swords, spears, metal knuckles, and razors, but also provided that anyone "who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person" said weapons also faced prosecution.[50] When the Arkansas law faced a constitutional challenge, it was also upheld by an appellate court.[51] 31. Vermont had

---

[46] Thomas M. Cooley, *A Treatise on the Law of Taxation: Including the Law of Local Assessments* 396 (1876). See https://archive.org/details/atreatiseonlawt01coolgoog/page/896/mode/1up.
[47] *Id.*
[48] *Burgoyne*, 75 Tenn. 173.
[49] 1881 Ark. Acts. ch. 96.
[50] *Id.* §§ 2–3. It is worth noting that the Arkansas policy was almost identical to that of Tennessee in that the public carrying of deadly weapons was strictly illegal with the exception of army/navy pistols carried "uncovered" and in the hand.
[51] *Dabbs v. State*, 39 Ark. 353 (1882).

DECLARATION OF BRENNAN RIVAS
NO. 3:23-cv-05364-RJB

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

prohibited the sale of slung shots in 1849, and continued to do so throughout the rest of the century.[52] Several other states followed suit, and some also banned the sale of metal knuckles, which were similarly associated with gang activity. By 1868, the sale and manufacture of them was punishable by fine or jail time in Florida.[53] Illinois did the same in 1881,[54] and so did Massachusetts in 1882,[55] Oklahoma Territory in 1890,[56] and Florida in 1893.[57] Manufacturing and selling a slung shot was a misdemeanor in the Dakota Territory, and using or attempting to use one was a felony.[58] That particular law remained in force in the state of North Dakota.[59]

32. These regulations did not prohibit the sale of all firearms, or even all revolvers. They targeted weapons which people at the time overwhelmingly associated with reckless and criminal behavior. Persons wishing to defend themselves, their property, and their homes still had access to rifles, shotguns, and army pistols in order to do so. Reserving access to these weapons, which were also associated with communal policing and militia service, meant that Second Amendment and state analogue rights were not implicated by prohibitions or restrictions placed upon the sale of certain deadly weapons. In upholding a prohibitive sales tax placed upon pistols in Texas, an appellate court asserted that the business of selling pistols was one "hurtful to the welfare of society" and among that class of occupations "detrimental to the health, morals, or good order of society."

---

[52] *Offenses against the person*, in Vermont Statutes, 1894: Including the Public Acts of 1894 at 879, ch. 212, § 4920 (1894).

[53] Of Offenses against the Public Peace, 1868 Fla. Sess. Laws, ch. 7, § 11, 95. The law was reiterated in the subsequent penal code revision. *See* Allen H. Bush, *Digest of the Statute Law of Florida of General and Public Character, in Force up to the First Day of January, 1872* at 253, ch. 49, § 12 (1872),.

[54] Criminal Code – Deadly Weapons: Regulates Traffic and Prevents Sale to Minors, 1881 Ill. Laws, 73, § 1.

[55] *Offenses against the Public Peace*, in *Public Statutes of the Commonwealth of Massachusetts, Enacted November 19, 1881, to Take Effect February 1, 1882* at 1164, § 11 (1886). (This appears to be a reiteration of a previously existing law in Massachusetts; citation is G. S. 164, § 11).

[56] Of Crimes against the Public Health and Safety, 1890 Ok. Sess. Laws, ch. 25, art. 38, § 18 at 475–476 (1890).

[57] 1893 Fla. Sess. Laws, § 1 at 4124.

[58] *Of Crimes against the Public Health and Safety*, in *Revised Codes of the Territory of Dakota, Comprising the Codes and General Statutes Passed at the Twelfth Session of the Legislative Assembly* 684, §§ 455–56 (1883).

[59] *Crimes against the Public Health and Safety*, in *Revised Codes of the State of North Dakota* 1461, § 7311 (Bismarck: Tribune Co., 1899).

DECLARATION OF BRENNAN RIVAS
NO. 3:23-cv-05364-RJB

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  As a result, the court reasoned that the legislature "would have the right, not only to levy an
2  excessive tax, which would be prohibitory thereof, but could go further and absolutely prohibit any
3  one from engaging therein."[60] This history of prohibiting the sale of especially dangerous weapons
4  paved the way for state-level bans on automatic firearms and the adoption of the National Firearms
5  Act of 1934.

## VIII.  CONCLUSION

33.  During the nineteenth century, Americans confronted rising levels of violence and homicide that resulted from socio-economic conflict occurring in conjunction with rapid developments in weapon technology. Report after report of needless death as a result of a culture armed to the teeth prompted Americans and their leaders to embrace gun regulation as a life saving policy. These regulations took many forms, such as public carry and taxation laws, and also embraced sales prohibitions against certain weapons deemed especially dangerous. Americans of the time did not see these regulations as violations of the Second Amendment or state analogues. It is my opinion that the State of Washington's restrictions against the sale of firearms classified as "assault weapons" aligns with this historical tradition.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED this _18_ day of May, 2023, at _Ft Worth_, _TX_.

_____
BRENNAN RIVAS
Historian and Independent Scholar

---

[60] *Caswell & Smith v. State*, 148 SW 1159 (Tex. Civ. App. 1912).

DECLARATION OF BRENNAN RIVAS
NO. 3:23-cv-05364-RJB

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

## DECLARATION OF SERVICE

I hereby declare that on this day I caused the foregoing document to be electronically filed with the Clerk of the Court using the Court's CM/ECF System which will serve a copy of this document upon all counsel of record.

DATED this 22nd day of May, 2023, at Seattle, Washington.

*s/ Andrew R.W. Hughes*
ANDREW R.W. HUGHES, WSBA #49515
Assistant Attorney General

DECLARATION OF BRENNAN RIVAS
NO. 3:23-cv-05364-RJB

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744