1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

7
8

| | |
|---|---|
| LAWRENCE HARTFORD; DOUGLAS MITCHELL; BRETT BASS; SPORTING SYSTEMS VANCOUVER, INC.; SECOND AMENDMENT FOUNDATION, INC.; AND FIREARMS POLICY COALITION, INC., | NO. 3:23-cv-05364 |
| | DECLARATION OF ROBERT J. SPITZER, PH.D. IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION |
| Plaintiffs, | |
| v. | |
| BOB FERGUSON, in his official capacity as Washington State Attorney General, et al., | |
| Defendants. | |

9
10
11
12
13
14
15
16

17    I, Robert J. Spitzer, Ph.D., declare as follows:

18    1.    I am over the age of 18, competent to testify as to the matters herein, and make this

19    declaration based on my personal knowledge.

20                    **I.    INTRODUCTION**

21    2.    I have been asked by the Washington State Attorney General's Office to render an

22    opinion on the history of firearms restrictions, including those pertaining to fully automatic and

23    semiautomatic firearms, ammunition feeding devices, the origins of multi-shot firearms, and the

24    historical regulation of other dangerous weapons.

25
26

DECLARATION OF ROBERT J.                    1
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

## II.   BACKGROUND AND QUALIFICATIONS

3.      I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland. I am currently an adjunct professor at the College of William and Mary School of Law. I was also a visiting professor at Cornell University for thirty years. I earned my Ph.D. in Government from Cornell University. I have been studying, teaching, and writing about gun policy for over thirty years. My first publication on the subject appeared in 1985.[1] Since then, I have published six books and over one hundred articles, papers, and essays on gun policy. My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues. My book, *The Politics of Gun Control,* has been in print since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, and criminology. The eighth edition of the book was published in 2021 by Routledge Publishers. My two most recent books on gun policy, *Guns across America* (Oxford University Press, 2015) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with the study of historical gun laws. I am frequently interviewed and quoted in the national and international media on gun-related matters. For over twenty years, I have been a member of both the National Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun Violence). I am being compensated at a rate of $500/hour for my work on any written materials, and $750/hour for any testimony in connection with this matter. A copy of my curriculum vitae is attached as Exhibit A.

## III.   SUMMARY OF OPINIONS

Gun ownership is as old as America, but so are gun laws. From the 1600s through the early twentieth century, the colonies, states, and localities enacted literally thousands of gun laws of every imaginable variety. In this document, I demonstrate that a specific relationship existed between the development of new weapons technologies, their spread into society, and

---

[1] Robert J. Spitzer, *Shooting Down Gun Myths*, *America* 468–69 (June 8, 1985). *reprinted in* Gun Control (Robert E. Long ed., H.W. Wilson 1989).

DECLARATION OF ROBERT J. SPITZER, PH.D. IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 3:23-cv-05364

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    subsequent regulation by the government as part of a centuries-long effort to protect the public

2    from harm and to dampen weapons-related criminality and violence. This pattern, including as

3    seen in contemporary restrictions on assault weapons and large capacity magazines, is not new;

4    in fact, it is a tradition that can be traced back throughout the Nation's history.

5        I examine a number of specific examples of weapons that illustrate a pattern seen

6    repeatedly throughout United States history. First, a new weapon or weapon technology is

7    invented. Second, it may then be patented, though the patenting of a design or idea by no means

8    assures that it will proceed beyond this point. Third, it is often developed with a focus on military

9    applications and supplying military needs, not directly for civilian acquisition or use. Fourth,

10   some military-designed weapons may then spread to, or be adapted to, civilian markets and use.

11   Finally, if such weapons then circulate sufficiently in society to pose a safety, violence, or

12   criminological problem or threat, calls for government regulation or restriction then may lead to

13   weapon policy/law changes. New weapon laws are not enacted when technologies are invented

14   or conceived. They are enacted when those technologies circulate sufficiently in society to spill

15   over into criminal or other harmful use, presenting public safety concerns that governments

16   attempt to address through their police and policy-making powers.

17       These examples include: (1) weapons that were subject to government restrictions in the

18   eighteenth and nineteenth centuries, such as Bowie and similar long-bladed fighting knives,

19   clubs and other blunt weapons, and "trap guns"; (2) multi-shot firearms in the nineteenth century,

20   including Colt revolvers and Winchester rifles, that proved more successful than the

21   experimental multi-shot firearms that preceded them; and (3) restrictions on fully automatic

22   (most famously the Tommy gun) and semi-automatic firearms, and detachable ammunition

23   feeding devices, both from the early twentieth century.

24       Firearms and other dangerous weapons were subject to remarkably strict, consistent, and

25   wide-ranging regulation throughout our history when they entered society, proliferated, and

26   resulted in violence, harm, or contributed to criminality. This historical record is even more

DECLARATION OF ROBERT J.                    3                ATTORNEY GENERAL OF WASHINGTON
SPITZER, PH.D. IN SUPPORT OF STATE                                Complex Litigation Division
DEFENDANTS' OPPOSITION TO                                         800 Fifth Avenue, Suite 2000
MOTION FOR PRELIMINARY                                              Seattle, WA 98104-3188
INJUNCTION                                                             (206) 464-7744
NO. 3:23-cv-05364

1    remarkable given that the United States was an evolving and developing nation-state that could

2    not claim to have reached maturity until the twentieth century. The historical record summarized

3    here makes clear that contemporary restrictions among the states pertaining to large capacity

4    ammunition magazines are merely the latest iteration of a centuries-long tradition of weapons

5    regulations and restrictions.

### IV.    CONTEXT

7    The current controversy surrounding legislative efforts to restrict large capacity

8    magazines would seem to be a purely contemporary matter, responding to the modern

9    phenomenon of mass shootings. The effort to restrict these accessories was sparked in part by a

10   shooting at an elementary school in Stockton, California, in 1989, when a man armed with an

11   AK-47 and a handgun killed five children and wounded thirty-three others. The assailant fired a

12   total of 105 rounds in about three minutes from a 75-round magazine and then a 30-round

13   magazine, both of which he emptied before killing himself.[2] California's 1989 law, amended in

14   1999, restricted assault weapons in part by whether they could accept a detachable ammunition

15   magazine, or if the weapon had a fixed magazine that could hold more than ten rounds.[3] In 1994,

16   Congress enacted a limited ten year ban on assault weapons and large capacity magazines (those

17   holding more than ten rounds).[4] As of this writing, ten states plus the District of Columbia have

18   enacted similar bans, as have various localities around the country.[5] These jurisdictions represent

19

20   [2] Nelson Kempsky, *A Report to Attorney General John K. Van de Kamp on Patrick Edward Purdy and the Cleveland School Killings* 7–8 (1989), https://schoolshooters.info/sites/default/files/Purdy&-&official&report.pdf

21   [3] https://giffords.org/lawcenter/state-laws/assault-weapons-in-california/

     [4] Robert J. Spitzer, *The Politics of Gun Control* 25–26, 205–11(8th ed. NY: Routledge 2020) (1995)

22   [5] *Assault Weapons*, Giffords Law Center, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/assault-weapons/; Robert J. Spitzer, *The Gun Dilemma* 14–15 (2023). The ten American states or

23   entities with assault weapons bans are: California, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois,
     Maryland, Massachusetts, New Jersey, and New York. Illinois enacted its law, including an LCM limit, in early

24   2023. C. Mandler, *Illinois governor signs ban on assault weapons and high-capacity magazines*, CBS News, Jan. 10, 2023, https://www.cbsnews.com/news/illinois-governor-signs-ban-on-assault-weapons-and-high-

25   capacity-magazines/. The U.S. House of Representatives passed a renewed federal assault weapons ban with
     magazine limitations in 2022 (H.R. 1808, 117th Cong. (2022)). Delaware enacted its assault weapons and large-

26   capacity magazine restrictions in June 2022. *See* Press Release, DE Office of the Governor, *Governor Carney Signs*

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   approximately 109 million people, or approximately 32.7% of the U.S. population.[6] Fourteen

2   states plus the District of Columbia restrict large capacity magazines (LCMs).[7] These

3   jurisdictions represent more than 115 million individuals, or approximately 34.5% of the U.S.

4   population.[8]

5       As of this writing, fourteen states plus the District of Columbia have enacted laws to

6   restrict LCMs.[9] These jurisdictions represent more than 115 million individuals, or

7   approximately 34.5% of the U.S. population.[10]

8       The pattern of criminal violence and concerns for public safety leading to weapons

9   restrictions is not new; in fact, it can be traced back to the Nation's beginnings. While the

10   particular weapons technologies and public safety threats have changed over time, governmental

11   responses to the dangers posed by certain weapons have remained constant. Current restrictions

---

*Package of Gun Safety Legislation* (June 30, 2022), https://news.delaware.gov/2022/06/30/governor-carney-signs-package-of-gun-safety-legislation/.

[6] *See* U.S. Census, *National Population Totals and Components of Change: 2020–2022*, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2022 state population estimates). The total population in these jurisdictions is estimated to be 101,000,000 out of a U.S. total of about 333,000,000.

[7] *Large Capacity Magazines*, Giffords Law Center, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/; Spitzer, *The Gun Dilemma*, *supra* note 5, at 30. The fifteen jurisdictions are California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington. With four exceptions (Colorado, Delaware, Illinois, and Vermont), all of these restrictions impose a ten-round limit on magazines, as did the 1994 federal law. The Illinois and Vermont laws limit magazines for long guns to ten rounds, and handguns to fifteen. Colorado law limits all magazines to fifteen rounds. Delaware law limits all magazines to seventeen rounds. Litigation challenging most of these assault weapon and LCM restrictions is currently pending.

[8] U.S. Census, *supra* note 6. The total population in these jurisdictions is estimated to be over 115,000,000 out of a U.S. total of about 333,000,000. In 2022, the U.S. House of Representatives passed a renewed nationwide assault weapons ban with LCM restrictions. H.R. 1808, 117th Cong. (2022).

[9] Giffords Law Center, *supra* note 7; Spitzer, *The Gun Dilemma*, *supra* note 5 at 30. The fifteen states are California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington. With three exceptions (Colorado, Delaware, and Vermont), all of these restrictions impose a ten-round limit on magazines, as did the 1994 federal law. Hawaii's restrictions apply to only handguns. The Illinois law limits magazines for long guns to ten rounds, and handguns to fifteen. Oregon voters approved by referendum a ten-round LCM limit in November 2022, but that law is under court challenge: Jonathan Levinson, *Oregon's new gun laws remain blocked, won't go into effect early Thursday*, Oregon Public Broadcasting, December 7, 2022, https://www.opb.org/article/2022/12/07/oregon-measure-114-new-gun-laws-remain-blocked-court-challenges/.

[10] U.S. Census, *supra* note 6. The total population in these jurisdictions is estimated to be over 115,000,000 out of a U.S. total of about 333,000,000. In 2022, the U.S. House of Representatives passed a renewed nationwide assault weapons ban with LCM restrictions. H.R. 1808, 117th Cong. (2022).

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    on detachable ammunition magazines are historically grounded. They are part of a pattern in

2    America's history of legislative restrictions on particular weapons stretching back centuries.

3    **V.    HISTORICAL RESTRICTIONS ON KNIVES, BLUNT WEAPONS, PISTOLS,**
              **AND TRAP GUNS**

4

5            The pattern in America's history of legislative restrictions related to dangerous weapons

6    dates to the country's earliest history.[11] More focused restrictions pertaining to particular

7    weapons began to appear in the late 1700s and early 1800s. These enactments appeared as violent

8    crimes involving dangerous weapons became more widespread in the early 1800s. For example,

9    from 1780-1809, at least four states (Connecticut, Ohio, New Jersey, Maryland) enacted

10   measures that increased the penalties for burglaries or other crimes if the perpetrators were

11   armed.[12] At least three states (New York, Ohio, Maryland) enacted laws to punish the discharge

12   of firearms near populated areas.[13] At least four states (Virginia, Massachusetts, North Carolina,

13   Tennessee) criminalized public arms carrying.[14] In addition, specific weapons that were

14   restricted, following the pattern I outlined above, are discussed in subsequent sections.

15           [11] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 *Law and Contemporary Problems* 57–62 (2017).

16           [12] An Act For The Punishment of Burglary And Robbery, 1783 Conn. Acts 633; An Act for Suppressing and Prohibiting Every Species of Gaming for Money or Other Property, and for Making Void All Contracts and
17   Payments Made in Furtherance Thereof, 1788-1801 Ohio Laws 42, ch. 13, § 4; Charles Nettleton, *Laws of the State of New-Jersey* 474, Image 501 (1821), *available at* The Making of Modern Law: Primary Sources, Part II, 1763–
18   1970; 1799 [*An Act to Describe, Apprehend and Punish Disorderly Persons (1799)*], The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of
19   Independence, And The Constitution Of The United States, And Its Amendments at § 2, 465, Image 466 (1811), *available at* The Making of Modern Law: Primary Sources, Part II, 1763–1970, 1809.

20           [13]James Kent, 1 *Laws of the State of New-York 1802–1812* at 41-42, Image 44-45, *available at* The Making of Modern Law: Primary Sources, 1785; An Act to Prevent the Firing of Guns and Other Fire-Arms within this
21   State, on certain days therein mentioned, 1785 N.Y. Laws, ch. 81; An Act for Suppressing and Prohibiting Every Species of Gaming for Money or Other Property, and for Making Void All Contracts and Payments Made in
22   Furtherance Thereof, 1788 Ohio Laws, ch. 13, § 4, 42; A Supplement To An Act Entitled, An Act to Improve and Repair the Streets in Elizabethtown, in Washington County, and For Other Purposes Therein Mentioned, 1792 Md.
23   Laws, chap. 52, § 4, 22.

             [14] An Act forbidding and punishing Affrays, 1786 Va. Laws 33, ch. 21; An Act to Prevent Routs, Riots,
24   and Tumultuous assemblies, and the Evil Consequences Thereof, 1786 Mass. Sess. Laws, ch. 38; Francois Xavier Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina* 60–61 (1792);
25   Judge Edward Scott, 1 *Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820*, at 710, Image 714 (1821) The Making of Modern Law: Primary
26   Sources. 1801, An Act for the Restraint of Idle and Disorderly Persons § 6.

DECLARATION OF ROBERT J.                    6            ATTORNEY GENERAL OF WASHINGTON
SPITZER, PH.D. IN SUPPORT OF STATE                              Complex Litigation Division
DEFENDANTS' OPPOSITION TO                                      800 Fifth Avenue, Suite 2000
MOTION FOR PRELIMINARY                                          Seattle, WA 98104-3188
INJUNCTION                                                          (206) 464-7744
NO. 3:23-cv-05364

## A.  Historical Restrictions on the Bowie Knife and Similar Long-Bladed Knives

The Bowie knife is generally credited with having been invented by the brother of adventurer Jim Bowie, Rezin Bowie. The knife was named after Jim Bowie, who reputedly killed one man and wounded another using a "big knife" given to him by his brother in the alternately notorious or celebrated "Sandbar Duel" in 1827.[15]

The "Bowie knife" rapidly became known beginning in the 1830s for the distinctive type of long-bladed and usually single-edged knife with a hand guard identified with Bowie, the man after whom the knife was named. While Bowie knives initially "came in a variety of forms— with or without guards, with differently shaped blades," they eventually became more standardized as "a large knife with a cross guard and a blade with a clipped point."[16] The distinctive traits of the Bowie knife are revealed in Robert Abels' book, *Bowie Knives*, which includes pictures of nearly one hundred Bowie knives made between 1835 and 1890.[17] The Bowie legend, the explosive growth and spread of Bowie-related mythology (only magnified by his death at the Alamo in 1836), and the knife's distinctive features encouraged its proliferation,[18] referred to by one historian as "the craze for the knives."[19] As was true of other knives with long, thin blades,[20] they were widely used in fights and duels, especially at a time

---

[15] Bowie Knife, *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/entries/bowie-knife-2738/; William C. Davis, *Three Roads to the Alamo* 207–8 (1998). Davis persuasively dismisses the claim of a blacksmith, James Black, that he invented or styled the distinctive knife for Rezin Bowie (*id.* at 676–77). David Kopel says, erroneously, that "Jim Bowie used a traditional knife at a famous 'sandbar fight' on the lower Mississippi River in 1827." Rezin Bowie had just developed the distinctive knife his brother used in the fight, so it could not have been "traditional." David Kopel, *Bowie knife statutes 1837-1899*, The Volokh Conspiracy, Nov. 20, 2022, https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

[16] Bowie Knife, *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/entries/bowie-knife-2738/.

[17] Robert Abels, *Bowie Knives* (1979).

[18] Virgil E. Baugh, *Rendezvous at the Alamo* 39–63 (1985).

[19] Davis, *supra* note 15, at 583.

[20] Other such long-bladed, thin knives of varying configurations typically named in laws barring their carrying included the Arkansas toothpick, the Spanish stiletto, dirks, daggers, and the like.

DECLARATION OF ROBERT J. SPITZER, PH.D. IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 3:23-cv-05364

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

when single-shot pistols were often unreliable and inaccurate.[21] Indeed, such knives were known as "fighting knives"[22] that were "intended for combat."[23] In the early nineteenth century, "guns and knives accounted for a growing share of the known weapons that whites used to kill whites."[24] In 1834, for example, a grand jury in Jasper County, Georgia deplored

> the practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[25]

As early as 1836, "most of the American public was well aware of the Bowie knife."[26] (Very much like the allure of contemporary assault weapons to some,[27] the Bowie knife's notorious reputation also, if perversely, fanned its sale and acquisition.[28])

As homicide rates increased in the South in the early nineteenth century, so did laws restricting the use and carrying of weapons. Some of the earliest such laws focused specifically on dueling. Dueling persisted during this time, even as the practice was widely deplored by religious and other groups, in newspapers, by anti-dueling societies and political leaders.[29] Arms expert Norm Flayderman provides abundant and prolific evidence of the early criminal use of Bowie knives in the 1830s, quoting from dozens of contemporaneous newspaper and other

---

[21] Davis, *supra* note 15, at 164, 208; Baugh, *supra* note 18, at 42; Karen Harris, *Bowie Knives: The Old West's Most Famous Blade*, Oldwest, n.d., https://www.oldwest.org/bowie-knife-history/; Norm Flayderman, *The Bowie Knife* 485 (2004).

[22] Randolph Roth, *American Homicide* 218 (2012).

[23] Flayderman, *The Bowie Knife, supra* note 21, at 59.

[24] Roth, *supra* note 22, at 218. White on white violence is more relevant from a social science perspective in order to better understand the dynamics of homicide, which is typically intra-racial.

[25] *Quoted in* Roth, *supra* note 22, at 218–19.

[26] Flayderman, *The Bowie Knife, supra* note 21, at 43.

[27] Ryan Busse, *Gunfight* 12–15, 65 (2021); David Altheide, *The cycle of fear that drives assault weapon sales*, The Guardian, March 2, 2013, https://www.theguardian.com/commentisfree/2013/mar/02/cycle-fear-assault-weapon-sales; Rukmani Bhatia, *Guns, Lies, and Fear*, American Progress, April 24, 2019, https://www.americanprogress.org/article/guns-lies-fear/.

[28] Flayderman, *The Bowie Knife, supra* note 21, at 46.

[29] Baugh, *supra* note 18, at 51.

DECLARATION OF ROBERT J. SPITZER, PH.D. IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 3:23-cv-05364

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

accounts, and providing references to literally hundreds of additional articles and accounts attesting to the widespread use of Bowie knives in duels, as well as fights, robberies, and other criminal activities.[30] Pistols were likewise prominently used in such affairs.[31] All this contributed to widespread enactment of laws prohibiting dueling in the states.[32] In 1839, Congress passed a measure barring dueling in the District of Columbia.[33]

The ubiquity of the concern about the criminal and violent consequences of carrying Bowie knives and other, similar long-bladed knives also gave rise to the widespread adoption of laws barring or restricting these weapons.[34] In the 1830s, at least six states enacted laws barring the carrying of Bowie knives by name.[35] From then to the start of the twentieth century, every state[36] plus the District of Columbia (with the sole exception of New Hampshire) restricted Bowie knives: a total of at least 42 states (including the District of Columbia) restricted Bowie knives by name; and another 8 states enacted laws restricting the category or type of knife embodied by the Bowie knife but without mentioning them by name (*see* Exhibits C and E) totaling 49 states plus the District of Columbia.[37] For example, 15 states all but banned the possession of Bowie knives outright (by banning both concealed carry and open carry), while others imposed taxes on the ability for individuals to acquire or possess them (*see* Exhibit H). The desirability and utility of such restrictions were precisely that they pushed dangerous weapons out of public spaces and places, improving public safety through the deterrent and

---

[30] Flayderman, *The Bowie Knife, supra* note 21, at 25–64; 495–502.

[31] Roth, *supra* note 22, at 180–83, 210–17.

[32] A search under the term "dueling" in the Duke Center for Firearms Law database of old gun laws yields 38 results. *See* https://firearmslaw.duke.edu/repository/search-the-repository/.

[33] H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838, https://history.house.gov/Records-and-Research/Listing/lfp_032/.

[34] The near-immediate effort in the states to restrict Bowie knives was noted. *See*, for example, in Davis, *supra* note 15, at 582, and in Flayderman, *The Bowie Knife, supra* note 21, at 53–54.

[35] A seventh state, Massachusetts, criminalized the carrying of fighting knives using labels that would have included the Bowie knife in an 1836 law. *See* Exhibit E.

[36] For these purposes, the word "state" includes territories which eventually became states, such as the Washington Territory, which became a state in 1889, and which first enacted a law restricting Bowie knives in 1854 during its territorial period. *See* Exhibits C and E.

[37] Bowie law enactment by decade: 1830s: 6 states; 1840s: 4 states; 1850s: 11 states; 1860s: 13 states; 1870s: 19 states; 1880s: 20 states; 1890s: 21 states; 1900s: 13 states. *See* Exhibits C and E.

DECLARATION OF ROBERT J. SPITZER, PH.D. IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 3:23-cv-05364

9

1  punishment effects of such laws, and also discouraging the settlement of private grievances and

2  disputes in public through weapons-fueled violence.

3      States relied on a variety of regulatory techniques to suppress Bowie knife carrying: 29

4  states enacted laws to bar their concealed carry; 15 states barred their carry whether concealed

5  or openly; 7 states enacted enhanced criminal penalties for those who used the knives to commit

6  a crime; 4 states enacted regulatory taxes attached to their commercial sale; 3 states imposed a

7  tax for those who owned the knives; 10 states barred their sale to specified groups of people; and

8  4 states enacted penalties for brandishing the knives (*see* Exhibit H).

9      The extensive and ubiquitous nature of these Bowie knife prohibitions raises a further

10  question: given the universal agreement that these knives were dangerous, why didn't more

11  states ban their possession outright? The answer is two-fold. First, America was a developing

12  nation-state in the nineteenth century. The federal and state governments did not yet possess the

13  maturity, powers, tools, or resources to implement and effectively enforce any measure as

14  sweeping as a knife ban, especially since knives are technologically very simple to produce.

15  After all, the front-line administrative entity on which we today rely for law enforcement, the

16  police, barely existed (in the way we think of policing today) in the early nineteenth century (up

17  to this time policing fell to a haphazard mix of the watch system, constables, militias, and

18  vigilantes). Modern police forces only came into being in a handful of large cities before the

19  Civil War.[38] Second, the chief remedy enacted by the states to address the problem of knife

20  fighting was far more focused and feasible: to bar the carrying of knives, along with the other

21  two categories of weapons that also threatened public safety, clubs and pistols. The fact that all

22  three types of weapons were consistently treated together shows that all were considered so

23

24      [38] Chris McNab, *Deadly Force: Firearms and American Law Enforcement* 13–24 (2009). Boston created
a police force in 1838, New York City created a standing police force in 1845, followed by Chicago in 1851,
Philadelphia in 1854, and Baltimore in 1857 (23). Jill Lepore, *The Invention of the Police*, The New Yorker, July
25  13, 2020, https://www.newyorker.com/magazine/2020/07/20/the-invention-of-the-police. Both McNab and Lepore
emphasize the role of slavery and slave suppression as key to the development of policing.
26

DECLARATION OF ROBERT J.                                    10                    ATTORNEY GENERAL OF WASHINGTON
SPITZER, PH.D. IN SUPPORT OF STATE                                               Complex Litigation Division
DEFENDANTS' OPPOSITION TO                                                        800 Fifth Avenue, Suite 2000
MOTION FOR PRELIMINARY                                                           Seattle, WA 98104-3188
INJUNCTION                                                                       (206) 464-7744
NO. 3:23-cv-05364

1  dangerous and inimical to public safety that they were subjected to anti-carry laws and bundled

2  together in legislative enactments.

3      At least four state court cases dealt in some manner with fighting knives like the Bowie

4  knife. In the 1840 case of *Aymette v. State*,[39] the Supreme Court of Tennessee upheld the

5  conviction of William Aymette for wearing a Bowie knife concealed under his clothes under a

6  state law of 1837–1838, ch. 137, sec. 2, providing "that, if any person shall wear any bowie-

7  knife, or Arkansas toothpick, or other knife or weapon that shall in form, shape, or size resemble

8  a bowie-knife or Arkansas toothpick, under his clothes, or keep the same concealed about his

9  person such person shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined

10 in a sum not less than two hundred dollars, and shall be imprisoned in the county jail not less

11 than three months and not more than six months."[40] In its decision, the court concluded that the

12 prohibition against wearing the named weapons was well justified in that they "are usually

13 employed in private broils, and which are efficient only in the hands of the robber and the

14 assassin."[41] The court continued, "The Legislature, therefore, have a right to prohibit the wearing

15 or keeping weapons dangerous to the peace and safety of the citizens. . . ."[42] Further, the court

16 added that the state law existed "to preserve the public peace, and protect our citizens from the

17 terror which a wanton and unusual exhibition of arms might produce, or their lives from being

18 endangered by desperadoes with concealed arms. . . ."[43]

19     Four years later, the Tennessee Supreme Court again dealt with a Bowie knife law

20 violation and challenge. In the case of *Haynes v. Tennessee* (1844),[44] Stephen Haynes was

21 indicted for carrying a concealed Bowie knife. He was convicted of wearing a knife that

22

23     [39] *Aymette v. State*, 21 Tenn. 152 (1840). This decision was cited in *District of Columbia v. Heller*, 554 U.S. 570 (2008).

24     [40] *Aymette*, 21 Tenn. at 153.
    [41] *Id.* at 156.

25     [42] *Id.* at 157.
    [43] *Id.*

26     [44] *Haynes v. State*, 24 Tenn. 120 (1844).

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

11

resembled a Bowie knife but appealed his conviction on the grounds that he was actually carrying a "Mexican pirate knife," which reputedly had a shorter, narrower blade. (At the trial, witnesses disagreed as to the proper name for the knife in question.) He also argued that the state law, in listing various types of knives including those "similar" to Bowie knives, was "too indefinite" and could therefore lead to "absurd consequences" that "must follow its enforcement. . . ."[45] On appeal, the court upheld his conviction and commended the Tennessee state legislature's enactment: "The design of the statute was to prohibit the wearing of bowie knives and others of a similar description, which the experience of the country had proven to be extremely dangerous and destructive to human life; the carrying of which by truculent and evil disposed persons but too often ended in assassination."[46] The court continued: "The design, meaning, and intent was to guard against the destruction of human life, by prohibiting the wearing [of] heavy, dangerous, destructive knives, the only use of which is to kill. . . ."[47] The court noted that the state law "wisely provides against bowie knives, Arkansas tooth picks, or any other weapon in form, shape or size, resembling them."[48] Noting the similarity among knives and the possibility of an unjust outcome where, say, a person might be convicted of carrying a mere pocket knife, the court posed this question: "what is to protect against conviction, when the words of the statute cover the charge, and its true spirit and meaning does not?" Their answer: "the judge and jury who try the case."[49] As the author of a book on Bowie knives noted, "the fact that the term 'bowie knife' had never been precisely defined did not help his [Haynes's] case."[50]

Two other state court cases are relevant to the legal status of Bowie knives, *Nunn v. State* (1846)[51] and *Cockrum v. State* (1859).[52] *Nunn* involved a man who was prosecuted for carrying

---

[45] *Id.* at 122.
[46] *Id.*
[47] *Id.* at 123.
[48] *Id.* at 122.
[49] *Id.* at 123.
[50] Paul Kirchner, *Bowie Knife Fights, Fighters, and Fighting Techniques* 43 (2010).
[51] *Nunn v. State*, 1 Ga. 243 (1846).
[52] *Cockrum v. State*, 24 Tex. 394 (1859).

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

12

1   a pistol (openly, not concealed), not a knife. A state law criminalized concealed carry of various

2   named weapons, including pistols and Bowie knives, whereas a different provision allowed for

3   open carrying of named weapons, including Bowie knives, but failed to include pistols on that

4   list. Noting the "great vagueness" in the statute's wording, the court reversed the man's

5   conviction and wrote that there was a constitutional right to open carry "for the important end to

6   be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the

7   security of a free State." By contrast, the court upheld the constitutionality of the concealed carry

8   restrictions, and noted that those restrictions were enacted "to guard and protect the citizens of

9   the State against the unwarrantable and too prevalent use of *deadly weapons*."[53]

10      1.      The *Cockrum* case involved John Cockrum, who was charged with the murder of

11  his brother-in-law, William Self, with a Bowie knife.[54] Under Texas law, "a homicide, which

12  would otherwise be a case of manslaughter, if committed with a bowie-knife or dagger, shall

13  be deemed murder and punished as such. . . ."[55] The court upheld the added penalty provision

14  of the law relating to use of a Bowie knife, despite the court's very expansive interpretation of

15  the right to bear arms, (though it reversed and remanded the man's conviction because of an

16  error related to statutory changes and jury instructions). It described Bowie knives as "an

17  exceeding destructive weapon," an "instrument of almost certain death," and "the most deadly

18  of all weapons in common use."[56] Further, the court said: "He who carries such a

19  weapon . . . makes himself more dangerous to the rights of others, considering the frailties of

20  human nature, than if he carried a less dangerous weapon."[57]

21      All of these cases underscore the courts' recognition of the dangerous nature and

22  nefarious use of Bowie knives not only by their characterizations of them, but by the fact that

---

[53] *Nunn*, 1 Ga. at 246.
[54] https://www.genealogy.com/ftm/p/i/l/Karen-Pilgrim-TX/WEBSITE-0001/UHP-0254.html
[55] *Cockrum*, 24 Tex. at 394.
[56] *Id.* at 403–04.
[57] *Id.* at 403.

DECLARATION OF ROBERT J.          13          ATTORNEY GENERAL OF WASHINGTON
SPITZER, PH.D. IN SUPPORT OF STATE              Complex Litigation Division
DEFENDANTS' OPPOSITION TO                       800 Fifth Avenue, Suite 2000
MOTION FOR PRELIMINARY                          Seattle, WA 98104-3188
INJUNCTION                                      (206) 464-7744
NO. 3:23-cv-05364

1    they are permissibly treated in the same restrictive and prohibitory manner in law as other

2    dangerous, deadly weapons including pistols and various named clubs.[58]

3    **B.      Historical Restrictions on Clubs and Other Blunt Weapons**

4            Among the most widely and ubiquitously regulated harmful implements in U.S. history

5    were various types of clubs and other blunt weapons. (*See* Exhibits C and E.) As discussed above,

6    these weapons were primarily regulated by anti-carry laws, which lumped them together with

7    pistols and specific types of knives. Although some states extended prohibitions to these

8    weapons' manufacture, possession, sale, or use in crime.[59] These laws follow the same pattern

9    mentioned above with regulations not coming about until the weapons become associated with

10   interpersonal violence.

11           The table in Exhibit C shows the various types of clubs and blunt objects that were

12   regulated in the United States. Notably, every state in the nation had laws restricting one or more

13   types of clubs. According to a detailed reference book on the subject of these blunt instruments

14   by Robert Escobar, they were considered "objectionable objects, once feared but now

15   forgotten."[60] Escobar provides what he calls "a family history" of these blunt weapons, but

16   adding that "[i]t's a disreputable family to say the least, black sheep even within the study of

17

18   _____

19       [58] Among the notorious incidents attached to the Bowie knife was its use by two of the conspirators in the
     Lincoln assassination in 1865. The plan was to assassinate President Lincoln, Vice President Andrew Johnson, and
20   Secretary of State William Seward. The man assigned to attack Seward, Lewis Powell, entered the Seward home
     armed with a pistol and a Bowie knife. When one of Seward's sons tried to stop him, Powell tried to shoot him, but
21   his gun misfired, so he used it as a club against the son. When he encountered another son, Powell slashed him with
     his Bowie knife, the weapon he then used to attack Seward who, thanks to a neck collar, survived. David Morgan,
22   *Lincoln assassination: The other murder attempt*, CBS News, May 10, 2015,
     https://www.cbsnews.com/news/lincoln-assassination-the-other-murder-attempt/; https://www.history.com/topics/
23   american-civil-war/william-seward. John Wilkes Booth also carried what was later identified as a Bowie knife
     which he used to slash the man who accompanied Lincoln to the theater and who tried to stop Booth after he shot
24   the president. Booth slashed the man in the arm with his knife to make his escape. Dave Taylor, *Cloak and Daggers:*
     *Cutting Through the Confusion of the Assassination Knives, LincolnConspirators.com*, Dec. 31, 2018,
     https://lincolnconspirators.com/2018/12/31/cloak-and-daggers-cutting-through-the-confusion-of-the-
25   assassination-knives/
         [59] *See, e.g.* 1917 Cal. Sess. Laws 221–225; 1923 Cal. Stat. 695.
26       [60] Robert Escobar, *Saps, Blackjacks and Slungshots: A History of Forgotten Weapons* 1 (2018).

DECLARATION OF ROBERT J.                                14                    ATTORNEY GENERAL OF WASHINGTON
SPITZER, PH.D. IN SUPPORT OF STATE                                                    Complex Litigation Division
DEFENDANTS' OPPOSITION TO                                                             800 Fifth Avenue, Suite 2000
MOTION FOR PRELIMINARY                                                                  Seattle, WA 98104-3188
INJUNCTION                                                                                 (206) 464-7744
NO. 3:23-cv-05364

weaponry."[61] They have been described as "wicked, cowardly, 'Soaked in blood and cured in whiskey.'"[62] Those who carried them (excluding police) "were called vicious, devils and lurking highwaymen."[63] These club-type blunt objects compose a family of objects used for striking others, and while they vary in name and construction, the categories are "somewhat fluid."[64]

Among the states with laws regulating these types of clubs, 15 states barred bludgeon carrying. A bludgeon is a short stick with a thickened or weighted end used as a weapon.[65] The earliest state anti-bludgeon law was in 1799; 11 other such state laws were enacted in the 1800s, and 4 in the early 1900s (as with each of these chronological categories, the state law total exceeds the total number of states because some states enacted the same or similar laws in multiple centuries).

A billy (sometimes spelled "billie") club is a heavy, hand-held rigid club,[66] usually made of wood, plastic, or metal,[67] that is traditionally carried by police, often called a nightstick or baton.[68] Escobar cites an early reference to the billy club in an 1854 New Orleans newspaper article in the *Daily True Delta* that referred to "police armed with batons,"[69] a synonym for a billy club. As this reference suggests, police have long adopted the billy club, or similar striking implements, as part of their on-duty weaponry. At least 16 states had anti-billy club laws, totaling

---

[61] *Id.* at 2.

[62] *Id.* .

[63] *Id.* .

[64] *Id.* at 1.

[65] https://www.merriam-webster.com/dictionary/bludgeon.

[66] Some versions were made to have some flexibility to increase their striking power. *See* Escobar, *supra* note 60, at 118–19.

[67] https://www.merriam-webster.com/dictionary/billy&club. Escobar discusses a Civil War veteran and later police officer, Edward D. Bean, who experimented with various types of billy clubs to improve their striking power and durability by utilizing leather, often adhered to wood, to reduce the likelihood that the club would break on use. Escobar, *supra* note 60, at 118. One of the earliest references to a "billy" was an 1857 newspaper article describing "an indiscriminate attack with slung-shot, billies, clubs, &c." *Local Intelligence*, Delaware Weekly Republican, June 15, 1857, *available at* https://bit.ly/3V9nVO7.

[68] Escobar, *supra* note 60, at 2, 69–70, 105, 113–30.

[69] *Id.* at 105.

DECLARATION OF ROBERT J. SPITZER, PH.D. IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 3:23-cv-05364

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    46 laws; the earliest law appears to have been enacted in Kansas in 1862,[70] followed by a New

2    York law in 1866.[71] Fourteen states enacted such laws in the 1800s; 11 states did so in the early

3    1900s.

4         At least 14 states barred the carrying of "clubs" more generically, without specifying the

5    type. The oldest known anti-club law was 1664; 6 states enacted these laws between 1750 and

6    1799, 7 states in the 1800s, and 2 in the early 1900s. (*See* Exhibit C.)

7         Another weapon long regulated for its use in interpersonal violence is the slungshot (or

8    slung shot), also referred to as "a type of blackjack,"[72] is a hand-held weapon for striking that

9    has a piece of metal or stone at one end attached to a flexible strap or handle that was developed

10   roughly in the 1840s (the first "known use" of a slungshot was 1842[73]). These weapons were

11   viewed as especially dangerous or harmful when they emerged in society, given the ubiquity of

12   state laws against carrying them enacted after their invention and their spreading use by criminals

13   and as fighting implements. These devices were invented and appeared in society during an

14   identifiable period of time in the mid-nineteenth century, sparking subsequent wide-ranging

15   prohibitions. The earliest anti-Slungshot law was enacted in 1850; 43 states legislated against

16   them in the 1800s (including the District of Columbia), and 11 states in the early 1900s (note

17   this incorporates multiple laws enacted in more than one century by a few states).

18        By one account, "[s]lungshots were widely used by criminals and street gang members

19   in the 19th Century. They had the advantage of being easy to make, silent, and very effective,

20

---

21        [70] C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45
     (1863), *available at* The Making of Modern Law: Primary Sources, 1862.
22        [71] Montgomery Hunt Throop, *The Revised Statutes of the State of New York; As Altered by Subsequent
     Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force,
23   Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the
     Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the
24   Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index* at 2512, Image 677 (Vol. 3,
     1882), *available at* The Making of Modern Law: Primary Sources, 1866.
          [72] Escobar, *supra* note 60, at 228.
25        [73] *See* https://www.merriam-webster.com/dictionary/slungshot. Escobar agrees with this rough date. *See*
     Escobar, *supra* note 60, at 67.
26

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

16

particularly against an unsuspecting opponent. This gave them a dubious reputation, similar to

that carried by switchblade knives in the 1950s, and they were outlawed in many jurisdictions.

The use as a criminal weapon continued at least up until the early 1920s."[74] Escobar concurs that

slungshots and blackjacks "were a regular part of criminal weaponry . . . and gangsters could be

merciless in their use."[75]

Sandbags, also known as sand clubs, were also a specific focus in anti-carry laws as well.

Consisting of nothing more than sand poured into a bag, sack, sock, or similar tube-shaped fabric

(although the weight could also be something dense and heavy, like a lock in the end of a sock),[76]

their particular appeal was that they could be dispensed with by simply pouring the sand out,

leaving nothing more than an empty cloth bag. (Alternately, they could be made heavier by

adding water to the sand.) The first anti-sandbag law was 1866, with 10 states enacting such

laws—7 in the 1800s and 7 in the early 1900s.

Thus, as shown above, laws regulating these weapons were ubiquitous and only 4 states

did not have any prohibitions in any of these categories. But 3 of those 4 (Louisiana, Ohio, and

Washington State) had blanket legislative provisions against the carrying of any

concealed/dangerous/deadly weapons. (*See* Exhibit C.) The fourth state, New Hampshire, may

not have enacted such a law during this time but did at some point.[77]

---

[74] "Slungshot," https://military-history.fandom.com/wiki/Slungshot.

[75] Escobar, *supra* note 60, at 86. In a criminal case considered the most famous of those involving lawyer Abraham Lincoln, the future president defended a man charged with murdering another using a slung shot. In the 1858 trial of William "Duff" Armstrong, Lincoln succeeded in winning Armstrong's acquittal. Lincoln was able to discredit the testimony of a witness who claimed to see Armstrong strike the victim with a slung shot at night because of the full moon. Lincoln used as evidence an Almanac to prove that on the night in question, there was no full moon. Judson Hale, *When Lincoln Famously Used the Almanac*, Almanac, May 4, 2022, https://www.almanac.com/abraham-lincoln-almanac-and-murder-trial.

[76] Ferris Law, *Dangerous Weapons in Nevada*, https://www.ferrislawnv.com/criminal-defense/weapons-offenses/dangerous-weapons/; Escobar, *supra* note 60, at 20–22 (Escobar dates the earliest reference to sandbags as weapons to the 1600s).

[77] Up to 2010, New Hampshire had this law on the books: "159:16 Carrying or Selling Weapons. Whoever, except as provided by the laws of this state, sells, has in his possession with intent to sell, or carries on his person any stiletto, switch knife, blackjack, dagger, dirk-knife, slung shot, or metallic knuckles shall be guilty of a misdemeanor; and such weapon or articles so carried by him shall be confiscated to the use of the state." In 2010,

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

C.      **Historical Restrictions on Pistols and Gun Carrying**

Carry restriction laws were widely enacted from the 1600s through the start of the twentieth century, spanning over three centuries. As early as 1686, New Jersey enacted a law against wearing weapons because they induced "great Fear and Quarrels." Massachusetts followed in 1751. North Carolina and Virginia passed similar laws in the 1790s. (*See* Exhibit C.) In the 1800s, as interpersonal violence and gun carrying spread, forty-three states joined the list; three more did so in the early 1900s. (*See* Exhibit B).[78] The enactment of laws restricting concealed weapons carrying followed the rise of homicides and interpersonal violence described by historian Randolph Roth, who noted that restrictions on firearms from the colonial period to the start of the Revolution were few because homicide rates were low. When homicides did occur, guns were seldom used, in large part because of the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy. After the Revolutionary period the spread of violence tied to concealable percussion cap pistols and fighting knives led to the enactment of anti-concealed carry weapons laws.[79] Concealed carry laws normally targeted pistols as well as the types of fighting knives and various types of clubs discussed here (*See* Exhibit E for text of such laws). In addition, at least three-fourths of the states enacted laws that penalized public weapons brandishing or display. At least four states did so in the 1600s, two in the 1700s, twenty-eight states in the 1800s, and two more in the early 1900s.[80] As of 1938, "the carrying of concealed pistols is either prohibited absolutely or permitted only with a license in every state but two."[81] Thus, the widespread enactment of concealed carry laws was the public

---

the law was amended when it enacted HB 1665 to exclude stilettos, switch knives, daggers, and dirk-knives. *Compare* N.H. Rev. Stat. § 159:16 *with* 2010 N.H. Laws, ch. 67 (H.B. 1665).

[78] Spitzer, *Gun Law History in the United States and Second Amendment Rights*, *supra* note 11, at 63–67.

[79] Roth, *supra* note 22, at 61–144, 216–21; Randolph Roth, *Why Guns Are and Are Not the Problem: The Relationship between Guns and Homicide in American History*, in *A Right to Bear Arms?* 116–17 (Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds, Washington, D.C.: Smithsonian Institution Scholarly Press, 2019); Roger Lane, *Murder in America* 344–45 (1997).

[80] Spitzer, *The Gun Dilemma*, *supra* note 5, at 77–80.

[81] Sam B. Warner, *The Uniform Pistol Act*, 29 *Journal of Criminal Law and Criminology* 530 (Winter 1938).

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

18

policy remedy to the emergent crime problem described here. In addition, and consonant with a maturing society, at least 30 states broadened their laws to restrict open weapons carrying as well. Most of these laws were enacted in the post-Civil War period (*see* Exhibit B).

Firearm technologies and the regulations concerning firearms are discussed in greater detail in Sections VI and VII below.

**D.  Historical Restrictions on Trap Guns**

Not to be confused with firearms used in trapshooting, trap guns were devices or contraptions rigged in such a way as to fire when the owner need not be present. Typically, trap guns could be set to fire remotely (without the user being present to operate the firearm) by rigging the firearm to be fired with a string or wire which then discharged when tripped.[82] This early law from New Jersey in 1771 both defines and summarizes the problem addressed by this law:

> Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.[83]

Also sometimes referred to as "infernal machines,"[84] the term trap gun came to encompass other kinds of traps designed to harm or kill those who might encounter them, including for purposes of defending property from intruders. At the time, some argued that thieves or criminals hurt or killed by the devices had it coming,[85] though the weight of opinion

---

[82] *See* Spitzer, *Gun Law History in the United States and Second Amendment Rights*, *supra* note 11, at 67.

[83] An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, 1763–1775 N.J. Laws, ch. 539, § 10, 346.

[84] *See e.g.* An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , 1901 Utah Laws, ch. 96, §§ 1–3, at 97–98.

[85] For example, this small item appeared in the Bangor (Maine) Daily Whig on October 27, 1870: "A burglar while attempting to break into a shop in New York, Monday night, had the top of his head blown off by a trap-gun so placed that it would be discharged by any one tampering with the window. A few such 'accidents' are needed to teach the thieves who have lately been operating in this city, a lesson."

19

1   seemed mostly against such devices because of the likelihood that innocent persons could be

2   injured or killed, and also because such devices represented an improper, arbitrary, and excessive

3   meting out of "justice."[86] Those who set gun traps typically did so to defend their places of

4   business, properties, or possessions. This 1870 newspaper account from an incident in New York

5   City provides an example where a burglar was killed by a gun-trap set by a shopkeeper, who was

6   then prosecuted: "As there is a statute against the use of such infernal machines, which might

7   cause loss of life to some innocent person, the jury censured Agostino." After the verdict the

8   man continued to be held under $2,000 bail.[87]

9       Inevitably, however, the traps sometimes wound up hurting or killing innocents, even

10  including the person who set the trap. For example, this 1891 newspaper account from

11  Chillicothe, Missouri illustrated the problem: "George Dowell, a young farmer, was fined $50

12  under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but

13  his wife was the first person to visit the crib and on opening the door was shot dead."[88] In all, at

14  least 16 states had anti-trap gun laws (*see* Exhibits B and F). The earliest such law encountered

15  was the 1771 New Jersey law (above). Eight such laws were enacted in the 1800s, and nine in

16  the early 1900s (counting states that enacted multiple laws across the centuries). (*See* Exhibit F.)

## VI.    THE HISTORY OF PRE-TWENTIETH CENTURY FIREARMS TECHNOLOGIES AND THEIR REGULATIONS

### A.    Early Multi-Shot Weapons Did Not Achieve Any Kind of Commercial Success or Popularity

20      As researchers and experts of gun history have noted, experimental multi-shot guns

21  existed in the eighteenth century (with multi-shot experimental designs dating back as much as

22  two centuries earlier). For example, a firearm from the late 1500s that could fire up to sixteen

---

[86] This is my observation based on my reading of historic newspaper accounts from the late 1800s, and from the number of anti-trap gun laws enacted. As policing became more consistent, professional, and reliable, support for vigilante-type actions like setting trap guns seems to have declined.

[87] *The Man Trap*, The Buffalo Commercial, November 1, 1870; from the *N.Y. Standard*, October 29, 1870, https://bit.ly/3yUSGNF. *See* Exhibit G.

[88] *Shot by a Trap-Gun*, South Bend Tribune, February 11, 1891, https://bit.ly/3CtZsfk. *See* Exhibit G.

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

20

rounds is described in a book titled, *Firearms Curiosa*. But this book's very title indicates why this narrative is irrelevant to the modern gun debate. The definition of "curiosa" is something that is rare or unusual. As the book's author, Lewis Winant says, his book is about "oddity guns" and "peculiar guns."[89] That is, they were anything but common, ordinary, or found in general circulation. Winant's description of the sixteen shot gun from the 1500s is that "the first pull of the trigger" fires "nine Roman candle charges, a second pull will release the wheel on the rear lock and set off six more such charges, and finally a third pull will fire the one remaining shot."[90] A "Roman candle charge" was defined by Winant as one where "the operator had no control of the interval between shots; he could not stop the firing once he had started it."[91] In other words, this firing process was more like lighting the fuse of a string of firecrackers, where their ignition occurs in a manner that cannot be controlled by the operator once the initial charge is ignited.

Roman candle firing was one type of "superposed" or "superimposed" firing. The other type was controlled, where the gun "was charged with one load on top of another, but the operator had control of the interval between shots. It might have one movable lock or several fixed locks. Each shot would be fired by trigger pull, presumably when the operator felt he had the proper aim."[92] Winant concludes: "Of all the ideas for producing multishot firearms the scheme of superimposing loads in one barrel is probably the oldest, the most discredited, the most frequently recurring, and also the most readily accepted as new."[93] Several "multi-shot" guns invented prior to the perfection of the revolver and repeating rifle relied on this strategy, which had a number of defects all stemming from the difficulty of loading multiple charges in one barrel, with potentially catastrophic results should a charge go off before it was supposed to.

---

[89] Lewis Winant, *Firearms Curiosa* 8, 9 (1955).
[90] *Id.* at 168.
[91] *Id.* at 166.
[92] *Id.*
[93] *Id.*

DECLARATION OF ROBERT J. SPITZER, PH.D. IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
NO. 3:23-cv-05364

21

1    An early multi-shot gun, the "Puckle Gun," patented in 1718 in London by James Puckle,

2    could fire nine rounds per minute (hardly comparable to the firing capabilities of semi- and fully

3    automatic weapons of the twentieth and twenty-first centuries). The patent drawing of this

4    weapon shows it sitting on a tripod on the ground.[94] It was not a hand-held weapon. In the patent,

5    Puckle described it as "a portable Gun or Machine (by me lately invented) called a DEFENCE."[95]

6    It was indeed a military weapon, as Winant says: "Of the oddities among military weapons none

7    has received more publicity than the Puckle gun. . . . The Puckle invention was probably the first

8    crank-operated machine gun. It embodied several elements that closely resemble construction

9    features of Gatling, Hotchkiss and other manually-operated machine guns." Winant continued,

10   "It is doubtful that any of the Puckle guns that may have been actually produced ever saw

11   service."[96] A different account of this weapon says: "There is in fact no record of such a gun

12   ever having been built,"[97] although there are claims to the contrary. A contemporaneous poet,

13   commenting on 'Puckle's Machine Company', wrote 'Fear not, my friends, this terrible machine.

14   They're only wounded who have shares therein.'"[98] This weapon "never advanced beyond the

15   prototype stage."[99] In short, it was an experimental weapon designed for military use, and the

16   patent's reference to "DEFENCE" was clearly a reference to military defense, not personal

17   defense. As this account confirms, it was likely never even manufactured beyond perhaps a

18   prototype. It was a failed effort, even though later gun inventors learned from its failure.

19        The Belton flintlock is another example of a purportedly multi-shot firearm that never

20   became popular. Joseph Belton was an inventor who corresponded with Congress in 1777,

21   claiming that he could produce and provide a flintlock that could fire as many as sixteen to

22

---

23   [94] *Id.* at 220.
     [95] *Id.* at 219.
24   [96] *Id.* at 219–20.
     [97] John Ellis, *The Social History of the Machine Gun* 13 (1975).
25   [98] Winant, *Firearms Curiosa*, *supra* note 89 at 219–21; *see also* Forgotten Weapons, *The Puckle Gun: Repeating Firepower in 1718*, YouTube (Dec. 25, 2016), https://www.youtube.com/watch?v=GPC7KiYDshw.
26   [99] Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter That Changed America* 3 (2021).

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  twenty consecutive rounds without reloading. After deliberation, Congress "dismissed Belton's
2  petition altogether"[100] even though Belton offered to provide a demonstration of his invention.
3  The problems with Belton's scheme were evident. It relied on "superposed loads" as a firing
4  method, a "discredited" and dead-end technology (see discussion above). Despite Belton's offer
5  to demonstrate the gun, not only are there "no known surviving examples of Belton's gun," but
6  "the only evidence" of the gun's existence is "the correspondence between Belton and
7  Congress."[101] Obviously, this anecdote bears no relationship to actual firearms in circulation in
8  the U.S. during this time.

9      Isaiah Jennings' multi-shot flintlock rifle from 1821, capable of firing up to twelve
10  "superposed" shots before reloading,[102] is also cited as an early multi-shot gun. Yet according to
11  *Flayderman's Guide to Antique American Firearms,* its production quantity was so small as to
12  be "unknown" and therefore is "extremely rare," unsurprising since it utilized fatally defective
13  "superposed" firing (discussed earlier) relying on twelve individual touchholes.[103] By one
14  account, "probably not more than 100 rifles of this type [were] manufactured."[104] Similar
15  problems plagued or doomed multi-shot flintlock pistols of the early nineteenth century.
16  According to Carl P. Russell: "Flintlock revolving pistols had been given trials and some
17  practical use very early in the nineteenth century, but the loose priming powder in the pan of
18  each cylinder constituted a hazard that was never eliminated."[105]

19      Another example often cited is the Girandoni (or Girardoni) air rifle, a military weapon
20  developed in Europe for crack shots—highly skilled target shooters—in the Austrian army that

21
22  [100] Logan Metesh, *As a Matter of Fact, the Founding Fathers Did Know About Repeating Rifles*, Nov. 24, 2019.https://www.thetruthaboutguns.com/founding-fathers-knew-repeating-rifles-bill-rights-drafted/.
    [101] "Belton Flintlock," https://military-history.fandom.com/wiki/Belton_flintlock.
23  [102] David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Albany Law Review 853 (2014–2015).
24  [103] Norm Flayderman, *Flayderman's Guide to Antique American Firearms* 683 (Gun Digest Books, 9th ed. 2007).
25  [104] "Isaiah Jennings," LittleGun.info,
    https://www.littlegun.info/arme%20americaine/artisan%20i%20j%20k%20l/a%20jennings%20gb.htm
26      [105] Carl P. Russell, *Guns on the Early Frontier* 91 (1957).

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

was capable of firing up to 20 rounds. One of these made its way to the U.S. where it was taken along on the Lewis and Clark expedition of 1804-1806.[106] But these guns were a rarity, as they were extremely expensive, fragile, and complex, and few were made—no more than about 1,500. As one writer noted: "The Girandoni air rifle is a might-have been; a footnote to military history."[107] Indeed, the rifles never caught on as they proved to be impractical on the battlefield, and even more so for civilian use. To wit: "Leather gaskets needed to be constantly maintained and swelled with water to sustain pressure. Once empty the reservoirs required a significant effort and 1500 strokes to restore full power. A supply wagon was subsequently outfitted with a mounted pump to readily supply soldiers but this negated one of the key features—mobility. The rudimentary fabrication methods of the day engineered weak threading on the reservoir neck and this was the ultimate downfall of the weapon. The reservoirs were delicate in the field and if the riveted brazed welds parted the weapon was rendered into an awkward club as a last resort."[108] First introduced to the Austrian army in the late 1700s, the gun was pulled from military service by 1815.[109] One American manufacturer, Isaiah Lukens of Pennsylvania, apparently produced perhaps four such weapons.[110] The rest were made and used in Europe.

---

[106] David Kopel, *The history of magazines holding 11 or more rounds: Amicus brief in 9th Circuit*, Washington Post, May 29, 2014, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/29/the-history-of-magazines-holding-11-or-more-rounds-amicus-brief-in-9th-circuit/. The Girandoni air gun taken by Lewis and Clark was never used in combat or battle, but to impress the Native Americans they encountered. Whenever they planned to fire the gun, they were careful to prepare it before encountering Native Americans so that they were not aware of the extensive pre-fire preparations needed. See Stephen E. Ambrose, *Undaunted Courage* (NY: Simon and Schuster, 1996), 158, 160, and passim.

[107] Mike Markowitz, *The Girandoni Air Rifle*, DefenseMediaNetwork, May 14, 2013, https://www.defensemedianetwork.com/stories/the-girandoni-air-rifle/.

[108] John Paul Jarvis, *The Girandoni Air Rifle: Deadly Under Pressure*, GUNS.com, March 15, 2011, https://www.guns.com/news/2011/03/15/the-girandoni-air-rifle-deadly-under-pressure.

[109] Markowitz, *supra* note 107; *Girandoni Air Rifle*, ForgottenWeapons.com, https://www.forgottenweapons.com/rifles/girandoni-air-rifle/

[110] Nancy McClure, *Treasures from Our West: Lukens air rifle*, Buffalo Bill Center of the West, Aug. 3, 2014, https://centerofthewest.org/2014/08/03/treasures-west-lukens-air-rifle/

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    To take another example, the Volcanic repeating pistol, patented in 1854, was said to

2 have the ability to fire up to "ten or greater rounds."[111] The Volcanic Repeating Arms Company

3 was founded in 1855, and it experimented with a number of design innovations. But the company

4 was "short-lived" and went "defunct" in 1866, even though its partners included Horace Smith,

5 Daniel B. Wesson, and Courtlandt Palmer.[112] Its patent and technological work were important

6 for subsequent developments, especially for Smith and Wesson's later work, but the actual

7 weapons produced by Volcanic were few, flawed, and experimental,[113] dubbed "radical defects"

8 by Winchester himself.[114] In 1857 and 1858, Volcanic produced 3,200 "flawed" repeaters, most

9 of which "collected dust for many decades" until the company finally sold them for fifty cents

10 each to employees.[115]

11    Another account laboring to establish early gun firing provenance asserts that "[s]emi-

12 automatic technology was developed in the 1880s" with the "Mannlicher rifle. . . generally

13 attributed to be the first semi-automatic rifle."[116] Yet this "development" was initially a failure:

14 "Ferdinand von Mannlicher's Model 1885 self-loading rifle design" was "a failure, never seeing

15 anything even resembling mass production."[117] The true semi-automatic weapon did not become

16 feasible and available until the beginning of the twentieth century, and the primary market was

17 the military.[118]

18

19

---

[111] Declaration of Ashley Hlebinsky (Hlebinsky Decl.) at 6, *Miller v. Becerra*, No. 3:19-cv-01537-BEN-JLB (Dkt. # 24-3) (S.D. Cal., Dec. 13, 2019) (Plaintiffs' Trial Exhibit 2).

[112] These are the three men who came together to form what became the Smith & Wesson gun company. Pamela Haag, *The Gunning of America* 51–52 (2016).

[113] "Volcanic Repeating Arms," https://military-history.fandom.com/wiki/Volcanic_Repeating_Arms, n.d.; Flayderman, *Guide to Antique American Firearms, supra* note 103, at 303–5.

[114] *Quoted in* Haag, *supra* note 112, at 56.

[115] Haag, *supra* note 112, at 60.

[116] Hlebinsky Decl. at 8, *Miller,* No. 3:19-cv-01537-BEN-JLB (Dkt. # 24-3).

[117] Ian McCollum, *Mannlicher 1885 Semiauto Rifle*, Forgotten Weapons, May 6, 2015, https://www.forgottenweapons.com/mannlicher-1885-semiauto-rifle/.

[118] Philip Schreier, *A Short History of the Semi-Automatic Firearm*, America's 1ˢᵗ Freedom, June 28, 2022, https://www.americas1stfreedom.org/content/a-short-history-of-the-semi-automatic-firearm/.

DECLARATION OF ROBERT J. SPITZER, PH.D. IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 3:23-cv-05364

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    The more well-known "pepperbox," a multi-shot firearm where the number of shots

2    capable of being fired repeatedly coincided with the number of barrels bundled together, found

3    some civilian market popularity in the early 1800s, but was ultimately unsuccessful. The reason:

4    pepperboxes were "heavy, lumpy, and impractical."[119] By another account, "because of its small

5    bore, short range, and lack of accuracy, the pepperbox was by no means as satisfactory as a

6    revolver for military use."[120] Further, "[t]hey also had a nasty habit of discharging all their barrels

7    at once. No shooter could be certain he would not get two or three innocent bystanders, as well

8    as his intended victim."[121]

9    Thus, single shot guns were the ubiquitous firearm until after the Civil War, although

10   some long gun repeaters appeared late in the Civil War.[122] Even so, the "standard infantry

11   weapon [in the Civil War] remained the single-shot, muzzle-loaded weapon."[123] Historian James

12   M. McPherson concurred that, even though some repeating rifles appeared in the Civil War as

13   early as 1863, single-shot muzzle-loaders "remained the principal infantry weapons throughout

14   the war."[124]

15   **B.    The Colt Revolver Did Not Achieve Popularity Until Decades After its Invention**

16   The Colt revolver was "the first widely used multishot weapon,"[125] although it took

17   decades after its invention for this and similar revolvers to catch on. The idea of an available,

18   affordable, reliable multi-shot firearm did not arise until the development of Colt's multi-shot

19   revolver in the 1830s. Indeed, Colt biographer Jim Rasenberger says that Colt's pistol was the

20

21        [119] Rasenberger, *supra* note 99, at 54.

22        [120] Lewis Winant, *Pepperbox Firearms* 30 (1952).
          [121] Larry Koller, *The Fireside Book of Guns* 154 (1959). By another account, "it was a disconcerting but
     not uncommon experience to have all six barrels go off in unison." Winant, *Pepperbox Firearms*, *supra* note 120,

23   at 32.

          [122] Kopel, *The history of magazines holding 11 or more rounds*, *supra* note 106; Lee Kennett and James

24   L. Anderson, *The Gun in America* 112–13 (1975).
          [123] Donald M. Snow and Dennis M. Drew, *From Lexington to Desert Storm: War and Politics in the

25   *American Experience* 90 (1994).
          [124] James M. McPherson, *Battle Cry of Freedom* 475 (1988).

26        [125] Rasenberger, *supra* note 99, at 401.

DECLARATION OF ROBERT J.                                    26                  ATTORNEY GENERAL OF WASHINGTON
SPITZER, PH.D. IN SUPPORT OF STATE                                                    Complex Litigation Division
DEFENDANTS' OPPOSITION TO                                                            800 Fifth Avenue, Suite 2000
MOTION FOR PRELIMINARY                                                                 Seattle, WA 98104-3188
INJUNCTION                                                                                 (206) 464-7744
NO. 3:23-cv-05364

first practical firearm that could shoot more than one bullet without reloading.[126] Even then, Colt could not readily manufacture multi-shot weapons for many years because he could find no market for them, either from the government or the public. The government, in fact, dismissed such firearms as mere "novelties."[127] After an 1837 test of Colt's gun and others the government concluded that it was "entirely unsuited to the general purposes of the service."[128] The government also rejected the weapon after tests in 1836, 1840, and 1850. Colt's early failure to cultivate either a military or a civilian market in the U.S. drove him to bankruptcy and then to market his guns to European governments in the 1840s. The gun made appearances in the pre-Civil War West, yet even during the Civil War, "Colt's revolver was a sideshow through most of the war. . . ."[129] And though the Colt-type revolver "had proved itself, the official sidearm of the United States Army [in the Civil War] remained a single shot pistol."[130] It took the Colt's limited use during the Civil War to finally spur the post-Civil War proliferation of the Colt-type revolver and similar firearms into society.[131] And as detailed below, once revolvers began to spread from the military to the civilian market following the Civil War, and became associated with lawless violence, they were swiftly met by laws and regulations aimed at curbing their possession and use.

## C.    The Winchester Repeating Rifle did Not "Win the West"

Even the famous Winchester repeating rifle did not obtain popularity until the onset of the twentieth century, despite the fanciful claim that it won the American West. Inventor Benjamin Henry claims credit for developing the first practical, lever action repeating rifle (patented in 1860), however his competitor Winchester "deftly gutted" the Henry Arms

---

[126] *Id.* at 3–5, 401.
[127] Haag, *supra* note 112, at 24.
[128] Rasenberger, *supra* note 99, at 136.
[129] *Id.* at 390.
[130] Kennett and Anderson, *supra* note 122, at 91.
[131] Haag, *supra* note 112, at 34–7, 46–64. As Haag said, "the Civil War saved" the gun industrialists. *Id.* at 65.

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

27

1  Company, coopting it to form the Winchester Arms Company in 1866, paving the way for

2  Winchester's dominance.[132]  The Winchester rifle could fire up to fifteen rounds without

3  reloading. Yet the widely known Winchester 1873, "was designed for sale to the Government as

4  a military arm."[133] A gun whose legendary status wildly outdistanced its actual production and

5  impact, it was nevertheless an important firearm in the late nineteenth century, although this

6  "quintessential frontier rifle flourished later, in the 'post-frontier' early 1900s. Its celebrity

7  biography backdated its diffusion and even its popularity."[134] In fact, the slogan stating that the

8  Winchester "won the West" was invented by a Winchester executive as a marketing ploy in

9  1919.[135]

10      As historian Michael Vorenberg concluded: "Rifles holding more than 10 rounds made

11  up a tiny fraction of all firearms in the United States during Reconstruction."[136] An analysis of

12  production runs of Henrys and Winchesters from 1861-1871 concluded that they produced a

13  total of 74,000 guns. Most of them—about 64,000—were sold to foreign militaries, leaving

14  about 9,200 for domestic American sales. Of those, 8,500 were acquired by Union soldiers,

15  leaving a very small supply of guns for domestic civilian acquisition.[137] By comparison, 845,713

16  Springfield "trap-door" single shot rifles were manufactured during this same time period.[138]

17      Additionally, the Winchester was not a semi-automatic firearm; it was a lever-action rifle

18  that required the shooter to manipulate a lever in a forward-and-back motion before each shot.

19

20

---

[132] *Id.* at 96.

[133] Koller, *supra* note 121, at 112.

[134] Haag, *supra* note 112, at 179.

[135] *Id.* at 353.

[136] Declaration of Michael Vorenberg ¶42, *Ocean State Tactical v. Rhode Island*, No. 1:22-cv-00246-JJM-PAS, (Dkt. #19-2) (D. R.I. Oct. 14, 2022).

[137] Herbert G. Houze, *Winchester Repeating Arms Company: Its History & Development from 1865 to 1981* at 21, 36–41, 51, 59, 65–66, 71, 73, 75 (2004); Tom Hall to D. C. Cronin, New Haven, May 18, 1951; Box 8, folder 16, Winchester Repeating Arms Company, Office files (MS:20), McCracken Research Library, Cody, WY.

[138] According to an account of the Springfield, "The end of the Trapdoor series came in 1892, when the government adopted a bolt-action repeating rifle known as the Krag-Jorgensen." *The Trap Door Rifle*, National Park Service, July 22, 2020, https://www.nps.gov/spar/learn/historyculture/trapdoor-rifle.htm

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

And when the gun was emptied, it had to be manually reloaded, one round at a time.[139] Winchester did not produce a true semi-automatic rifle—then called a "self-loading" rifle—until the Winchester Model 1903 was released in 1903, and did not produce a semi-automatic rifle with a detachable magazine until the Winchester Model 1905, two years later. The Model 1905 could receive a five or ten round box magazine, although from 1905 to 1920 only about 30,000 of the guns were made. Even in World War I, soldiers primarily used bolt-action one shot rifles that could fire about twelve rounds per minute.[140]

With all this, the Winchester was by no means universally embraced by long gun users. Indeed, "a good many westerners would have nothing to do with the early Winchesters or other repeaters, for reasons they considered very sound, and not until the 1880s did the repeating rifle assert its dominance over the single-shot breechloader."[141] According to A.C. Gould, writing in 1892, single-shot rifles were: "less complicated, and less liable to get out of order; will shoot a greater variety of ammunition; will shoot uncrimped ammunition, patched or unpatched bullets; will permit the use of a longer barrel; an explosive bullet can be used; a greater range of rear sights on tang can be used."[142] Historian Vorenberg confirms this analysis: "There were civilians during Reconstruction who owned high-capacity rifles, to be sure. Yet almost all such civilians were 'frontiersmen' of the Western Territories, and the population of the Western Territories was tiny compared to the population of the United States as a whole. Furthermore, Henrys and

---

[139] Normally, a Remington-type rifle is loaded from a feed ramp on the side of the rifle.

[140] Robert Johnson and Geoffrey Ingersoll, *It's Incredible How Much Guns Have Advanced Since The Second Amendment*, Military & Defense, Dec. 17, 2012, https://finance.yahoo.com/news/incredible-much-guns-improved-since-174927324.html; Phil Bourjaily, *Blast From the Past: Winchester Model 1905*, Field & Stream, Jan. 11, 2019, https://www.fieldandstream.com/blast-from-past-winchester-model-1905/.

[141] Louis A. Garavaglia and Charles G. Worman, *Firearms of the American West, 1866-1894* at 129 (1985). Historian Michael Vorenberg says that "Henrys and Winchesters were. . . repeating rifles, but because they were in a class of their own, due to their high capacity, they were generally known only as Henrys or as Winchesters." Declaration of Michael Vorenberg. *supra* note 136, ¶ 15.

[142] *Quoted in* Garavaglia and Worman, *supra* note 141, at 131.

DECLARATION OF ROBERT J. SPITZER, PH.D. IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 3:23-cv-05364

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Winchesters, the only high-capacity firearms of the era, were not the preferred firearms of the 'frontiersmen' of the region."[143]

**D.     The Rise of Post-Civil War Multi-Shot Handguns Was Accompanied by Escalating Firearm Violence and then Firearm Regulations**

Following the Civil War, revolvers were marketed to the civilian population in newspaper advertisements extolling their virtues. For example, when Smith & Wesson's near-monopoly over the manufacture of cartridge revolvers ended with the expiration of its Rollin White patent in 1870, "dozens of other [gun] makers"[144] entered the market. Soon these other manufacturers were producing abundant cheap revolvers at low cost to the consumer. As Kennett and Anderson noted, Colt's initial revolvers sold for $35, but by 1900 the "'two dollar pistol' was a fixture in American life."[145] Further, as the mail order business boomed from the 1870s on, companies like Montgomery Ward and Sears began selling revolvers through their catalogs—especially small, cheaper, lighter-weight models that cost less to mail. Cheap handguns were advertised not only through catalogs, but also through newspaper and magazine advertisements.[146]

The rise in the circulation of multi-shot handguns in society following the Civil War was accompanied by escalating interpersonal violence associated with the weapons and, soon thereafter, the rapid spread of concealed carry restrictions (*see* Exhibits B–E).[147] By the end of the nineteenth century, virtually every state in the country prohibited or severely restricted concealed gun and other weapons carrying.[148] In addition, in the late 1800s and early 1900s

---

[143] Declaration of Michael Vorenberg, *supra* note 136, ¶ 97.
[144] Kennett and Anderson, *supra* note 122, at 98.
[145] *Id.* at 99.
[146] *Id.* at 99–100; *see also* Haag, *supra* note 112, at 251–55.
[147] Dickson D. Bruce, *Violence and Culture in the Antebellum South* (1979); Roth, *American Homicide*, *supra* note 22, at 218–19.
[148] Spitzer, *Gun Law History in the United States and Second Amendment Rights*, *supra* note 11, at 63–67.

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

30

1   several states and localities barred possession of such weapons outright, regardless of other

2   circumstances.[149]

3   It was only in the post-World War I era when multi-shot semi-automatic and fully

4   automatic long guns began to circulate appreciably in society and came to be associated with

5   criminal use that they became a regulatory and public policy concern, leading to the enactment

6   of anti-machine gun laws in at least 32 states, between eight and eleven state laws restricting

7   semi-automatic firearms, and the first significant national gun regulatory law in 1934.[150]

8   As noted earlier, the problems with arguments claiming that historical multi-shot

9   weapons were both viable and commonly possessed before the late nineteenth century are two-

10  fold: they misrepresent the actual past of the weapons cited, and even more importantly fail to

11  understand the connection between gun technology developments and the steps leading up to

12  changes in weapons-related public policy to regulate threats posed by those developments.

13  As discussed previously, that process has occurred, both historically and in the modern

14  era, through a series of sequential steps. First, a new gun or gun technology must be invented.

15  Second, it is then normally patented, noting that there are many steps between a patent, actual

16  gun production, distribution and dissemination. As Lewis Winant sardonically observed, "Many

17  patents are granted for arms that die a-borning."[151] And as gun expert Jack O'Connor wrote,

18  "many types of guns were invented, produced and discarded through the early years of the

19

20

---

[149] Illinois Act of Apr. 16, 1881, 1885 Ill. Stat. Ann., Crim. Code, ch. 38, 88; George R. Donnan, *Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5* § 410, 172, Image 699 (1885); Geoffrey Andrew Holmes, *Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa* § 105, 206–207, Images 209–210 (1887); William H. Baily, *The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa* § 209, 89–90, Images 89–90 (1900); An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons, 1911 N.Y. Laws ch. 195 § 1, 442–43; 1913 N.Y. Laws ch. 608, § 1, 1627–30; 1915 N.D. Laws 96, ch. 83, §§ 1–3, 5; 1917 Cal. Sess. Law 221–225; 1923 Cal. Stat. 695; 1931 N.Y. Laws 1033, ch. 435, § 1. Not included in this list are other state laws that barred weapons possession to specific groups (enslaved persons, minors) or that criminalized weapons possession by individuals if they committed a crime with the listed weapons.

[150] *See infra* § VII.

[151] Winant, *Firearms Curiosa*, *supra* note 89, at 36.

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

31

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   development of the United States."[152] Third, in many cases, weapons development is historically

2   tied to military need and military acquisition, not directly for civilian use or self-defense

3   applications. Military weaponry is developed without consideration of potential civilian use and

4   the consequences of dissemination in the civilian market.[153] Fourth, some weapons may then

5   spill over into, or be adapted to, civilian markets and use. Fifth, if such weapons then circulate

6   sufficiently to pose a public safety or criminal problem or threat, calls for government regulation

7   or restriction then may lead to gun policy/law changes. This general sequence is echoed in works

8   like the Buyer's Guide to Assault Weapons, a standard reference work on assault weapons.[154]

9        Again, to simply assert or assume that past firearms design/development, invention, or

10   patenting equals commonality, viability, or a measurable presence or impact on society, is a leap

11   in logic without historical foundation. It would be as logical to reject modern governmental

12   regulation of electric power through such government agencies as state power commissions and

13   the Federal Energy Regulatory Commission (founded in 1977) because no such regulation was

14   enacted around the time of Benjamin Franklin's experiments with electricity in the mid-

15   eighteenth century. The fact that inventors worked on new firearm designs and modifications

16   tells us nothing about the consequences of such designs for society and public policy. And the

17   existence of such designs does not equal technological viability or reliability, much less general

18   availability, much less societal circulation and use of these weapons. Other weapons subject to

19   government restriction in our history further illustrate these principles.

20

21

22

---

[152] Jack O'Connor, *Complete Book of Rifles and Shotguns* 42 (1961).

[153] Note that the third step, and perhaps the second, do not apply to non-firearms weapons discussed here—in particular the Bowie knife and various clubs. These weapons were mostly not developed for military use, though Bowie knives, for example, were carried by some soldiers during the Civil War. Knives and clubs are far simpler technologically compared to firearms (and of course do not rely on ammunition) and thus were much more easily made, reproduced, and circulated.

[154] Phillip Peterson, *Gun Digest Buyer's Guide to Assault Weapons* 4–7 (2008). Peterson's Foreword summarizes a similar relationship between weapons development and subsequent calls for regulation.

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

32

## VII.   HISTORY AND REGULATION OF FULLY AUTOMATIC AND SEMIAUTOMATIC FIREARMS

### A.   The History

A clear example of this historical pattern is provided by early twentieth-century restrictions related to fully automatic firearms. While weapons capable of firing rounds in rapid succession can be traced to guns of the late nineteenth and early twentieth centuries, like the hand-cranked, multi-barreled Gatling gun which could fire up to 200 rounds per minute,[155] it and its successors were military weapons designed to be used in combat and fired from a tripod or similar supporting apparatus, owing to the Gatling gun's size and weight. Strictly speaking, guns like the Gatling gun were not fully automatic as they did not fire a continuous stream of bullets while depressing a gun trigger. The development of a fully automatic machine gun for battlefield use, capable of firing all of its rounds from a single barrel and with a single trigger pull, came to fruition during World War I. These tripod-mounted military guns, like the Maxim, operated to devastating effect on the battlefield. They initially fired 200-400 rounds per minute but later 400-600 rounds per minute from a gun weighing roughly 100 pounds.[156]

Out of World War I came a practical, lighter-weight, reliable, hand-held, fully automatic weapon: the Thompson submachine gun, widely known as the Tommy gun. Though it was developed for use in World War I as "purely a military weapon,"[157] it came too late in the war to have much effect. Its inventor, John Thompson, patented his .45 caliber gun in 1920.[158] It

---

[155] The Gatling gun, a manually operated, hand-cranked machine gun, was adopted by the U.S. Army in 1866, and was utilized in warfare against Native Americans and in the Spanish-American War of 1898. Richard W. Stewart, *American Military History, Vol. I: The U.S. Army and the Forging of a Nation, 1775-1917* at 367–68 (2008); Gatling Gun, *History.com*, September 9, 2021, https://www.history.com/topics/american-civil-war/gatling-gun.

[156] Donald M. Snow and Dennis M. Drew, *From Lexington to Desert Storm: War and Politics in the American Experience* 127 (Armonk, NY: M.E. Sharpe, 1994); "How the Machine Gun Changed Combat During World War I," Norwich University Online, October 15, 2020, https://online.norwich.edu/academic-programs/resources/how-machine-gun-changed-combat-during-world-war-i.

[157] William J. Helmer, *The Gun That Made the Twenties Roar* 75 (1969).

[158] Matthew Moss, *From Gangland to the Battlefield — 15 Amazing Facts About the Thompson Submachine Gun*, Military History Now, January 16, 2015, https://militaryhistorynow.com/2015/01/16/from-gangland-to-the-battlefield-15-amazing-facts-about-the-thompson-submachine-gun/.

DECLARATION OF ROBERT J. SPITZER, PH.D. IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 3:23-cv-05364

33

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

typically fired with either a 20–30 round stick magazine or a 100-round drum magazine. The Tommy gun was initially unregulated after World War I. In an effort to boost anemic post-war sales, the manufacturer marketed the gun for civilian purchase. (The U.S. military showed little interest in acquiring the weapon, as the military largely demobilized and contracted sharply in size after the war.[159])

It was only at this point—in the early 1920s—that reliable hand-held automatic weapons were made available to civilians and began to circulate in society,[160] though sales in the early 1920s were sluggish. By 1925, Thompson's marketing company, Auto Ordnance, had sold only about 3,000 of the 15,000 it had manufactured up to this point, including to police forces and individuals.[161] This pattern of anemic sales typified the gun's commercial trajectory: "Despite its initial publicity and later notoriety, the Thompson submachine gun was a failure from the start."[162] This was especially true for sales to police forces, to whom Thompson and his company marketed the gun aggressively, even as criminals began adopting the gun. "As a criminal's weapon, the Tommygun was an unqualified success. As a police weapon, it was such a flop that many law-enforcement officials wished sincerely that it had never come off the drawing board."[163] For example, after the St. Valentine's Day massacre, a representative of Auto-Ordnance visited Chicago police captain John Stege to offer assistance. Captain Stege "practically ran him out of the office. . . .It was Stege's opinion that not even the police should be armed with machine guns," an opinion shared "by many other lawmen in the country."[164] Another police chief explained why: "It is not possible for a police officer to open a machine

---

159 Ellis, *The Social History of the Machine Gun*, 149–52; Helmer, *supra* note 157 at 161–64.

160 Peter Suciu, *The Thompson Submachine Gun: Made for the U.S. Postal Service?*, The National Interest, July 3, 2020, https://nationalinterest.org/blog/reboot/thompson-submachine-gun-made-us-postal-service-164096.

161 Kennett and Anderson, *supra* note 122, at 203. Helmer confirms the number of 3000 guns sold by 1925. Helmer, *supra* note 157, at 74. Helmer says that "sales declined steadily" after 1921; *see id.* at 130.

162 Helmer, *supra* note 157, at 129.

163 *Id.* at 126. Helmer quotes numerous police officials denouncing the weapon as useless for the police; *see id.* at 126–28.

164 *Id.*

DECLARATION OF ROBERT J. SPITZER, PH.D. IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 3:23-cv-05364

34

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

gun up on a crowded street . . . because you are going to kill possibly ten innocent people to one criminal."[165] Poor military and law enforcement sales forced the company to "peddle the new gun in peacetime" by trying "to think up something else it might be good for." Their conclusion was to market the gun as "good for anything"[166] as seen by this 1922 advertisement from Auto-Ordnance:

---

[165] *Id.* The gun's rare actual use by police confirmed this fear. In an attack on John Dillinger, for example, FBI agents "mistakenly shot three innocent customers." (*Id.* at 128).

[166] *Id.* at 75.

DECLARATION OF ROBERT J. SPITZER, PH.D. IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 3:23-cv-05364

35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26



# The Thompson Submachine Gun
## *The Most Effective Portable Fire Arm In Existence*

THE ideal weapon for the protection of large estates, ranches, plantations, etc. A combination machine gun and semi-automatic shoulder rifle in the form of a pistol. A compact, tremendously powerful, yet simply operated machine gun weighing only seven pounds and having only thirty parts. Full automatic, fired from the hip, 1,500 shots per minute. Semi-automatic, fitted with a stock and fired from the shoulder, 50 shots per minute. Magazines hold 50 and 100 cartridges.

THE Thompson Submachine Gun incorporates the simplicity and infallibility of a hand loaded weapon with the effectiveness of a machine gun. It is simple, safe, sturdy, and sure in action. In addition to its increasingly wide use for protection purposes by banks, industrial plants, railroads, mines, ranches, plantations, etc., it has been adopted by leading Police and Constabulary Forces, throughout the world and is unsurpassed for military purposes.

*Information and prices promptly supplied on request*

**AUTO-ORDNANCE CORPORATION**
302 Broadway  *Cable address: Autordco*  New York City

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

36

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    Another automatic weapon developed for World War I was the Browning Automatic Rifle

2    (BAR). It fired a .30-06 caliber round, could receive a 20-round box magazine, and could fire up

3    to 650 rounds per minute. The BAR first appeared on the battlefield in 1918.[167] It was "a heavy

4    machine rifle weighing nearly twenty pounds with bipod and loaded magazine. . . ."[168] It, too,

5    made its way into civilian life and found favor among criminals and gangsters in the 1920s and

6    early 1930s.[169]

7    Before the early 1920s, these fully automatic weapons were unregulated for the obvious

8    reason that they did not exist or were not circulating widely in society. When they did begin to

9    circulate, however, their uniquely destructive capabilities rapidly became apparent, especially to

10   the emergent Prohibition-fueled gangster organizations of the 1920s. Guns like the Tommy gun

11   and the BAR were actually used relatively infrequently by criminals generally, but when they

12   were used, they exacted a devastating toll and garnered extensive national attention, such as their

13   use in the infamous St. Valentine's Day massacre in Chicago in 1929.[170]

14   I conducted a search of Newspapers.com from 1920-1930 using the search terms "Tommy

15   Gun," "Thompson submachine" and "machine gun." The term "Tommy Gun" turned up

16   essentially no hits until 1928, a clear indication that this particular term did not come into wide

17   use until fairly late in the decade. The search for "machine gun" turned up more, but many of

18   them referenced the weapons owned or used by the military (including many stories about World

19   War I). The search for "Thompson submachine," by contrast, yielded many articles from across

20   the country. Starting in the fall of 1920, a few newspaper articles described regular reports of

21

22   [167] Paul Richard Huard, *Browning Automatic Rifle: The Most Dangerous Machine Gun Ever?*, The
     National Interest, November 19, 2019, https://nationalinterest.org/blog/buzz/browning-automatic-rifle-most-

23   dangerous-machine-gun-ever-97662; *Browning automatic rifle*, Britannica, September 8, 2022,
     https://www.britannica.com/technology/Browning-automatic-rifle.

24   [168] Helmer, *supra* note 157, at 37.
     [169] Derek Avery, *Firearms* 12 (Wordsworth eds., 1995). The BAR was a favorite of the notorious outlaws

25   Bonnie and Clyde, for example. Christian Oord, *The Weapons of Bonnie & Clyde & the Guns That Stopped Them*,
     War History Online, April 26, 2019, https://www.warhistoryonline.com/history/weapons-of-bonnie-and-

26   clyde.html?A1c=1.
     [170] Chris McNab, *supra* note 38, at 97–98.

DECLARATION OF ROBERT J.                       37              ATTORNEY GENERAL OF WASHINGTON
SPITZER, PH.D. IN SUPPORT OF STATE                                    Complex Litigation Division
DEFENDANTS' OPPOSITION TO                                             800 Fifth Avenue, Suite 2000
MOTION FOR PRELIMINARY                                                  Seattle, WA 98104-3188
INJUNCTION                                                                 (206) 464-7744
NO. 3:23-cv-05364

1    demonstrations of the gun for police and other government officials and agencies, and reports of

2    local police forces sometimes purchasing a few of the guns. Reports of demonstrations of the

3    gun to police forces and other state and local officials and also of some purchases appeared

4    regularly starting in 1921, and continued throughout the 1920s, as did numerous articles

5    describing the gun's development and capabilities by inventor John Thompson. These articles

6    also reprinted standard accounts of the Tommy gun's weight, size, firing capabilities and

7    possible uses by law enforcement.

8         To cite a few examples of early news coverage, an account in the Western Sentinel from

9    December 3, 1920,[171] reported on a demonstration of the Tommy gun, saying that it weighed

10   about seven pounds, fired .45 caliber rounds, could fire up to 1500 rounds per minute, and could

11   receive a box magazine holding 20 rounds, or a drum magazine with either 50 or 100 rounds. It

12   went on to say that the gun was "without equal for riot use and for the police chasing thieves and

13   other lawbreakers who attempt to escape in automobiles, for with this little weapon it is a very

14   easy thing to rip the tires off of an escaping car, and the gun is so light and simple that an

15   inexperienced man can fire with the effect of an expert marksman and moving targets can be hit

16   with the ease that a fireman sprays a hose on a flame." Other articles touted the gun's usefulness

17   in controlling riots and mobs. An account from the Jamestown Weekly Alert reported that state

18   and county officials were provided with ten of the guns for "hunting down whiskey runners in

19   the northern part of the state."[172]

20        Starting in roughly late 1921 and early 1922, a handful of small news items reported thefts

21   of Tommy guns from armories or police stations. The one notable crime-related case to receive

22   enormous press attention was a major seizure of about 600 Tommy guns with ammunition and

23   magazines, first reported about June 16, 1921, from a ship docked at the port of Hoboken, New

24   _____

[171] *New Type of Gun is Demonstrated Here*, Winston-Salem, North Carolina, December 3, 1920;
25   https://www.newspapers.com/image/89498556/?terms=%22Thompson%20submachine%22&match=1
[172] *New Submachine Guns Received*, Jamestown, North Dakota, May 12, 1921;
26   https://www.newspapers.com/image/465633429/?terms=%22Thompson%20submachine%22&match=1

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

38

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    Jersey, bound for Ireland for use by the IRA in the ongoing Irish rebellion (Ireland won its

2    independence from Britain in 1922).[173]

3         Newspaper reports of criminal use of Tommy guns were few, small, and spare until 1926,

4    when a few very sensational news reports of their criminal use received widespread and

5    extensive attention in newspapers across the country. Most of these initial stories were reports

6    of Chicago gangster use (notably one "Al Caponi" in an early account) along with stories from

7    the New York City-New Jersey area. For example, an AP story from October 16, 1926, with the

8    dateline Somerville, N.J. reported on "the advance of 500 city, state and volunteer police on the

9    mountain stronghold of New Jersey's machine gun mail bandits."[174] According to the account,

10   eight men robbed a truck of over $100,000 and were holed up at the stronghold. The authorities

11   were also armed with weapons that included machine guns, and were contemplating the

12   expansion of the search party with 2000 militiamen.

13        Coinciding with these extensive stories were articles, editorials, and exposés calling for

14   changes in the law to address this growing gun crime problem. For example, an article from the

15   Boston Herald began by quoting a magazine story from Collier's Weekly that observed: "The

16   police authorities are powerless to interfere with the sale and distribution of the highest powered

17   instrument of destruction that has yet been placed at the convenience of the criminal element in

18   this country." The Herald sent out a man to see if an average person could buy a machine gun

19   "without trouble." The buyer's conclusion: "He had no trouble" purchasing the gun, which the

20   article labeled "a diabolical engine of death." The article detailed that for the prospective gun

21   purchaser, "Pistols would not be shown unless the customer exhibited a permit, but machine

22   guns could be had over the counter with no such formalities." The article concluded this way:

23   "Here is a case where it seems that 'there ought to be a law.' This weapon . . . was designed for

24

25   [173] Helmer, *supra* note 157, at 53–64.
     [174] *Use Expert Riflemen to Hunt Robbers*, Ithaca Journal, N.Y., Oct. 16, 1926,

26   https://www.newspapers.com/image/254505945/?terms=%22Thompson%20submachine%22&match=1

     DECLARATION OF ROBERT J.                    39        ATTORNEY GENERAL OF WASHINGTON
     SPITZER, PH.D. IN SUPPORT OF STATE                         Complex Litigation Division
     DEFENDANTS' OPPOSITION TO                                   800 Fifth Avenue, Suite 2000
     MOTION FOR PRELIMINARY                                        Seattle, WA 98104-3188
     INJUNCTION                                                       (206) 464-7744
     NO. 3:23-cv-05364

war. . . . a machine gun is the greatest aid to crime that yet has been placed within the reach of criminals."[175]

Reports and exposés, juxtaposed with lurid and sensational accounts of Tommy gun criminality, built pressure on the states to enact anti-machine gun laws and also put pressure on Congress to act. A long-stalled bill in Congress to restrict the interstate shipment of guns received renewed interest and support in 1926, eventually leading to congressional enactment of the Mailing of Firearms Act of 1927, a limited measure that failed to restrict interstate handgun shipment because it did not affect non-Postal Service shipments. From 1926 on, news stories were filled with the kind of sensational gangster-related stories that led to the Tommy gun being labeled the weapon that "made the Twenties roar," and that also led to many anti-machine gun laws. For example, an article dated November 27, 1928, reported that "Chicago's war on gangsters and racketeers was reopened tonight with the drafting of a law to prohibit the sale of machine guns. 'Tommy guns,' the bullet spitting little Thompson submachine guns which are inseparable from gang fights, bank robberies, assassinations and other major crimes . . . could be purchased as easily and legally in Chicago as a pound of meat. . . . practically every sporting goods establishment in Chicago carried the firearms and sold them readily."[176] (Illinois adopted an anti-machine gun law in 1931.[177])

**B.      State-Level and Nationwide Attempts to Regulate Automatic and Semi-Automatic Firearms and Ammunition Feeding Devices**

In response to the wider availability of firearms like the Tommy gun and the BAR, between 1925 and 1934, at least 32 states enacted anti-machine gun laws (*see* Exhibits B and D). These state (and eventually federal) enactments were anticipated, justified, and promoted by

---

[175] *Machine Guns for All*, Kennebec Journal, Augusta, Maine, December 4, 1926, https://www.newspapers.com/image/857617757/?terms=%22Thompson%20submachine%22&match=1
[176] *Machine Gun Ban Plan of Chicago*, The Salt Lake Tribune, Nov. 27, 1928, https://www.newspapers.com/image/542285510/?terms=%22Thompson%20submachine%22&match=1
[177] An Act to regulate the sale, possession and transportation of machine guns, Ill. Rev. Stat. ch. 38, ¶¶ 414(a) to 414(g), approved July 2, 1931.

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

40

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

the National Conference of Commissioners on Uniform State Laws, a national organization

formed in 1892 to provide "non-partisan, well-conceived and well-drafted legislation that brings

clarity and stability to critical areas of state statutory law."[178] (Today, the organization is known

as the Uniform Law Commission.) In 1923, the Commission organized a special committee to

draft a "Uniform Act to Regulate the Sale and Possession of Firearms." In 1928, it issued a model

law calling for the prohibition of the possession of "any firearm which shoots more than twelve

shots semi-automatically without reloading."[179] In 1930, it issued a model firearms act focusing

on "guns of the pistol type." In 1932, it issued a model act "intended not only to curb the use of

the machine gun, but to make it unwise for any civilian to possess one of the objectionable type."

The Commission explained that, between 1923 and 1930, "the infant industry of racketeering

grew to monstrous size, and with it the automatic pistol replaced the revolver, to be in turn

displaced by a partly concealable type of machine gun—the Thompson .45 inch caliber

submachine gun becoming most popular. . . ."[180]

Congress enacted a machine gun ban for the District of Columbia in 1932 which defined

a machine gun as "any firearm which shoots automatically or semiautomatically more than

twelve shots without reloading."[181] The National Rifle Association endorsed D.C.'s ban, stating

"it is our desire [that] this legislation be enacted for the District of Columbia, in which case it

can then be used as a guide throughout the states of the Union."[182] In his testimony before

Congress in 1934 on the bill that became the National Firearms Act, NRA vice president Milton

A. Reckord extolled his organization's role in passing the 1932 D.C. law, saying, ". . . the

[178] Uniform Law Commission, *About Us*, https://www.uniformlaws.org/aboutulc/overview.

[179] Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928).

[180] Uniform Machine Gun Act, National Conference of Commissioners on Uniform State Laws, Forty-Second Annual Conference, Washington, D.C., October 4–10, 1932, http://www.titleii.com/bardwell/1932_uniform_machine_gun_act.txt.

[181] National Firearms Act, Hearings Before the H. Comm. on Ways and Means,  H.R. 9066, April 16, 18, May 14, 15, and 16, 1934, at 45 (Washington, D.C.: GPO, 1934); Act of July 8. 1932, 47 Stat. 650, ch. 465, §§ 1, 14 (1932).

[182] S. Rep. No. 72-575, at 5–6 (1932).

DECLARATION OF ROBERT J. SPITZER, PH.D. IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 3:23-cv-05364

41

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    association I represent is absolutely favorable to reasonable legislation. We are responsible for

2    the uniform firearms act. . . . in the District of Columbia. It is on the books now."[183]

3        In 1934, Congress enacted the National Firearms Act, which imposed a series of strict

4    requirements on the civilian acquisition and general circulation of fully automatic weapons, like

5    the Tommy gun. The National Firearms Act imposed a tax on the manufacture, sale, and transfer

6    of listed weapons, including machine guns, sawed-off shotguns and rifles, silencers, and "any

7    other weapons" with certain firing capabilities. Such weapons had to be registered with the

8    Treasury Department, and the owners fingerprinted and subject to a background check, with the

9    payment of a $200 tax.[184] The early models of the Tommy gun could fire "an astounding 1,500

10   rounds per minute. A Tommy gun could go through a 100-round drum magazine in four seconds.

11   Later versions fired 600 to 700 rounds per minute."[185]

12       In his opening statement to the Ways and Means Committee of the U.S. House of

13   Representatives, Attorney General Homer Cummings made clear that the bill under

14   consideration was designed to fight the epidemic of gun crime where criminals could evade

15   capture by crossing state lines:

16       The development of late years of the predatory criminal who passes rapidly from
17       State to State, has created a situation which is giving concern to all who are
         interested in law and order. . . . there are more people in the underworld today
18       armed with deadly weapons, in fact, twice as many, as there are in the Army and
         the Navy of the United States combined. . . . In other words, roughly speaking,
19       there are at least 500,000 of these people who are warring against society and who
         are carrying about with them or have available at hand, weapons of the most deadly
20       character.[186]

21

22       [183] *Hearings Before the Committee on Ways and Means*, *supra* note 181, at 36.
         [184] National Firearms Act, Pub. L. No. 73-474, 48 Stat. 1236 (1934).
23       [185] Moss, *supra* note 158.

24       [186] *Hearings Before the Committee on Ways and Means*, *supra* note 181, at 4. The version of the bill that
         appears on page 1 of the Hearings had this definition of machine gun: "The term 'machine gun' means any weapon
25       designed to shoot automatically or semiautomatically twelve or more shots without reloading." Congress eventually
         settled on strict regulation of fully automatic weapons, sawed-off shotguns, and silencers. This political compromise
26       was the result of the Congressional focus on weapons used by organized criminals of the era.

DECLARATION OF ROBERT J.                          42         ATTORNEY GENERAL OF WASHINGTON
SPITZER, PH.D. IN SUPPORT OF STATE                              Complex Litigation Division
DEFENDANTS' OPPOSITION TO                                        800 Fifth Avenue, Suite 2000
MOTION FOR PRELIMINARY                                            Seattle, WA 98104-3188
INJUNCTION                                                           (206) 464-7744
NO. 3:23-cv-05364

1      In addition to the National Firearms Act's restrictions on fully automatic weapons, during

2 this same time period at least seven states plus the District of Columbia, and as many as ten states

3 plus D.C., enacted laws restricting semi-automatic weapons (*see* Exhibit B).[187] The reason for

4 restricting semi-automatic firearms is not hard to discern. These restrictions all appeared in the

5 same statutes as those restricting fully automatic weapons, which utilize the same fundamental

6 firearms technology: an action that automatically loads a new round into the chamber after each

7 shot is fired, potentially with the use of detachable ammunition magazines or similar feeding

8 devices, and is capable of firing numerous rounds without reloading.[188] During the time that

9 Thompson and his company were developing and marketing the Tommy gun (which could fire

10 in semi- or full-auto modes[189]), they were also developing the Thompson Autorifle, a "strictly

11 semiautomatic rifle" for which the military showed greater interest than it did for the Tommy

12 gun.[190] The Autorifle was also promoted to police and military organizations, though it was

13 overshadowed in the public mind by the Tommy gun.[191]

14      As the prior discussion reveals, the regulation of automatic and semi-automatic weapons

15 in the 1920s and 1930s was closely tied to the enhanced firing capacity of these weapons and

16 the attractiveness (and use) of these weapons by criminals at that time, and the related

17 understanding that these weapons had no justifiable civilian use. By that time, gun technology

18 was available that made it possible for ammunition to be reliably fired in rapid succession and

19 guns to be reloaded through interchangeable ammunition magazines or similar devices. Again,

20 the lesson is the same: once these technologies began to spread in civil society and be used for

21

22      [187] *See also* Spitzer, *Gun Law History in the United States and Second Amendment Rights*, *supra* note 11, at 68–71. The language of the restrictions in Illinois, Maine, and South Carolina was ambiguous regarding whether they applied to semi-automatic weapons.

23      [188] Spitzer, *The Gun Dilemma*, *supra* note 5, at 32–33. In 1913, Florida enacted this measure: "It shall, at any time, be unlawful to hunt game in Marion County with guns—known as Automatic guns." While an automatic weapon fires a continuous stream of bullets when the trigger is depressed, a semi-automatic weapon fires a single shot with each pull of the trigger.

24

25      [189] Helmer, *supra* note 157, at 48–49, 255–56.
     [190] *Id.* at 37, 50.

26      [191] Ultimately, the military opted for the semiautomatic M1 Garand over the Autorifle. *Id.* at 161.

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

43

1  criminal or other dangerous purposes, and because of the belief that it was "unwise for any

2  civilian to possess" such weapons,[192] regulatory efforts ensued.

3        Restrictions on fully automatic and semi-automatic firearms were closely tied to

4  restrictions on ammunition magazines or their equivalent, as both automatic and semi-automatic

5  weapons are predicated on some kind of mechanical loading function or device that

6  automatically feeds new rounds into the firing chamber after the previous round is fired. As is

7  the case with contemporary state limitations on ammunition magazine capacity, state laws

8  enacted early in the twentieth century imposed restrictions based on the number of rounds that

9  could be fired without reloading, ranging from more than one (Massachusetts and Minnesota)

10  up to a high of eighteen (Ohio).

11        In fact, magazine capacity/firing limits were imposed in at least 23 states, representing

12  approximately 58% of the American population at that time.[193] These state laws fell into three

13  categories (*see* Table 1 below): ten states plus the District of Columbia regulated semi-automatic

14  and fully automatic weapons (California, District of Columbia, Massachusetts, Michigan,

15  Minnesota, New Jersey, North Carolina, Ohio, Rhode Island, South Dakota, and Virginia[194]);

16  eleven states regulated fully automatic weapons only, where the regulation was defined by the

17  number of rounds that could be fired without reloading or by the ability to receive ammunition

18  feeding devices (Illinois, Louisiana, Minnesota, New Jersey, North Dakota, Oregon,

19

---

20       [192] Uniform Machine Gun Act, *supra* note 180.

21       [193] U.S. Census, *Historical Population Change Data (1910-1920)* (using 1920 census data), https://www.census.gov/data/tables/time-series/dec/popchange-data-text.html.

22       [194] 1933 Cal. Stat. 1169; Act of July 8, 1932, ch. 465, §§ 1, 8; 47 Stat. 650, 650, 652 (District of Columbia); Act of July 2, 1931, 1931 Ill. Laws 452, 452; 1927 Mass. Acts 413, 413–14; Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888; Act No. 206, 1929 Mich. Pub. Acts, Sec. 3, Comp. Laws 1929; Act of Apr. 10, 1933, , 1933 Minn. Laws, ch. 190, at 231–232; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189; 1927 R.I. Pub. Laws 256; Uniform Machine Gun Act, 1933 S.D. Sess. Laws 245, ch. 206, 245; Act of Mar. 7, 1934, 1934 Va. Acts, ch. 96, 137. Two of these states enacted early laws focused on such weapons' use in hunting. New Jersey had a 1920 law making it "unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading." 1920 N.J. Laws 67, ch. 31, § 9. North Carolina made it "unlawful to kill quail with any gun or guns that shoot over two times before reloading" in 1917. 1917 N.C. Sess. Laws 309, ch. 209, § 1.

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

44

Pennsylvania, South Carolina, Texas, Vermont, and Wisconsin[195]); and four states restricted all guns that could receive any type of ammo feeding mechanism or round feeding device and fire them continuously in a fully automatic manner (California, Hawaii, Missouri, and Washington State).[196]

**TABLE 1**

AMMUNITION MAGAZINE RESTRICTIONS IN 23 STATES, 1917–1934[197]

| Semi-automatic and Fully Automatic Firearms (barred firearms holding more than the listed number of rounds or more without reloading) | Fully Automatic Firearms (barred firearms capable of firing the listed number of rounds or more without reloading or that could receive ammunition feeding devices) | All Firearms (any weapon capable of receiving rounds through certain named round-feeding devices) |
|---|---|---|
| -California (10 rounds; 1933) <br> -District of Columbia (12 rounds; 1932) <br> -Massachusetts (1 round; 1927) <br> -Michigan (16 rounds; 1927) <br> -Minnesota (1 round; 1933) <br> -New Jersey (2 rounds; hunting only; 1920) <br> -North Carolina (2 rounds; hunting only; 1917) <br> -Ohio (18 rounds; 1933) <br> -Rhode Island (12 rounds; 1927) <br> -South Dakota (5 rounds; 1933) | -Illinois (8 rounds; 1931) <br> -Louisiana (8 rounds; 1932) <br> -Minnesota (12 rounds; 1933) <br> -New Jersey (any removable device holding rounds; 1927) <br> -North Dakota (loadable bullet reservoir; 1931) <br> -Oregon (2 rounds; 1933) <br> -Pennsylvania (2 rounds; 1929) <br> -South Carolina (8 rounds; 1934) <br> -Texas (5 rounds; 1933) <br> -Vermont (6 rounds; 1923) <br> -Wisconsin (2 rounds; 1933) | -California (1927) <br> -Hawaii (1933) <br> -Missouri (1929) <br> -Washington State (1933) |

[195] An Act to Regulate the Sale, Possession and Transportation of Machine Guns, 1931 Ill. Laws, §§ 1–2, 452–53; Act of July 7, 1932, no. 80, A Supplement to an Act Entitled "An Act for the Punishment of Crimes,"1932 La. Acts 336; 1927 N.J. Laws, ch. 95, §§ 1–2, 180–81,; An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , 1931 N.D. Laws ch. 178, §§ 1-2, 305–6; An Act to Amend Sections 72-201, 72-202, 72-207, 1933 Or. Laws 488; 1929 Pa. Laws 777, § 1; Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288; An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , 1933 Tex. Gen. Laws 219–20, ch. 82, §§ 1–4, 6; An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, 1923 Vt. Acts and Resolves, § 1, 127; 1933 Wis. Sess. Laws 245, 164.01.

[196] 1927 Cal. Stat. 938; 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; 1933 Wash. Sess. Laws 335.

[197] Including the District of Columbia. Note that California, Minnesota, and New Jersey appear twice in this table. The dataset from which this information is drawn ended in 1934, so it does not include any states that might have enacted similar restrictions after 1934. *See* Duke Law Center for Firearms Law, *Repository of Historical Gun Laws*, https://law.duke.edu/gunlaws/.

DECLARATION OF ROBERT J. SPITZER, PH.D. IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 3:23-cv-05364

45

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

| -Virginia (7 rounds; 1934) | | |
| --- | --- | --- |

*See* Exhibit D for statutory text.

A 1927 California law, for example, prohibited the possession of any "machine gun," where that term was defined to include:

> all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.[198]

The other three states in this category (Hawaii, Missouri, Washington[199]) utilized this same description. In all, at least twenty-three states enacted twenty-six gun restrictions based on the regulation of ammunition magazines or similar feeding devices, and/or round capacity (*see* Table 1). Of the states appearing in Table 1, fifteen of them restricted weapons or ammunition feeding devices of more than ten rounds. Another five states barred any weapons that could receive removable ammunition feeding devices (i.e., no rounds), totaling twenty states. The original version of the legislation that became the National Firearms Act of 1934, as noted earlier, included this definition of machine gun that encompassed both semi-automatic and fully automatic firearms: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically 12 or more shots without reloading."[200] (This text was derived from the law enacted by Congress for the District of Columbia in 1932, which also stipulated a 12 round limit, as noted previously.[201] The final version of the 1934 bill was limited to fully automatic firearms only and did not include any limitation by number of rounds fired.) Regulations concerning removable magazines and magazine capacity were thus common as early as the 1920s—the period of time when these weapons and devices began to make their way into civilian life and also contributed to violence and criminality, as illustrated by the Tommy

---

[198] 1927 Cal. Stat. 938.
[199] 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; 1933 Wash. Sess. Laws 335.
[200] Hearings before the H. Comm. on Ways and Means, *supra* note 181, at 52.
[201] *Id.* at 45.

DECLARATION OF ROBERT J. SPITZER, PH.D. IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 3:23-cv-05364

46

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

gun narrative and other weapons discussed here—as these regulations were adopted by nearly half of all states.

## C.   Lessons From The Regulations of Automatic and Semi-Automatic Firearms and Ammunition Feeding Devices

The lesson from this sequence of events early in the twentieth century demonstrates that changes in gun policy followed the series of steps described in this Report that respond to developments in firearms technologies and their use in crime, each dependent on the previous step. This lesson is significant because some argue that the absence of government gun regulations in history—at the time of the invention of various weapons or weapons developments—means that regulations now are unjustifiable, or have no historical basis.

For example, David Kopel argues that "[m]agazines of more than ten rounds are older than the United States."[202] Drawing on examples like a firearm "created around 1580" capable of firing sixteen "'superposed' loads" (with each round stacked on top of the other); the Puckle gun said to fire eleven shots and patented in 1718; the Girandoni air rifle, invented in the late 1700s; and the Pepperbox pistol of the early 1800s,[203] Kopel suggests that "magazines of more than ten rounds are older than the Second Amendment."[204] Therefore, by Kopel's reckoning, since these weapons existed early in (or even before) the country's existence, and were not specifically regulated, ipso facto, today's governments are unable to regulate assault weapons, like AR-platform rifles, or magazines exceeding certain capacities (typically, a ten-round limit).[205]

---

[202] Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, *supra* note 102, at 851.
[203] *Id.* at 852–54.
[204] *Id.* at 849.
[205] *Id.* at 871–72 ("a court which today ruled that [10-round] magazines are 'dangerous and unusual' would seem to have some burden of explaining how such magazines, after a century and a half of being 'in common use' and 'typically possessed by law-abiding citizens for lawful purposes,' became 'dangerous and unusual' in the twenty-first century.").

DECLARATION OF ROBERT J. SPITZER, PH.D. IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 3:23-cv-05364

47

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    Kopel's and similar arguments[206] fail for two sets of reasons. First, as explained in the

2    preceding sections, this sort of narrative misrepresents the availability, viability, and capabilities

3    of these early weapons. Kopel's claim that ammunition magazines holding "more than ten

4    rounds" were "very commonly possessed in the United States since 1862" and were "owned by

5    many millions of law-abiding Americans" dating back to the "mid-nineteenth century"[207] is

6    simply false, as this narrative demonstrates. Second, the account fails to understand the

7    relationship between firearms' technological development, their spread into civil society, and

8    government gun policy. As one gun history expert noted, "the guns of 1830 were essentially

9    what they had been in 1430: single metal tubes or barrels stuffed with combustible powder and

10   projectiles" where "after every shot, the shooter had to carry out a minimum of three steps: pour

11   powder into the barrel; add a projectile. . .; then ignite the gunpowder and send the projectile on

12   its way."[208] The firearms and firearm feeding devices regulated in the early twentieth century in

13   the previous account represented a dramatically different type of firearm, capable of reliable,

14   rapid fire utilizing interchangeable ammunition feeding devices.

## VIII.   CLARIFYING TERMS AND CONCEPTS ABOUT ASSAULT WEAPONS AND LCMS

17         According to the Plaintiffs' Motion in this case the "term 'assault weapons' is a

18   misnomer. 'Prior to 1989, the term "assault weapon" did not exist in the lexicon of firearms. It

19   is a political term, developed by anti-gun publicists.'"[209] Assertions like this are incorrect. The

---

[206] Hlebinsky Decl., *Miller*, No. 3:19-cv-01537-BEN-JLB (Dkt. # 24-3).

[207] Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, *supra* note 102, at 871. Kopel insists "that [10-round] magazines" have been "'in common use' and 'typically possessed by law-abiding citizens for lawful purposes'" for "a century and a half" (*id.* at 871–72). This claim is both false and unverified by his article.

[208] Rasenberger, *supra* note 99, at 3–4. Indeed, as the United States evolved from an agrarian to an urban/industrial society, the resultant industrial revolution that took hold by the latter part of the nineteenth century resulted in the "acceleration in the processes of technical innovation . . . ." Freddie Wilkinson, *Industrial Revolution and Technology*, National Geographic (June 2, 2022)*,* https://education.nationalgeographic.org/resource/industrial-revolution-and-technology/. This was no less true for the development of firearms, which witnessed a similar acceleration in developments by the start of the twentieth century.

[209] Motion for Preliminary Injunction, Dkt. # 10 at p. 13 (*quoting Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissent)).

---

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

48

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    terms "assault weapon" and "assault rifle" were the very terms used by the gun companies that

2    first produced, marketed, and sold such weapons to the public.

3         Gun industry use of the terms "assault weapons" and "assault rifles" appeared in the early

4    1980s (and even earlier), before efforts to regulate them emerged in the late 1980s and early

5    1990s.[210] A study of the marketing strategies employed by gun manufacturers and gun

6    publications from the time that such weapons emerged in the American civilian market in a

7    significant way in the early 1980s verifies this.[211] It reports on and quotes directly from gun

8    company advertisements and gun magazines. Examples include: Heckler and Koch selling its

9    "HK 91 Semi-Automatic Assault Rifle"; ads for the "Bushmaster assault rifle"; the AKM

10   "imported assault rifle"; the Beretta M-70 that "resembles many other assault rifles"; the

11   AR10/XM-10 (made by Paragon S&S Inc.) advertised as a "Famous Assault Rifle [that] is Now

12   Available in a Semi Auto Civilian Legal Form!" (*see* Exhibit J); the "AMT 25/.22 Lightning

13   Carbine" that was advertised as an "assault-type semi-auto"; Intratec extolling its TEC-9 as one

14   that "clearly stands out among high capacity assault-type pistols" (*see* Exhibit I); and the after-

15   market supplier Assault Systems that appealed to civilian owners of "assault weapons," among

16   many other examples. The use of military terminology, and the weapons' military character and

17   appearance, were key to marketing the guns to the public.[212] *Guns & Ammo* magazine described

18   the "success of military assault rifles in the civilian market" in its July 1982 issue.[213] In 1984,

19   *Guns & Ammo* advertised a book called *Assault Firearms* that the magazine extolled as "full of

20   the hottest hardware available today."[214]

21

22       [210] Violence Policy Center, *The Militarization of the U.S. Civilian Arms Market*, June 2011,

23   http://www.vpc.org/studies/militarization.pdf#page=33; *see also* Violence Policy Center, *Assault Weapons and Accessories in America*, 1988, http://www.vpc.org/studies/awacont.htm; http://www.vpc.org/studies/thatintr.htm.
        [211] Tom Diaz, *Making a Killing* (1999).

24       [212] *Id.* at 124–128, 230–231; Tom Diaz, *The Last Gun* 142–43 (2013); Ryan Busse, *Gunfight* 8 (2021).
        [213] *Wooters Chooses the 10 Best Gun Designs*, Guns & Ammo (July 1982), at 58, 68; Diaz, *Making a*

25   *Killing, supra* note 211, at 126.
         [214] Erica Goode, *Even Defining 'Assault Rifles' Is Complicated*, New York Times, Jan. 17, 2013,

26   https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html

DECLARATION OF ROBERT J.                    49          ATTORNEY GENERAL OF WASHINGTON
SPITZER, PH.D. IN SUPPORT OF STATE                          Complex Litigation Division
DEFENDANTS' OPPOSITION TO                                   800 Fifth Avenue, Suite 2000
MOTION FOR PRELIMINARY                                          Seattle, WA 98104-3188
INJUNCTION                                                         (206) 464-7744
NO. 3:23-cv-05364

1    As a standard buyer's guide on assault weapons noted, the "popularly-held idea that the

2    term 'assault weapon' originated with anti-gun activists, media or politicians is wrong. The term

3    was first adopted by the manufacturers, wholesalers, importers and dealers in the American

4    firearms industry . . . ."[215] The more expansive phrase "assault weapon" is generally used over

5    "assault rifle" because "weapon" also includes not only rifles but some shotguns and handguns

6    that were also subject to regulation in the federal 1994 assault weapons ban and subsequent laws.

7    An article in *Outdoor Life* belied the claim that assault weapons are limited only to

8    firearms that fire fully automatically. That article urged its readers to share its information with

9    non-shooting friends to dispel "myths" about "assault weapons." In its account, it correctly noted

10   that "the term 'assault weapon' . . . generally referred to a type of light infantry firearm initially

11   developed in World War II; a magazine-fed rifle and carbine suitable for combat, such as the

12   AK-47 and the M16/M4. These are selective-fire weapons that can shoot semi-auto, full-auto, or

13   in three-round bursts."[216]

14   The effort to rebrand "assault weapons" as something more benign and severed from its

15   military origins was seen in the publication struggles of Phillip Peterson, whose book, titled as

16   recently as 2008, *Gun Digest Buyer's Guide to Assault Weapons*,[217] is a well-known reference

17   work on the subject. As Peterson explained, the gun industry "moved to shame or ridicule" those

18   who used the phrase "assault weapons," insisting that the term should now only apply to fully

19   automatic weapons. Peterson noted that the origin of the term "assault weapon" was the industry

20   itself.[218] He found that the NRA refused to sell his book until he changed the title, which in 2010

21   he renamed *Gun Digest Buyer's Guide to Tactical Rifles.*[219] The very same pattern played out in

22   Canada, where gun companies also used the term "assault rifle" in the 1970s and 1980s until

---

[215] Phillip Peterson, *Gun Digest Buyer's Guide to Assault Weapons, supra* note 154, at 11.

[216] John Haughey, *Five Things You Need to Know About 'Assault Weapons'*, Outdoor Life, March 19, 2013, http://www.outdoorlife.com/blogs/gun-shots/2013/03/five-things-you-need-know-about-assault-weapons/

[217] Peterson, *Gun Digest Buyer's Guide to Assault Weapons*, *supra* note 154.

[218] Goode, *supra* note 214.

[219] Phillip Peterson, *Gun Digest Buyer's Guide to Tactical Rifles* (2010).

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

50

political pressure began to build to restrict such weapons in the aftermath of a mass shooting in Montreal in 1989. By the 1990s, gun companies marketing guns in Canada and their allies also adopted terms like "modern sporting rifles."[220]

Critics of statutory limits on large capacity magazines (LCMs), usually defined as those holding more than ten rounds, similarly complain that such terms are "often purposely and wrongly applied by anti-gun groups during conversations on gun politics to mislabel standard capacity magazines."[221] Yet the LCM term is neither "wrongly applied" nor a political "mislabel," and for three reasons.

First, the LCM definition of one holding ten or more rounds dates back to at least 1991,[222] in an early version of the law Congress eventually passed in 1994 that said the term "large capacity ammunition feeding device" was defined in the law as "a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition. . . ."[223] Since that time, ten states plus the District of Columbia have adopted the LCM ten round limit (see earlier discussion).

Second, the definition of LCMs based on a ten-round limit has been and is widely accepted and used in the scholarly literature in criminology and other fields examining such devices.[224]

---

[220] According to Blake Brown, Canadian newspapers ran ads from gun companies selling weapons like the "AR-15 semi-automatic assault rifle," the "Colt AR-15 Semi Auto Assault Rifle," and the "SKS Assault Rifle" among others, in 1976, 1982, 1983, 1985, and 1986 from dealers and companies including MilArm, Colt, and Ruger. Blake Brown, *Gun Advocates' Changing Definition of 'Assault Rifles' is Meant to Sow Confusion*, The Globe and Mail, May 21, 2020, https://www.theglobeandmail.com/opinion/article-gun-advocates-changing-definition-of-assault-rifles-is-meant-to-sow/

[221] Chris Eger, *Magazines: Standard Capacity v Large Capacity*, Guns.com, Nov. 18, 2020, https://www.guns.com/news/2020/11/18/magazines-standard-capacity-v-large-capacity

[222] Violent Crime Control and Law Enforcement Act of 1994, H.R. Rep. 103-489, H.R. Rep. No. 489, 103rd Cong., 2nd Sess. 1994, at 36.

[223] *Id.* at 6.

[224] *For example*, 3 *Guns in American Society* § III, 777–78, (Gregg Lee Carter, ed. Santa Barbara, CA: ABC-CLIO, 2012),; Jaclyn Schildkraut and Tiffany Cox Hernandez, *Laws That Bit The Bullet: A Review of Legislative Responses to School Shootings*, 39 American Journal of Criminal Justice, 358-74 (2014); Luke Dillon, *Mass Shootings in the United States: An Exploratory Study of the Trends from 1982-2012*, Mason Archival Repository Service (May 22, 2014) (M.A. Thesis, George Mason University),

DECLARATION OF ROBERT J. SPITZER, PH.D. IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION NO. 3:23-cv-05364

51

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    Third, as Table 1 and the accompanying discussion in this document shows, from 1917

2    to 1934 roughly half of the states in the U.S. enacted laws that restricted various ammunition

3    feeding devices, or guns that could accommodate them, based on a set number of rounds, though

4    the numerical cap for gun firing without reloading varied at that time from more than a single

5    round up to eighteen. Thus, the idea of restricting removable magazines by capping the number

6    of rounds dates back at least a century.

7                                    **IX.    CONCLUSION**

8    As I describe in this Report, and as the series of examples examined here illustrate, gun

9    policy changes occur in and through a sequential process. *First*, a new gun or gun technology is

10   invented. *Second*, it may then be patented, though the patenting of a design or idea by no means

11   assures that it will proceed beyond this point. *Third*, it is often developed with a focus on military

12   applications and supplying military needs, not directly for civilian acquisition or use. *Fourth*,

13   some weapons may then spread to, or be adapted to, civilian markets and use. *Finally*, if such

14   weapons then circulate sufficiently in society to pose a safety, violence, or criminological

15   problem or threat, calls for government regulation or restriction then may lead to gun policy/law

16   changes. New gun laws are not enacted when firearm technologies are invented or conceived.

17   They are enacted when those technologies circulate sufficiently in society to spill over into

18   criminal or other harmful use, presenting public safety concerns that governments attempt to

19   address through their police and policy-making powers.

20   Contemporary restrictions among the States pertaining to large capacity ammunition

21   magazines are merely the latest iteration of a centuries-long tradition of weapons regulations and

22   restrictions. Gun ownership is as old as the country. But so are gun and other dangerous weapons

23

24   http://mars.gmu.edu/xmlui/handle/1920/8694; Jaclyn Schildkraut, *Assault Weapons, Mass Shootings, and Options for Lawmakers, Rockefeller Institute of Government*, March 22, 2019, https://rockinst.org/issue-area/assault-weapons-mass-shootings-and-options-for-lawmakers/; Christopher Koper, et al., *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 *Criminology & Public Policy* 157, (Feb. 2020); Philip J. Cook and Kristin A. Goss, *The Gun Debate* 201, (2nd ed. NY: Oxford University Press, 2020).

DECLARATION OF ROBERT J.                                52          ATTORNEY GENERAL OF WASHINGTON
SPITZER, PH.D. IN SUPPORT OF STATE                                         Complex Litigation Division
DEFENDANTS' OPPOSITION TO                                                   800 Fifth Avenue, Suite 2000
MOTION FOR PRELIMINARY                                                        Seattle, WA 98104-3188
INJUNCTION                                                                         (206) 464-7744
NO. 3:23-cv-05364

1   laws, which have adapted to changes in threats to public safety. Given the importance of history

2   to considerations of contemporary gun laws, the lesson is abundantly clear: Firearms and other

3   dangerous weapons were subject to remarkably strict, consistent, and wide-ranging regulation

4   throughout our history when they entered society, proliferated, and resulted in violence, harm,

5   or contributed to criminality. The historical record from the 1600s through the early twentieth

6   century, as seen in the examples examined here, is even more remarkable given that the United

7   States was an evolving and developing nation-state that could not claim to have reached maturity

8   until the twentieth century. Contemporary restrictions among the states pertaining to assault

9   weapons and large capacity ammunition magazines are merely the latest iteration of a centuries-

10  long tradition of weapons regulations and restrictions.

11          I declare under penalty of perjury under the laws of the State of Washington that the

12  foregoing is true and correct to the best of my knowledge.

13          EXECUTED this 18ᵗʰ day of May, 2023 at Williamsburg, Virginia.

14

15          _____

16                  ROBERT J. SPITZER, Ph.D.

17

18

19

20

21

22

23

24

25

26

DECLARATION OF ROBERT J.                        53              ATTORNEY GENERAL OF WASHINGTON
SPITZER, PH.D. IN SUPPORT OF STATE                              Complex Litigation Division
DEFENDANTS' OPPOSITION TO                                       800 Fifth Avenue, Suite 2000
MOTION FOR PRELIMINARY                                          Seattle, WA 98104-3188
INJUNCTION                                                      (206) 464-7744
NO. 3:23-cv-05364

1

## <u>DECLARATION OF SERVICE</u>

2

I hereby declare that on this day I caused the foregoing document to be electronically

3

filed with the Clerk of the Court using the Court's CM/ECF System which will serve a copy of

4

this document upon all counsel of record.

5

DATED this  22nd  day of  May, 2023, at Seattle, Washington.

6

7

*s/ Andrew R.W. Hughes*
ANDREW R.W. HUGHES, WSBA #49515
Assistant Attorney General

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF ROBERT J.
SPITZER, PH.D. IN SUPPORT OF STATE
DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY
INJUNCTION
NO. 3:23-cv-05364

54

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744