Hon. Robert J. Bryan

# In The United States District Court
# For The Western District Of Washington

Lawrence Hartford; Douglas Mitchell; Brett Bass; Sporting Systems Vancouver, Inc.; Second Amendment Foundation; and Firearms Policy Coalition, Inc.,

*Plaintiffs*,

v.

Bob Ferguson, in his official capacity as Washington State Attorney General; John R. Batiste, in his official capacity as Chief of the Washington State Patrol; John Gese, in his official capacity as Sheriff for Kitsap County, Washington; Clayton Myers, in his official capacity as Sheriff for Kittitas County, Washington; John Horch, in his official capacity as Sheriff for Clark County, Washington; Adam Fortnoy, in his official capacity as Sheriff for Snohomish County, Washington; Chad M. Enright, in his official capacity as County Prosecutor for Kitsap County, Washington; Greg Zempel, in his official capacity as County Prosecutor for Kittitas County, Washington; Tony Golik, in his official capacity as County Prosecutor for Clark County, Washington; and Jason Cummings, in his official capacity as County Prosecutor for Snohomish County, Washington,

*Defendants.*

No. 3:23-cv-05364-RJB

Plaintiffs' Reply In Support Of Motion For Preliminary Injunction

Reply iso Motion For PI - i

*Hartford v. Ferguson*, No. 3:23-cv-05364-RJB

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

# I. The Firearm Ban Is Unconstitutional Under *Bruen*.

Under *New York State Rifle & Pistol Association, Inc. v. Bruen*, if a challenged law implicates the plain text of the Second Amendment, then the *only way* the law can be justified is if the government can show that it is consistent with the Nation's historical tradition of firearm regulation. *Bruen*, 142 S. Ct. 2111, 2126 (2022). And under *District of Columbia v. Heller*, 554 U.S. 570 (2008), to be consistent with history an arms ban can only succeed if the banned arms are dangerous and unusual. Because the arms Washington bans here are in common use, Washington's firearm ban is unconstitutional.

## A. The Banned Firearms Are Arms.

The Second Amendment says: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II. "The people," means "all Americans," *Heller*, 554 U.S. at 581, "to keep" means "to have," *id.* at 582, "to bear" means to "carry," *id.* at 584, and "Arms" means "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," *id.* at 581 (citation omitted), and extends to include any "modern instruments that facilitate armed self-defense," *Bruen*, 142 S. Ct. at 2132.

The State attempts to squeeze several inapposite arguments into this textual inquiry. *See* State Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. at 12–18, Doc. 42 (May 22, 2023) ("State Br."). But not *one* of its arguments are relevant to interpreting the *plain text* of the Amendment. The text makes no distinction between types of bearable arms. The Supreme Court has indicated that the government may restrict "dangerous and unusual weapons," but that is a matter of "historical tradition." *See Heller*, 554 U.S. at 627; *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016); *Bruen*, 142 S. Ct. at 2128. In fact, when *Bruen* was explaining "*Heller*'s methodology," the historical regulation of "dangerous and unusual weapons" was the Court's *example* of a relevant historical regulatory tradition. *Bruen*, 142 S. Ct. at 2128.

Reply iso Motion For PI - 1

*Hartford v. Ferguson*, No. 3:23-cv-05364-RJB

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

B. **There Is No Historical Tradition of Banning Firearms In Common Use.**

The historical analysis described by *Bruen* and *Heller* "requires courts to assess whether modern firearm[] regulations are consistent with the Second Amendment's text and historical understanding" as demonstrated by "an enduring American tradition of state regulation." *Bruen*, 142 S. Ct. at 2131, 2155. In the context of bans on bearable arms, the Supreme Court has already identified the only relevant enduring tradition: a State may ban only "dangerous and unusual weapons." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627). "This is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment). A firearm in "common use today" is, by definition, outside of this historical tradition and cannot be banned. *Bruen*, 142 S. Ct. at 2143; *see also Heller*, 554 U.S. at 627; *Caetano*, 577 U.S. at 411–12. The banned arms are unquestionably in common use today, so the Washington ban is unconstitutional. Pls.' Mot. for Prelim. Inj. at 8–14, Doc. 10 (May 4, 2023) ("Pls.' Mot.").

The State argues that the Second Amendment's protection excludes weapons that are "most useful in military service." State Br. 13 (quoting *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015) and *Kolbe v. Hogan*, 849 F.3d 114, 131 (4th Cir. 2017)). This is wrong for several reasons. First, this is an historical argument, though the State styles it as a textual one. *Heller*'s statement that the Second Amendment protects only "certain types of weapons," comes not from the *text* of the Amendment, but in its discussion of its earlier decision in *United States v. Miller*, 307 U.S. 174 (1939), *see Heller*, 554 U.S. at 623, and *Heller* later makes clear that *Miller*, and this rule that some firearms are outside the scope of the Second Amendment, was "fairly supported by the *historical tradition* of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627 (citation omitted).

Second, the State's position is a distortion of *Heller*'s discussion of firearms "most useful in military service" such as "M-16 rifles." 554 U.S. at 627. The reason *Heller* gave why such firearms potentially "may be banned" is that they are "highly unusual in society at large" and thus within the category of dangerous and unusual weapons. *Id. Heller* did not establish a free-floating

Reply iso Motion For PI - 2

*Hartford v. Ferguson*, No. 3:23-cv-05364-RJB

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

"useful in military service" test. Indeed, such a test would be perverse given the prefatory clause's stated purpose of the Second Amendment, and *Heller*'s discussion of this issue was a defensive one explaining why under the operative clause weapons that are unusual in society generally but useful in military service potentially may be banned notwithstanding that purpose. *Kolbe* therefore badly misread *Heller* by crafting a "heretofore unknown" "standalone inquiry" that dispensed with any "historically rooted" analysis in favor of "ad hoc" comparisons between types of firearms. 849 F.3d at 155–56 (Traxler, J., dissenting). And *Bruen* confirms that *Kolbe* erred by making clear that *all* firearms "in common use today" are protected, 142 S. Ct. at 2143, regardless of whether or not they are useful in the military.

*Friedman* likewise is unpersuasive and abrogated by *Bruen*. There, rather than assessing common use, *Friedman* thought "it better to ask whether a regulation bans weapons that were common at the time of ratification or those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,' and whether law-abiding citizens retain adequate means of self-defense," *Friedman*, 784 F.3d at 410 (internal citation omitted). None of these considerations survive *Bruen*. Whether a type of firearm existed in the 1790s has no bearing on whether it is constitutionally protected; *Bruen* clarified that weapons that are protected are those that are "in common use *today*." 142 S. Ct. at 2143 (emphasis added). The same is true for whether the banned arms have "some reasonable relationship to the preservation or efficiency of a well regulated militia." *Friedman*, 7384 F.3d at 410 (quoting *Heller*, 554 U.S. at 622). In *Bruen*, the Court analyzed *English v. State*, 35 Tex. 473 (1871), in which the Texas Supreme Court had concluded that the Second Amendment and the state's analogous provision only protected such arms "as are useful and proper to an armed militia." *Id.* at 474. *Bruen* dismissed this rationale as an "outlier[]," and reiterated that the Second Amendment right to keep and bear arms "does not depend on service in the militia." 142 S. Ct. at 2153, 2127. And *Bruen* did nothing to disturb *Heller*'s rejection of the claim that the government can ban one type of arm so long as others remain available for use. 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to

Reply iso Motion For PI - 3

*Hartford v. Ferguson*, No. 3:23-cv-05364-RJB

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed.").

Next, the State claims that the banned firearms "are not 'in common use … for lawful purposes like self-defense.' " State Br. 13 (quoting *Heller*, 554 U.S. at 624). In support, the State argues that "assault weapons are almost never used in self-defense," whether the banned firearms "are commonly *possessed* is irrelevant," State Br. 14, 16, that "of the tiny percentage of Americans who own assault weapons, only a fraction cite self-defense as a major reason," State Br. 16, and that the common-use test "leads to the absurd conclusion that a firearm's constitutional status turns on whether the gun industry chooses to engage in mass campaigns to flood the market," *id.*

All of the State's arguments on this score founder because the Supreme Court *has* equated possession with use in this context. While making clear that the Second Amendment protects arms that are "in common *use*," *Heller* also acknowledged the flip side to be that "the Second Amendment does not protect those weapons not typically *possessed* by law-abiding citizens for lawful purposes." 554 U.S. at 624–25 (emphases added). And this makes sense, because *Heller* explained that to keep and bear arms means "being *armed and ready* for offensive or defensive action in a case of conflict with another person." 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)) (emphasis added). Similarly, in *Bruen* the Court explained that "[a]lthough individuals often 'keep' firearms in their home, *at the ready for self-defense*, most do not 'bear' (*i.e.*, carry) them in the home beyond moments of actual confrontation. To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections." 142 S. Ct. at 2134–35 (emphasis added). The State would go further and nullify *both* of the Second Amendment's operative protections. It is impossible to square the State's insistence that "use" means firing a gun in self-defense with the Supreme Court's repeated acknowledgment that the purpose of the Second Amendment is to permit citizens to be "ready." *See, e.g.*, *Heller*, 554 U.S. at 584. Therefore, when large numbers of law-abiding citizens *own* a firearm, that firearm is in "common use" within the meaning of the Second Amendment and cannot be banned.

Reply iso Motion For PI - 4

*Hartford v. Ferguson*, No. 3:23-cv-05364-RJB

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Three active Supreme Court justices, all in the *Bruen* majority and including *Bruen*'s author, have applied the common use test after *Heller*, and they all have done so in a way that comports with our approach. Justice Thomas, in his dissent from denial of certiorari in *Friedman v. City of Highland Park*, explained that a semiautomatic firearm ban like Washington's was "highly suspect because it broadly prohibits common semiautomatic firearms used for lawful purposes. Roughly five million Americans own AR-style semiautomatic rifles." 577 U.S. 1039 (2015) (Thomas, J., dissenting from the denial of certiorari). Justice Kavanaugh, in his dissent in *Heller II* while on the D.C. Circuit, similarly pointed to sales statistics in concluding that firearms like those banned by Washington are in common use. *See Heller v. District of Columbia*, 670 F.3d 1244, 1286–87 (Kavanaugh, J., dissenting). And Justice Alito, in his concurrence in *Caetano v. Massachusetts*, a case involving stun guns, explained that the "relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 states." 577 U.S. at 420 (Alito, J., concurring) (cleaned up). In each case the touchstone for "common use" was ownership.

Moreover, while it is true that handguns make up the lion's share of defensive gun uses, the 2021 National Firearms Survey found that 13.1% of defensive gun uses involve the use of a rifle, which would amount to around 200,000 defensive uses of a rifle a year given the survey's finding of approximately 1.67 million annual defensive gun uses. William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 9, 14–15, SSRN (May 13, 2022), *available at* https://bit.ly/3MzrFFc. The State relies upon the Heritage Foundation's database of reported defensive gun uses to try to minimize the extent to which these firearms are used for self-defense, State Br. 7, but that database is illustrative, not comprehensive, and Heritage itself notes that it is limited only to incidents for which there are "verifiable reports found through public sources." *Defensive Gun Uses in the United States*, Heritage Found., (May 12, 2023), *available at* https://bit.ly/43sU3Qt. While it has details regarding some 3,180 incidents from 2019 to 2023, Heritage notes that his significantly undercounts things, since "[a]ccording to the Centers for

Reply iso Motion For PI - 5

Hartford v. Ferguson, No. 3:23-cv-05364-RJB

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

Disease Control and Prevention, almost every major study on defensive gun use has found that Americans use their firearms defensively between 500,000 and 3 million times each year." *Id.*

The State's alternative arguments—that the banned firearms are not actually commonly possessed, and that counting possession leads to an absurd result—fare no better. As Plaintiffs explained at length in their motion for a preliminary injunction, the banned firearms are among the most popular in the country, chosen overwhelmingly for lawful purposes like self-defense. Pls.' Mot. at 9–11. Indeed, in recent years only semiautomatic handguns have sold better than AR-15 and similar rifles. *See 2021 Firearms Retailer Survey Report* 14, NAT'L SHOOTING SPORTS FOUND., INC., *available at* https://bit.ly/3gWhI8E. The State attempts to shift the Court's attention away from these real (and dispositive) numbers to comparisons, emphasizing that "only 5 percent of firearms in the U.S. are assault weapons" and "less than 2 percent of all Americans own assault weapons." State Br. 16 (citations omitted). But even accepting the State's low-end estimates, that would mean that *millions* of Americans own the banned firearms. And *Caetano* shows that is more than sufficient. The State warns against using real numbers and comparing to *Caetano* "because the number of stun guns owned by Americans is roughly equal to the number of 'legal civilian-owned machine guns in the United States,' " implying that if *Caetano* is read that way, then the Court is opening the door to legalizing machine guns. State Br. 17 (quoting *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, No. 22-951, 2023 WL 2655150, at *5 (D. Del. Mar. 27, 2023) ("*DSSA*")). In fact, the number of civilian-owned machine guns sits at around 176,000, *see DSSA*, at *5, below the number of stun guns (200,000) that Justice Alito pointed to in *Caetano*, 577 U.S. at 420 (Alito, J., concurring). And in any event, there is no reason to think the same analysis, applied here to the *millions* of AR-15s and similar rifles in circulation, which "traditionally have been widely accepted as lawful possessions," *Staples v. United States*, 511 U.S. 600, 612 (1994), would necessitate invalidating restrictions on machine guns, which have been heavily regulated, even as their possession has not been nationally forbidden, since shortly after they appeared.

REPLY ISO MOTION FOR PI - 6

*HARTFORD V. FERGUSON*, NO. 3:23-cv-05364-RJB

ARD LAW GROUP PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1    Finally, it is not "absurd" that the popularity of a firearm should have relevance to
2 determining its constitutionality. Justice Breyer, in dissent in *Heller*, made a very similar criticism
3 of common use test and "the *Heller* majority was obviously unmoved." *Kolbe*, 849 F.3d at 153
4 (Traxler, J., dissenting). Although the State cynically claims that, as a result, "a firearm's
5 constitutional status turns on whether the gun industry chooses to engage in mass campaigns to
6 flood the market," *Heller* took a different (and binding) view on the matter: when a type of firearm
7 is "chosen by American society," regardless of whether it was chosen because of canny marketing,
8 a sober assessment of its functionality, or "[w]hatever the reason," that type of firearm is protected
9 "and a complete prohibition of [its] use is invalid." 554 U.S. at 628–29.

10 **C.     The State's Other Historical Evidence Is Unavailing.**

11   The Court can end its analysis there. The Second Amendment's text covers the banned
12 firearms, and the firearms are in common use. That is dispositive. Nevertheless, the State offers
13 additional historical evidence, none of which is adequate to support the ban.

14   First a note on the methodology is required. The State claims that this case involves
15 "dramatic technological developments and unprecedented social change." State Br. 19. But even
16 if that were the case, that does not get the State out of *Bruen*. *Bruen* is clear that this Court must
17 *always* "reason by analogy"—a process that requires finding constitutional historical regulations
18 and asking whether a modern regulation "impose[s] a comparable burden on the right of armed
19 self-defense and whether that burden is comparably justified." 142 S. Ct. at 2132. In any event, this
20 case involves no "dramatic technological change" that alters the analysis for the simple reason that
21 the "dangerous and unusual" test by its nature accounts for technological and societal changes by
22 asking what is commonly used by modern Americans. Furthermore, both today and when *Heller*
23 was decided, the firearms overwhelmingly most used in crimes are handguns, and yet *Heller*, which
24 found handguns protected by the Second Amendment, did not alter its analysis in light of those
25 issues. The test is, plain and simply, *only* whether the banned firearms are "dangerous and
26 unusual." And the State has failed to show that they are.
27

Reply iso Motion For PI - 7

*Hartford v. Ferguson*, No. 3:23-cv-05364-RJB

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

The other laws the State cites are inadequate to support the ban. For instance, the first two types of historical laws the State points to are laws "prohibit[ing] setting trap guns" and "laws regulating clubs and other bludgeoning instruments." State Br. 20. There are several apparent problems with these analogies. Trap guns, or guns fired automatically when a trap (*i.e.*, a trip wire) is triggered, are not a type of firearm, but an illegal and dangerous way of rigging a firearm to go off without a human pulling the trigger. Laws against setting traps do not impact the right to possess or lawfully use any firearms, they criminalize a specific sort of misuse. And as for clubs, the State merely suggests such clubs were "regulated." The State's expert has submitted a chart, entitled "Dangerous Weapons Restrictions" which collects statutes by year of enactment and the type of weapon "restricted." *See* Spitzer Ex. C, Doc. 48-3 (May 22, 2023); *see also* State Br. 14 ("The table in Exhibit C shows … every state in the nation had laws restricting one or more types of clubs."). But this chart appears to be of limited use, since it provides *no* detail as to what sort of "restrictions" were placed on the identified types of weapons (information that is crucial to determining whether the modern and historical laws "impose a comparable burden" on the Second Amendment right). *Bruen*, 142 S. Ct. at 2132. And digging into the supporting citations demonstrates the chart is entirely useless. For instance, one of the most timely restrictions listed is a 1797 Delaware law labeled as restricting clubs in some way. Laws from this time period—just 6 years after the ratification of the Second Amendment—are the most valuable for determining the meaning of the Amendment. *See Bruen*, 142 S. Ct. at 2136; *see also* Mark W. Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868*, at 1, HARV. J. L. & PUB. POL'Y PER CURIAM (Fall 2022), *available at* bit.ly/3FKF9us. But the law in question is entirely irrelevant for this case, as it says: "[I]f any Negro or Mulatto slave shall presume to carry any guns … clubs, or other arms and weapons whatsoever, without his master's special license … he shall be whipped with twenty-one lashes, upon his bare back." *See* 1797 Del. Laws 104 (quoted at Spitzer Ex. E at 15, Doc. 48-5 (May 22, 2023)). And the 1664 law which the State describes as the one in which "the Colony of New York prohibited the[] public carry" of clubs, State Br. 20, was, just like Delaware, targeted at carrying weapons by "any slave" unless "in the presence or by the direction

REPLY ISO MOTION FOR PI - 8

*HARTFORD V. FERGUSON*, No. 3:23-cv-05364-RJB

ARD LAW GROUP PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

of his her or their Master or Mistress." *See* Spitzer Ex. E at 58. Laws so obviously rooted in racism, which targeted a group of people who were not, at the time, understood to have *any* constitutional rights, cannot tell us anything today about the scope of the Second Amendment, and the State's description of these laws is deeply misleading. Other laws Spitzer cites as "restrictions" on clubs that date to this period are inapplicable for the same reason, *see, e.g.*, 1798 Ky. Acts 106, or for entirely different reasons, *see, e.g.*, 1750 Mass. Acts 544 (prohibiting riotous assembly of twelve or more persons armed with clubs) (quoted at Spitzer Ex. E at 39). And in fact, there is strong evidence that the right to possess clubs for defensive uses *was* protected. At the trial of the soldiers involved in the Boston Massacre, John Adams, defending the soldiers, said of the crowd of Americans who had assembled armed with, among other things, clubs, "every private person is authorized to arm himself, and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defence." John Adams, *Argument for the Defense: 3-4 December 1770*, *available at* https://bit.ly/435ah2j (last accessed May 26, 2023). The key point is that *none* of the State's laws prohibited ownership of an arm in common use, which is what they would need to show to justify the State's firearm ban.

Next the State points to "regulations on Bowie knives and pistols." The state emphasizes that "[s]tarting in the 1830s and ending around the start of the twentieth century, 'every state' except New Hampshire 'restricted Bowie knives.' " State Br. 21. But Plaintiffs are not aware of any antebellum statute that completely banned possession of Bowie knives. And there is significant evidence that the more onerous restrictions on Bowie knives were understood to violate the right to bear arms for self-defense unless they could be construed more narrowly. *See Nunn v. Georgia*, 1 Ga. 243 (1846); *see also Heller*, 554 U.S. at 612, 626, 629 (singling out *Nunn* as "particularly instructive" regarding the meaning of the Second Amendment). In fact, most of the restrictions cited by the State are *not* as severe as the restrictions at issue here, instead they often escalate punishments for crimes committed with Bowie knives, *see* 1837 Ala. Acts 7 (Ex. E at 1); 1853 Comp. L. Cal. § 127 (Ex. E at 9), or target concealed carry (or open carry with intent to do harm), *see* 1859 Ind. Acts 129 (Ex. E at 27), but leave the right to possess such weapons intact. As for pistols, the

Reply iso Motion For PI - 9

*Hartford v. Ferguson*, No. 3:23-cv-05364-RJB

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

State points to two states, Tennessee and Arkansas, which "completely prohibited the sale of easily concealed pistols in the late 1800s." State Br. 21–22. Both post-date the Civil War (Tennessee's in 1879, Arkansas' in 1881, *see* Rivas Dec. ¶¶ 29-30, Doc. 47 (May 22, 2023), and so cannot inform the meaning of the Second Amendment to the extent they differ from the earlier practices of the American people. And in any event these two regulations, which are, as the state admits, aimed at concealed carriage, are outliers in terms of the breadth of their prohibition, and unlike the present regulation in their goal. They also provide no support to the State.

Finally, the State turns to "early twentieth century regulations on automatic and semi-automatic weapons." State Br. 22. As to automatic firearms, to the extent that those bans are consistent with the Second Amendment it is because those firearms were and remain dangerous *and unusual*; they are not in common use. *See Heller*, 554 U.S. at 627. By contrast, the banned firearms at issue here *are* in common use today. The State also claims that ten jurisdictions had laws regulating semi-automatics. But again, only a very small number of jurisdictions actually *banned* semiautomatic firearms (and in each case, the ban was limited to semiautomatics with the ability to fire a certain number of rounds without reloading). *See* 1932, Public-No. 275-72D (District of Columbia) (Spitzer Ex. D at 2, Doc. 48-4 (May 22, 2023) ("Ex. D")); 1927 Mich. Pub. Acts 888-89 (Ex. D at 14); 1927 R.I. Pub Laws 256 (Ex. D at 25); 1933 Minn. Laws ch. 190 (Ex. D at 14-15). Another law targeted the same firearms but did not ban them, only required a permit, *see* 1933 Ohio Laws 189-90 (Ex. D at 20); and two laws permitted ordinary possession but banned possession for an "offensive or aggressive purpose," 1933 S.D. Sess. Laws 245-47 (Ex. D at 28); 1934 Va. Acts 137-39 (Ex. D at 30-31). The rest of the laws the State cites, on their own terms, apply to machine guns that are capable of automatic fire. 1931 Ill. Laws 452-53 (Ex. D at 9); 1932 La. Acts 337-38 (Ex. D. at 12); 1927 Mass. Acts 416 (Ex. D. at 13); 1934 S.C. Acts 1288 (Ex. D. at 26). Of the laws that most stringently restricted possession of semiautomatic firearms, only the D.C. law was not repealed. *See* 1959 Mich. Pub. Acts 249, 250; 1959 R.I. Acts & Resolves 260, 263; 1963 Minn. Sess. L. ch. 753, at 1229; 1972 Ohio Laws 1866, 1963. In other words, the State has

Reply iso Motion For PI - 10

Hartford v. Ferguson, No. 3:23-cv-05364-RJB

Ard Law Group PLLC

P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

failed to show an enduring tradition of lawful restriction on the right to own a commonly possessed firearm, and the Washington firearm ban is unconstitutional.

## II. The Other Factors All Favor Plaintiffs

If this Court finds Plaintiffs are likely to succeed on the merits, each of the other factors weigh in favor of an injunction for the same reason. The State's argument that Plaintiffs do not face irreparable harm turns on the finding that "nothing in SHB 1240 impinges on [Plaintiffs'] individual right to bear arms in self-defense." State Br. 24. Of course, if this Court finds the firearm ban likely violates the Second Amendment, then that is not true. And "it is no answer" to suggest that *other* firearms, which the State has so far not banned, are available for Plaintiffs to purchase. *See Heller*, 554 U.S. at 629. And the equities favor enjoining an unconstitutional law.

## III. Conclusion

This Court should grant Plaintiffs' request for a preliminary injunction, or, in the alternative, for summary judgment.

///
///
///

Reply iso Motion For PI - 11

Hartford v. Ferguson, No. 3:23-cv-05364-RJB

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243

1  I certify that this memorandum contains 4,193 words, in compliance with the Local Civil Rules.

2  May 26, 2023.

Ard Law Group PLLC

By: /s/ Joel B. Ard

Joel B. Ard, WSBA # 40104
Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
206.701.9243
Joel@Ard.law
Attorneys For Plaintiffs

Reply iso Motion For PI

*Hartford v. Ferguson*, No. 3:23-cv-05364-RJB

Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
Phone: (206) 701-9243