1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7
8
9

LAWRENCE HARTFORD; DOUGLAS
MITCHELL; BRETT BASS; SPORTING
SYSTEMS VANCOUVER, INC.;
SECOND AMENDMENT
FOUNDATION, INC.; AND FIREARMS
POLICY COALITION, INC.,

CASE NO. 3:23-cv-05364-RJB

ORDER DENYING MOTION FOR
PRELIMINARY INJUNCTION

10
11

Plaintiffs,

v.

12
13
14
15
16
17
18
19
20
21
22

ROBERT FERGUSON, in his official
capacity as Washington State Attorney
General; JOHN R. BATISTE, in his official
capacity as Chief of the Washington State
Patrol; JOHN GESE, in his official capacity
as Sheriff for Kitsap County; CLAYTON
MYERS, in his official capacity as Sheriff
for Kittitas County; JOHN HORCH, in his
official capacity as Sheriff for Clark
County; ADAM FORTNOY, in his official
capacity as Sheriff for Snohomish County;
CHAD M. ENRIGHT, in his official
capacity as County Prosecutor for Kitsap
County; GREG ZEMPEL, in his official
capacity as County Prosecutor for Kittitas
County; TONY GOLIK, in his official
capacity as County Prosecutor for Clark
County; and JASON CUMMINGS, in his
official capacity as County Prosecutor for
Snohomish County,

Defendants.

23

This matter comes before the Court on the Plaintiffs' Motion for Preliminary Injunction.

24

Dkt. 10. The Court has considered the pleadings filed regarding the motion and the remaining

file.  It is fully advised.  No party has requested oral argument on this motion under Local Rule W.D. Wash. 7(b)(4) and argument is not necessary to decide the motion fairly.

In this case, the Plaintiffs challenge a recently enacted Washington State assault weapons regulation, Substitute House Bill 1240 ("HB 1240"), arguing that it violates their constitutional right to bear arms.  Dkt. 1.  They now move for an order preliminarily enjoining HB 1240's enforcement.  Dkt. 10.  For the reasons provided below, the motion (Dkt. 10) should be denied.

## I.    FACTS AND PROCEDURAL HISTORY

On April 25, 2023, HB 1240 was enacted in the State of Washington.  2023 Wash. Sess. Laws, ch. 162, § 1.  HB 1240 prohibits the manufacture, importation, distribution or sale of "assault weapons" with certain exceptions.  *Id.*  It does not bar the possession or inheritance of an "assault weapon."  *Id.*  "Assault weapons" are defined in HB 1240 to include specific firearms like AK-47s, AR15s, and M16s, semiautomatic rifles that have an overall length of less than 30 inches, conversion kits, and semiautomatic weapons that accept a detachable magazine and have one of several other enumerated accessories.  *Id.*  While the Plaintiffs maintain that these weapons are not "assault weapons," this opinion will refer to the weapons regulated under HB1240 as "assault weapons" because that is the term that is used, and defined, in the statute.

The Plaintiffs, individual gun owners who wish to purchase weapons covered by HB 1240, a gun dealer, and two associations of gun owners dedicated to Second Amendment advocacy, filed this case on April 25, 2023, arguing that HB 1240 violates their Second Amendment rights, as applied to enactments of Washington state through the Fourteenth Amendment.  Dkt. 1.

Plaintiffs moved for a preliminary injunction on May 5, 2023.  Dkt. 10.  In addition to moving for a preliminary injunction, the Plaintiffs move the Court to advance a trial on the

1   merits and consolidate it with the preliminary injunction, or in the alternative, grant summary

2   judgment to the Plaintiffs. *Id.*

3          In Plaintiffs' Motion for Preliminary Injunction and supporting documents, they contend

4   that they have alleged, both directly and impliedly, all of the facts necessary to justify their

5   position and to pass the test justifying a preliminary injunction. In Defendants' responsive

6   pleadings, however, Defendants have alleged facts contrary to Plaintiffs' showing which raise

7   fact questions challenging Plaintiffs' showing.

8                          **II.      DISCUSSION**

9   **A.  STANDARD ON MOTION FOR PRELIMINARY INJUNCTION**

10          Plaintiffs seeking a preliminary injunction in the Ninth Circuit must establish one of two

11  tests. *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017). The first test

12  requires plaintiffs to show:  (1) that they are "likely to succeed on the merits," (2) that they are

13  "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of

14  equities tips in [their] favor," and (4) "an injunction is in the public interest." *Coffman v. Queen*

15  *of Valley Med. Ctr.*, 895 F.3d 717, 725 (9th Cir. 2018)(*citing Winter v. Nat. Res. Def. Council*,

16  Inc., 555 U.S. 7 (2008)). Under the second variant of the Ninth Circuit's test for a preliminary

17  injunction, the "sliding scale" version of the *Winter* standard provides that "if a plaintiff can only

18  show that there are serious questions going to the merits—a lesser showing than likelihood of

19  success on the merits—then a preliminary injunction may still issue if the balance of hardships

20  tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *All. for the*

21  *Wild Rockies* at 1217 (*cleaned up*).

22          A preliminary injunction may only be awarded "upon a clear showing" of evidence that

23  supports each relevant preliminary injunction factor. *Winter* at 22. Even though a "clear

24  showing" is required under *Winter*, "[d]ue to the urgency of obtaining a preliminary injunction at

a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n. 5 (9th Cir. 2013).  Further, "[i]n deciding a motion for a preliminary injunction, the district court is not bound to decide doubtful and difficult questions of law or disputed questions of fact." *Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson,* 799 F.2d 547, 551 (9th Cir. 1986).

## B.  SUCCESS ON THE MERITS/SERIOUS QUESTIONS GOING TO THE MERITS

Adopted in 1791 as part of the Bill of Rights, the Second Amendment to the U.S. Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  At the time of the Bill of Rights' adoption, it was understood to only apply to the federal government.  *D.C. v. Heller*, 554 U.S. 570, 619 (2008).  In 1868, the Fourteenth Amendment was adopted, applying the Bill of Rights, including the Second Amendment, to the States.  *McDonald v. City of Chicago, Ill.,* 561 U.S. 742, 764 (2010).

The Second Amendment protects "a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home."  *McDonald* at 780.  This Second Amendment right "is not unlimited."  *Heller* at 626.  The Supreme Court in *Heller* noted:

> From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-627.  The *Heller* Court also "recognized another important limitation on the right to keep and carry arms . . . the sorts of weapons protected were those 'in common use at the time.'" *Id.* at 627.  *Heller's* list of permitted prohibitions on arms use, possession, and sale does not purport to be exhaustive.  *Id.* at 626 n. 26.

In determining whether Washington's assault weapons regulation violates the Plaintiffs' Second Amendment rights, a test announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111, 2138 (2022), applies.  First to be considered under *Bruen,* is whether the "Second Amendment's plain text covers an individual's conduct" regulated by the challenged law.  *Bruen* at 2126, 2129-2130.  If so, the "Constitution presumptively protects that conduct." *Id.*  Second, under *Bruen,* the burden shifts to proponents of the law to justify the challenged law "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 2126 and 2130.

The Plaintiffs maintain that they need only show that the "arms" regulated by HB 1240 are "in common use" today for lawful purposes and so are not "unusual."  Dkts. 10 and 50.  If they do, they contend, the weapon cannot be banned under *Heller* and *Bruen*.  *Id.*

The Plaintiffs misread *Heller* and *Bruen*.  *Heller* noted that the right to keep and bear arms protected under the Second Amendment is limited to the sorts of weapons "in common use at the time."  *Heller* at 627.  It found that this limitation is "supported by the historical tradition of prohibiting 'dangerous and unusual weapons.'"  *Id.*  *Heller* does not hold that access to all weapons "in common use" are automatically entitled to Second Amendment protection without limitation.  Further, under *Bruen,* if Plaintiffs demonstrate that their proposed conduct, that of buying and selling weapons regulated by HB1240, is covered by the Second Amendment, the "Constitution **presumptively** protects that conduct."  *Bruen* at 2126, 2129-2130 (*emphasis added*).  This presumption can be overcome.  *Id.*

1

This opinion will now turn to the two *Bruen* considerations.

2

     1.  <u>Whether Plain Text Covers Conduct Regulated by HB 1240</u>

3

The first consideration under the *Bruen* analysis requires inquiry into whether the plain

4

text of the Second Amendment protects each of the individual Plaintiffs' proposed courses of

5

conduct. *Id.* at 2126.

6

The Plaintiffs seek to either buy or sell weapons regulated by HB 1240. Dkt. 10. In

7

support of their theory that the weapons regulated by HB 1240 are protected under the Second

8

Amendment, the Plaintiffs point to various articles and websites purporting to indicate that there

9

are millions of assault weapons sold in the United States. Dkts. 10 and 50. They point to court

10

cases in which the number of assault weapons in the United States is discussed. *Id.* However,

11

the Plaintiffs' submissions fail to submit any **evidence** in the record before this Court. Their

12

showing is marked by argument without citations and sources showing that their argument would

13

be supported by admissible evidence, even under the relaxed rules for preliminary injunctions. It

14

is wholly unclear whether **all** of the weapons (like conversion kits or semiautomatic pistols)

15

regulated by HB 1240 are "in common use" based on the Plaintiffs' scant submission. The

16

Plaintiffs have not made "a clear showing" of evidence (*Winter* at 22) that supports their

17

contention that all of the weapons covered by HB 1240 are "in common use" and therefore not

18

"unusual" (*Heller* at 626).

19

Nevertheless, for purposes of this motion only, the Court is willing to assume that

20

Plaintiffs can produce evidence in support of *Bruen's* first requirement, that the Plaintiffs had

21

made a "clear showing" that the Constitution presumptively protected the Plaintiffs' proposed

22

conduct. That assumption does not end the inquiry. *Bruen* at 2130. This opinion will now

23

address the second portion of *Bruen* - the burden shifting analysis.

24

2.  <u>Whether the Regulations in HB 1240 are Consistent with Historical Regulations</u>

At this stage, the burden shifts to the law's proponents to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen* at 2126, 2130.  In order to show that a law is "consistent with the Nation's historical tradition of firearm regulation," the proponents must point to a historic regulation (or regulations) that is an  analogue for the modern firearm regulation at issue.  *Id.* at 2132.  This inquiry "requires a determination of whether the two regulations are relevantly similar" using at least two metrics: the "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2133.  The proponents need not point to a "historical twin" or a "dead ringer for historical precursors" to pass constitutional muster.  *Id.*

While no U.S. Circuit Court of Appeals has ruled on this issue, other district courts have held that several regulations in our Nation's history are sufficiently analogous to newly passed assault weapons bans to justify those bans and defeat motions for preliminary injunction consistent with the Second Amendment.  *Bevis v. City of Naperville, Illinois*, 2023 WL 2077392, at *11-12 (N.D. Ill. Feb. 17, 2023); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 2023 WL 2655150, at *12 (D. Del. Mar. 27, 2023); *Herrera v. Raoul*, 2023 WL 3074799, at *6 (N.D. Ill. Apr. 25, 2023).  The reasoning in these cases is persuasive.

As in *Bevis, Delaware State Sportsmen,* and *Herrera,* HB 1240's proponents have demonstrated that HB 1240 is arguably consistent with the Nation's historic tradition of arms regulation.  According to the proponents' experts, Brennan Rivas, Ph.D. and Robert J. Spitzer, Ph.D., throughout the Nation's history, there are times when a new weapon is invented, perhaps for the military, and then ended up on the commercial market for civilian use.  Dkts. 47 at 2-3; 48 at 2-3.  Drs. Rivas and Spitzer further note that often these new weapons proliferated and

resulted in a rise in criminal violence that terrorized the public.  *Id.*  They point out that it was

then that States historically stepped in and regulated those dangerous weapons.  *Id.*

HB 1240's proponents convincingly point to regulations on trap guns, bowie knives,

clubs, slingshots, multi-shot revolvers, and automatic weapons (like the Thompson submachine

gun or "Tommy Gun") as historical examples of weapons that, after being invented, their use

proliferated, the weapons began to be used for interpersonal violence, and then States regulated

the weapons.  Dkt. 42 (*citing* Dkts. 47 and 48).

As early as 1771, twenty years before the Second Amendment was adopted, regulations

banning dangerous weapons existed.  According to Dr. Spitzer, in 1771, New Jersey passed a

law that prohibited trap guns, "devices or contraptions rigged in such a way as to fire when the

owner need not be present."  Dkt. 48 at 19.  Fifteen more states followed suit over the next

several years.  Dkt. 48-2.

As stated above, this court is not the only court to consider historical analogues for

assault weapons bans.  The *Bevis* court (that was considering whether a state and local ban on the

sale of assault weapons and related accessories violated the Second Amendment) examined over

fifty examples of arms regulation from the Colonial era to the early 20th century, including those

that HB 1240's proponents point to here.  Relying on Dr. Spitzer's opinion (also filed in this case

at Dkt. 48), the *Bevis* court's review of a portion of those regulations provided, in part:

> An early example of these regulations concerned the "Bowie knife," originally
> defined as a single-edged, straight blade between nine and ten inches long and
> one-and-half inches wide. In the early 19th century, the Bowie knife gained
> notoriety as a "fighting knife" after it was supposedly used in the Vidalia Sandbar
> Fight, a violent brawl that occurred in central Louisiana. Shortly afterwards, many
> southerners began carrying the knife in public because it offered a better chance
> to stop an assailant than the more cumbersome guns of the era, which were
> unreliable and inaccurate. They were also popular in fights and duels over the
> single-shot pistols. Responding to the growing prevalence and danger posed by
> Bowie knives, states quickly enacted laws regulating them. Alabama was first,
> placing a prohibitively expensive tax of one hundred dollars on "selling, giving or

disposing" the weapon, in an Act appropriately called "An Act to Suppress the Use of Bowie Knives," followed two years later by a law banning the concealed carry of the knife and other deadly weapons. Georgia followed suit the same year, making it unlawful "for any merchant ... to sell, or offer to sell, or to keep ... Bowie, or any other kinds of knives." By 1839, Tennessee, Florida, and Virginia passed similar laws. The trend continued. At the start of the twentieth century, every state except one regulated Bowie knives; thirty-eighty states did so by explicitly naming the weapon, and twelve more states barred the category of knives encompassing them.

*Id.* at 10.  Dr. Spitzer notes that, all told, fifteen states barred the carrying of a Bowie knife.  Dkt. 48 at 9.  After noting that state courts uniformly upheld the laws regulating Bowie knives, the *Bevis* court turned to other laws regulating "melee weapons," again relying on Dr. Spitzer's opinion:

As early guns proved unreliable, many citizens resorted to clubs and other blunt weapons. Popular instruments included the billy (or billie) club, a heavy, hand-held club usually made of wood, plastic, or metal, and a slungshot, a striking weapon that had a piece of metal or stone attached to a flexible strip or handle. States responded to the proliferation of these weapons. The colony of New York enacted the first "anti-club" law in 1664, with sixteen states following suit, the latest being Indiana in 1905, which proscribed the use of clubs in sensitive places of transportation. The city of Leavenworth, Kansas passed the first law regulating the billy club in 1862. By the early 1900s, almost half of states and some municipalities had laws relating to billy clubs. Many, such as North Dakota and the city of Johnstown, Pennsylvania, banned their concealed carry, while others outlawed them entirely. "Anti-slungshot" carry laws proved the most ubiquitous though. Forty-three states limited slungshots, which "were widely used by criminals and street gang members in the 19th Century" because "[t]hey had the advantage of being easy to make silent, and very effective, particularly against an unsuspecting opponent." . . .

*Bevis* at 11.

The regulatory pattern continued when multi-shot revolvers became popular. According to Dr. Spitzer, "single shot guns were the ubiquitous firearm until after the Civil War."  Dkt. 48 at 26.  It wasn't until the 1830s when the "affordable, reliable" Colt multi-shot revolver was developed that multi-shot weapons became widely used.  *Id.* Once revolvers began to spread from the military to the civilian market following the

Civil War "and became associated with lawless violence, they were swiftly met by laws and regulations aimed at curbing their possession and use." *Id.* at 26 and 30-31; Dkt. 47 at 13-15.

Dr. Spitzer opines that it was only in the post-World War I era when multi-shot semiautomatic and fully automatic long guns, like Tommy guns, began to publicly circulate and "came to be associated with criminal use that they became a regulatory and public policy concern, leading to the enactment of anti-machine gun laws in at least 32 states and between eight and eleven state laws restricting semi-automatic firearms." Dkt. 48 at 31.  As an example of restrictions on semiautomatic weapons, in the 1920s, Rhode Island enacted a law that prohibited the manufacture, sale, purchase, and possession of "any weapon which shoots more than twelve shots semi-automatically without reloading." 1927 R.I. Pub. Laws 256-57, ch. 1052 §§ 1,4.

In response to the rise in crime related to automatic weapons, in 1934, Congress enacted the National Firearms Act, which imposed extensive regulations on fully automatic weapons. Dkt. 48 at 42.  Later, in 1994, Congress passed the Violent Crime Control Act of 1994, which imposed a ten-year ban on semiautomatic assault weapons.  Pub. L. 103-322.  In part, it prohibited the manufacture, transfer or possession of assault weapons.  18 U.S.C. § 922(v)(1)(*now expired*).  Even these late events are part of assault weapon regulation in the Nation's history.

Each of the above arms restrictions, including bans and restrictions on carrying, arose from the same historical pattern.  The weapon was invented, perhaps for the military, became widely popular with civilians, was associated with criminal use, and was then regulated by the States.  Dkts. 47 and 48.  As has been the case throughout our Nation's history, HB 1240's

prohibition on the manufacture, import, and sale of semiautomatic assault weapons responds to the same pattern:  technological weapons change that sets forth unprecedented social concerns.

Semiautomatic assault weapons represent a significant technological change - they allow a shooter to fire as fast as they can pull the trigger, unlike previous guns.  Dkt. 45 at 3-6.  While semiautomatic weapons like the AR-15 were invented in the 1950s, the growth in ownership of semiautomatic assault weapons proliferated in the late 2000s.  *Id.* at 6-15.

HB 1240's proponents have shown that unprecedented social concerns have arisen from the proliferation of these weapons.  These weapons are exceptionally dangerous.  Assault weapons are used disproportionately in mass shootings (Dkt. 46 at 11), police killings (*Bevis* at 15) and gang activity (*Id.*).  Mass shootings are on the rise.  Dkt. 46 at 6-8.  Use of assault weapons in mass shootings leads to a disproportionately greater likelihood of death.  Dkt. 46 at 12.  "For instance, assault weapons were used in 80% of all mass public shootings resulting in more than 24 deaths and 100% of all high-fatality mass shootings resulting in more than 40 deaths."  *Id.*  In the last ten years, the use of assault weapons in high-fatality mass shootings and mass public shootings has resulted, respectively, in 109% and 106% increases in average fatalities per incident.  Dkt. 46 at 14-15.  Regulation of assault weapons and their dangerous accessories, as HB 1240 regulates, is arguably consistent with our Nation's history and tradition of exceptionally dangerous arms regulation.

The Plaintiffs argue that not all of the regulations recounted above were complete bans so they are not historical analogues of the type required under *Bruen*.  Dkt. 50.  This argument is unavailing.  *Bruen* does not require that the historical regulation be the exact same; it is not a "historical straight jacket."  *Bruen* at 2133.  Analogical reasoning requires that the law's proponents "identify a well-established and representative historical analogue, not a historical twin." *Id.*.  Further, as explained by Dr. Spitzer in relation to the Bowie knife regulations,

1    complete bans on the possession of certain weapons (as opposed to laws forbidding the carrying

2    of those weapons) did not occur as much in our early Nation's history because the federal and

3    state governments did not have the "maturity, powers, tools, or resources" to implement and

4    enforce a complete ban.  Dkt. 48 at 10.  Instead, the chief remedy enacted by the states was to bar

5    the carrying of knives, "along with the other two categories of weapons that also threatened

6    public safety, clubs and pistols."  *Id.  Bruen* specifically cautioned that in cases of "dramatic

7    technological changes" or "unprecedented societal concerns," a "more nuanced approach" may

8    be necessary.  *Bruen* at 2132.

9         The burden imposed by both the historical regulations and HB 1240 are "relevantly

10   similar:" they impose "comparable burdens" on the right of armed self-defense, and those

11   burdens are "comparably justified."  *Bruen* at 2133.  The burden of HB 1240 on armed self-

12   defense is slight.  The proponents of HB 1240 have pointed to evidence that assault weapons are

13   rarely used for self-defense.  Dkts. 44 and 45.  Moreover, the burdens imposed by the historical

14   regulations listed above and HB 1240 are "comparably justified."  All were enacted to respond to

15   public safety concerns regarding weapons considered to be extremely dangerous.

16        The Plaintiffs have not shown a "likelihood of success on the merits" or that there are

17   "serious questions going to the merits" on the issue of whether HB 1240 violates their Second

18   Amendment rights.

19   **C. IRREPARABLE HARM**

20        The Plaintiffs have not shown that they are "likely to suffer irreparable harm in the

21   absence of preliminary relief."  While the Plaintiffs maintain that any constitutional violation

22   results in irreparable harm, the case law cited is from First and Fourth Amendment violations and

23   not from alleged Second Amendment violations.  Dkt. 10 (*citing Elrod v. Burns,* 427 U.S. 347

24   (1976)(First Amendment violation) and *Melendres v. Arpaio,* 695 F.3d 990 (Fourth

Amendment)).  The individual Plaintiffs assert that they already own assault weapons and are

harmed because they wish to purchase more.  Yet, Plaintiffs have other alternative weapons

available, particularly for self-defense.  HB 1240 does not affect several other weapons,

including handguns, which are the "quintessential self-defense weapon."  *Bruen* at 2143.

Moreover, Sporting Systems Vancouver, Inc., the gun dealer Plaintiff, has no independent

Second Amendment right to sell firearms separate from its customer's right to acquire them.

*Teixeira v. County of Alameda,* 873 F.3d 670, 690 (9th Cir. 2017).  The Plaintiffs do not

demonstrate an irreparable harm or a constitutional emergency warranting the "extraordinary

remedy" of a preliminary injunction.  *Winter* at 24.

### D.  BALANCE OF EQUITIES AND PUBLIC INTEREST

When the government is a party, as here, the last two *Winter* factors merge.  *Drakes Bay Oyster Co. v. Jewell,* 747 F.3d 1073, 1092 (9th Cir. 2014).

The Plaintiffs have not shown that the "balance of equities tips in their favor" or that an "injunction is in the public interest."  *Winter* at 7.  The Plaintiffs wish to buy or sell more assault weapons.  Considering the exceptional dangerousness of these weapons, the public interest in their regulation by the State outweighs the Plaintiffs' desire to purchase more assault weapons. In light of recent mass deaths caused by assailants using assault weapons (Dkt. 44), it is appropriate for governmental bodies to find ways to protect the public from dangerous weapons, within the limits of the Second Amendment.  Public opinion is apparently strongly divided between the Plaintiffs and Defendants – between those who wish unfettered access to assault weapons and those who seek to curtail that access for public protection.  From the record here, neither position reflects the true public interest nor balances the equities in the favor of the Plaintiffs.

**E.  CONCLUSION**

The Plaintiffs' Motion for Preliminary Injunction (Dkt. 10) should be denied.  Plaintiffs have failed to demonstrate a likelihood of success on the merits of the motion nor have they raised a serious question on the merits tipping the balance of hardships in Plaintiffs' favor.  They have not pointed to irreparable harm if an injunction does not issue, that the balance of equities tips in their favor, or that public interest favors a preliminary injunction.  Issues raised in this opinion cannot be resolved on a motion for preliminary injunction.

To the extent that the Plaintiffs move to advance a trial on the merits or for summary judgment, those motions should be denied without prejudice.

## III.    ORDER

It is **ORDERED** that:

- The Plaintiffs' Motion for Preliminary Injunction (Dkt. 10) **IS DENIED;** and

- The Plaintiffs' motion to advance to a trial on the merits and/or motion for summary judgment (Dkt. 10) **ARE DENIED WITHOUT PREJUDICE**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 6th day of June, 2023.

ROBERT J. BRYAN
United States District Judge